# UNITED STATES DISTRICT COURT

## THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Sally Loveland, a California Resident, | § | **CIVIL ACTION:** |
| Sharon Cheatle, a Florida Resident, | § | |
| Janine Cortese, a North Carolina Resident, | § | |
| Tyler Boyle, a Pennsylvania Resident, and | § | (1) FIRST, FOURTH, FIFTH AND |
| Steve McCann, a Pennsylvania Resident | § | FOURTEENTH AMENDMENTS |
| | § | TO THE U.S. CONSTITUTION |
| | § | (*Bivens* action); |
| | § | (2&3) SHERMAN ACT § 2; |
| | § | CLAYTON ACT § 4; |
| | § | (4) RICO FRAUD (18 U.S.C. § 1962); |
| Plaintiffs | § | (5) DEFAMATION; |
| v. | § | (6) BREACH OF CONTRACT; |
| | § | (7) PROMISSORY ESTOPPEL; and |
| FACEBOOK, INC., a Delaware corporation, | § | (8) DECLARATORY RELIEF |
| MARK ZUCKERBERG, a California resident, | § | |
| FACTCHECK.ORG, a Pennsylvania corporation, | § | |
| POYNTER INSTITUTE, a Florida corporation, | § | **JURY TRIAL DEMANDED** |
| LEAD STORIES LLC, Colorado company, | § | |
| and DOES 1-20, Defendants. | § | |

## VERIFIED COMPLAINT

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION…………………………………………………… ………4

JURISDICTION AND VENUE…………………………………………..……… ..9

PARTIES……………………………...………………………………………...10

ALLEGATIONS………………………………………………………………....14

    Facebook establishes a monopoly on the public square……………………………14

    Facebook acquires access to user content through terms of service that are
    made possible by its monopoly and through a scheme of concealing the
    material terms of its financial arrangement with Plaintiffs and users…………………………17

    Facebook uses its monopoly to surveil users and seize total dominion over the
    creation, storage, and access of content on its platform……………………………………..21

    Defendant Facebook works to garner favor with its governmental overseers………………24

    Facebook expands "curation" protocols that promote Mandatory Vaccine Policy,
    and the COVID-19 pandemic response became a pretext to promote new vaccines,
    new drugs and to suppress free expression……………………………………………………..25

    Defendant's violated Plaintiffs' constitutional rights to discuss the existence
    of off-patent prophylaxis and treatments on the public square and to spotlight
    the systemic corruption and ineffectual pandemic response…………………………………27

DEFENDANT'S SCHEMES TO DEFRAUD

    Overview of Pre-Pandemic Censorship Conditions Regarding Vaccines Policy and
    Defendant's Agency with the Government……………………………………………………32

    To curry favor with its Government Overseers, Facebook expands its Vaccine
    Censorship program into a Pandemic Vaccines and New Drugs program………………46

        In January 2020, HCQ is a cheap, available drug that has safely
        treated 800 million people over 65 years under FDA approval that
        infectious diseases experts deem to be efficacious as a prophylaxis
        and cure for the emerging new Coronavirus (COVID-19) ………………....…46

            COVID-19……………………………………………………...46

            Hydroxychloroquine ("HCQ")…………………………….…...……48

How did HCQ become a dangerous drug in less than a year with a laundry list of newly emerging and dangerous side effect……………………………………55

Plaintiffs hoped to use the social network to share information, and potentially life-saving health information with fellow Americans………....……58

Facebook, as an agent of government, and to protect its Special Immunities, ensured Plaintiffs could not collaborate and share information, and kept lifesaving "off patent" treatments from Americans……………………….…60

While "off-patent" HCQ is tragically ignored, "on-patent" Remdesivir gets attention unwarranted by any efficaciousness claims………………………………………60

The New England Journal of Medicine Rushes to Publish a Remdesivir "study" Based on One Remdesivir Patient, a French Study Vanishes, and NIH Rushes Remdesivir Trials……………………………….……………61

Lackluster China Remdesivir Studies Suspended or Aborted Reducing Statistical Power………………………………………62

Remdesivir Trials Flop, yet Top CDC Officials Focus on Remdesivir and Vaccines with No Mention of HCQ……………63

Facebook Agrees to an Official Truth Policy to Appease its Government Overseers ………………………………………65

HCQ was Universally Cited as a Treatment Protocol until Supported by President Trump………………………….…68

President Trump Raises Official Concerns about WHO………..…75

MEANS AND METHODS OF DEFENDANT'S MONOPLOIZATION SCHEME AND SCHEMES TO DEFRAUD AND DEFAME PLAINTIFFS…………………………………108

DEFENDANTS FALSELY DISPARAGE PLAINTIFFS AND HAN THROUGH WARNING LABELS AND MATERIALLY DECEPTIVE USE OF FACT CHECKERS AND FALSELY BRANDING POSTS……………………………………………………………....…116

CAUSES OF ACTION……………………………………………………………146

PRAYER FOR RELIEF……………………………………………………....…178

VERIFICATION………………………………………………………….…179

3

## I.   INTRODUCTION

1.      Sally Loveland, Sharon Cheatle, Janine Cortese, Tyler Boyle, and Steven McCann, by and through their undersigned attorney, sue Defendants Facebook, Inc., Mark Zuckerberg, Factcheck.Org, Poynter Institute, Lead Stories LLC and Does 1-20, and for its Complaint alleges on personal information as to itself and on information and belief as to all other things.

2.      Plaintiffs were drawn together because of their common interest in pharmaceutical solutions like hydroxychloroquine (HCQ) that could end the COVID-19 pandemic in days or weeks.  Plaintiffs sue Defendants for their deliberate use of suppression, censorship and "known lies" to infringe on Plaintiffs' Constitutional rights in agency with the U.S. government. Defendants have irreparably damaged Plaintiffs sacred obligations to fulfill their duty as Americans to share important health care information with their fellow citizens THAT COULD HAVE PREVENTED MANY DEATHS. Treatments beginning at the earliest stage of COVID-19 infection were preempted by Facebook's "fact checkers" preventing important life-saving information from getting to Americans including physicians, nurses and health care workers, and their elected representatives. Sadly, censorship is so comprehensive and withering, that Plaintiffs are forced to create an insuppressible record, in a protected federal court docket, in the Cradle of Liberty, in this very unusual case, so that it may be able to be seen and shared with other Americans.

3.      This is a case about the most powerful monopoly on Earth, Facebook, which acquired its monopoly over the American public square through fraud and artifice by offering "free" services that were not free in any sense. All Facebook users were adversely impacted on

October 1, 2020, when Facebook breached its contracts and claimed total dominion over their users' content and an unfettered right to separate users from and to confiscate their content.



4.      Defendant Facebook monopolized the public square as it acquired total dominion over users' content.  It surveilled users while they were not using Facebook and imposed speech codes on the public square in violation of the Constitutional rights of its users. The Defendants monitored, censored and libelously branded Plaintiffs as purveyors of false, misleading and dangerous information to curry favor with politicians who were positioned to protect Facebook's monopoly, immunities, anti-competitive position and content dominion, most notably, its monopoly and its continued immunity under Section 230 of the Communications Decency Act (hereinafter sometimes referred to interchangeably as "Special Immunities")

5.      Facebook branded Plaintiffs' life-saving informational posts false, curating content and differences of reasonable opinions, and reframing issues in deceptive ways to benefit their "government overseers,",[1]  who would benefit if Facebook diverted Americans to their own

---

[1] Plaintiffs include those who support and don't support President Trump politically, but share the experience of having promoted an idea that was deemed invalid or banned by the Defendants because of its subsequent association with President Trump. "Government overseers" as used throughout includes elected Congressional representatives, the World Health Organization (WHO), the Food and Drug Administration (FDA), the Centers for Disease Control (CDC), the National Institutes of Health (NIH), and their agents and representatives, who adopted positions seen by commentators as being opposite of President Trump. Plaintiffs have no position regarding this other than Ivermectin, Hydroxychloroquine and other early treatments can

brand of "government approved" opinions that they sought to promote. To appease these government overseers, Facebook destroyed the public square and stripped Plaintiffs of their Constitutional Rights while converting itself to a publisher, or an "information content provider" under Section 230(f)(3).[2] Through in house "mods" that included artificial intelligence moderators, and with a constellation of Orwellian "factcheckers," including co-defendants Factcheck.Org, Poynter Institute, and Lead Stories LLC, Facebook suppressed and censored life-saving information from being discussed and shared while it published its own erroneous false information as an "information content provider."

6.     Our system of government is premised on an informed citizenry. Nowhere did the Constitutional Framers outsource from local citizens the job of determining "the truth" to government overseers. Nor did the Constitution outsource to government overseers authority to define the parameters of objective truth or outsource control over the public square to private agents like the Defendants, to enforce government "official" or "approved" truth, in a manner that would be forbidden by U.S. Constitutional law. Violating Plaintiffs' Constitutional rights, Facebook made a mockery of any definition of "good faith curation"[3] that warrants it's retaining

---

save lives now and prevent damage to children now. CHOP Researchers Find Elevated Biomarker Related to Blood Vessel Damage in All Children with SARS-CoV-2 Regardless of Disease (December 8, 2020) https://www.chop.edu/news/chop-researchers-find-elevated-biomarker-related-blood-vessel-damage-all-children-sars-cov-2 (last checked Dec 10, 2020) Plaintiffs sought to help their fellow Americans and instead got caught between a "Clash Between Titans."

[2] Under 47 U.S.C. §230 (f)(3)The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

[3] 47 U.S.C. § 230 (C)(2) CIVIL LIABILITY No provider or user of an interactive computer service shall be held liable on account of—
(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent,

its immunity under Section 230 of the Communications Decency Act ("Section 230"). For financial gain and to protect its Special Immunities, Facebook became a promoter and developer of false information that displaced Plaintiffs' content in the service of its government overseers and helped inflame the COVID-19 pandemic creating a dangerous echo chamber for elected officials, physicians and nurses trying to save lives.

7.      While the economy was being shut down, COVID-19 patients were being packed into nursing homes, and Americans were forced to socially isolate indoors, skip funerals, and to wear masks, Defendants muted Plaintiffs from discussing cheap and available preventative and treatment solutions for COVID-19.  Vibrant discussion on the public square on Facebook would have been a reasonable communal response. Instead, Facebook and the government overseers had other agendas. As discussed at length below, the Government's lead agent, Dr. Anthony Fauci, promoted a conspicuously fraudulent "*Lancet*" study showing that HCQ (off-patent) did not work while simultaneously and shamelessly promoting Remdesivir (on-patent), a risky anti-viral drug with minimal efficacy and dangerous side effects.[4] Facebook, as a U.S. government agent, under the guise of stamping out "misleading" information, promoted false information approved or ideologically consistent with its government overseers by gagging Plaintiffs. This sabotaged all Americans because physicians and nurses were robbed of the life-saving tools of their trade.

---

harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or
(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

[4] See infra paragraphs 120, 137, 144, 150, 165, 166, 170, 174, 179, 185, 187, 192, and 196.

8.      In 17th-century England, government-controlled speech through its monopoly on printing presses.[5] The first newspapers were also met by prosecutions of unlicensed news-sheet printers and the power of the crown to grant privileges of monopoly.[6] Indeed, "history discloses a persistent effort on the part of the British government to prevent or abridge the free expression of any opinion which seemed to criticize or exhibit in an unfavorable light, however truly, the agencies and operations of the government." *Grosjean v. American Press Co*., 297 U.S. 233, 245 (1936).

9.      Here, government overseers actively partnered with Defendant Facebook, one of today's leading "printing presses," that achieved its monopoly status, in part, because of its willingness to infringe on Plaintiffs' Constitutional rights and censor Plaintiffs' speech critical of government policy. The framers were familiar with the English struggle and enacted the First Amendment to establish and preserve the right of the People to full information about the doings or misdoings of their government. *Grosjean*, 297 U.S. at 247-49. This case mirrors the framers' concerns. The government cannot accomplish indirectly what the Constitution forbids it to do directly.

10.     How could this travesty have occurred? How was a multi-billion-dollar monopoly incentivized to squelch Plaintiffs' First Amendment Rights as agents of government overseers while holding Plaintiffs' content hostage to erasure and confiscation of their property in violation of the Fourth and Fifth Amendments? How did an "interactive computer service provider" engage in bad faith curation as an "information content provider" disqualifying its qualified

---

[5] See L. Levy, Emergence of a Free Press 6 (1985).
[6] See F. Siebert, Freedom of the Press in England 1476-1776 (1965); see also 2 J. Story, Commentaries on the Constitution of the United States, § 1882 (5th ed. 1891).

immunity under Section 230 and shattering its "good Samaritan" exceptions? How was a social media monopoly permitted to engage in a fraud scheme where it provided its services for "free" yet simultaneously sold those services based on total surveillance it never disclosed while asserting total dominion over Plaintiffs content? To understand what happened, and the immense harm that was done to the Plaintiffs and to Americans in general, we file this in the cradle of Liberty, the City of Philadelphia.

## II.     JURISDICTION AND VENUE

11.     This Court has personal jurisdiction over all Defendants because they conducted business with and injured Plaintiff in this District. Plaintiffs Tyler Boyle and Steven McCann are located in the Eastern District of Pennsylvania as is Defendant Factcheck.org, which touts itself as a Project of The Annenberg Public Policy Center of the University of Pennsylvania.[7] The schemes alleged in this Complaint caused injury to persons throughout the United States, including in this District.  Moreover, Defendant Facebook also conducted substantial business from which the claims in this case arise in Pennsylvania.

12.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), § 1332(a) (complete diversity of the parties, and the amount in controversy exceeds $75,000), § 2201 (declaratory relief), and § 2202 (further relief). The action asserts continuing violations of the First, Fourth and Fifth, and Fourteenth Amendments, 15 U.S.C § 2 (monopolization), 18 U.S.C. § 1962 and 18 U.S.C. §1964 of the Racketeer Influenced and

---

[7] https://penntoday.upenn.edu/experts/factcheckorg-0

Corrupt Organizations Act ("RICO") and the Court has jurisdiction over the defamation, breach of contract claims under 28 U.S. Code § 1367 (supplemental jurisdiction).

13.     Venue is appropriate in this District under 15 U.S.C. § 15(a) (Clayton Act), 15 U.S.C. § 22 (nationwide venue for antitrust matters), and 28 U.S.C. § 1391(b) (general venue provision).  Facebook transacts business within this District, and it transacts its affairs and carries out interstate trade and commerce, in substantial part, in this District.


### III.     PARTIES

14.     Plaintiff Sally Loveland an American citizen living in Los Angeles County, California and joined Facebook in or about 2009. Loveland joined Hydroxychloroquine Access Now (HAN) in May 2020. She has experienced censorship, threats of bans and suspensions on HAN and other newsgroups and on her personal page since she joined Facebook. Intimidation by Facebook initially caused her to refuse to be an administrator for HAN. When Loveland created a Facebook account, she believed Facebook would make money only through selling advertisements and that she would always have access, control, and ownership of her content.

15.     Sharon Cheatle is an American citizen living in St. Johns County, Florida, and joined Facebook in or about 2009.  Cheatle joined HAN in July 2020. She has experienced censorship, threats of bans and suspensions on HAN and other newsgroups and on her personal page since she joined Facebook.  When Cheatle created a Facebook account she believed Facebook would make money only through selling advertisements and that she would always have access, control, and ownership of her content.

16.     Janine Cortese is an American citizen living in Hendersonville, NC.  Cortese joined HAN in June 2020. She has experienced censorship, threats of bans and suspensions on HAN and other newsgroups and on her personal page since she joined Facebook. When Cortese created a Facebook account, she believed Facebook would make money only through selling advertisements and that she would always have access, control, and ownership of her content.

17.     Plaintiff Tyler Boyle is an American citizen and lives in Philadelphia, Pennsylvania and joined Facebook in 2008. Boyle joined HAN in July 2020. Boyle has experienced censorship, threats of bans and suspensions on HAN and other newsgroups and on his personal page since he joined Facebook. When Boyle created a Facebook account in 2009 when he believed Facebook would make money only through selling advertisements and that he would always have access, control, and ownership of his content.

18.     Plaintiff Steve McCann is an American citizen and lives in Wallingford, Pennsylvania and joined Facebook in 2008. McCann joined HAN in July 2020. McCann has experienced censorship, threats of bans and suspensions on HAN and other newsgroups and on his personal page since he joined Facebook.  When McCann created a Facebook account, he believed Facebook would make money only through selling advertisements and that he would always have access, control, and ownership of his content.

19.     Defendant Facebook, Inc. is a Delaware corporation, with its principal place of business at 1 Hacker Way Menlo Park, California 94025.

20.     Defendant Mark Zuckerberg is a co-founder of Facebook, Inc., and at all times relevant hereto, has served as Facebook's chairman, chief executive officer, and controlling

shareholder. He resides in the Northern District of California and is a "person" who may be sued under 18 U.S.C. § 1961(3).

21.     According to Facebook's 2019 Proxy Statement:

> *Because Mr. Zuckerberg controls a majority of our outstanding voting power, we*
> *are a "controlled company" under the corporate governance rules of The Nasdaq*
> *Stock Market LLC (Nasdaq). Therefore, we are not required to have a majority of*
> *our board of directors be independent, nor are we required to have a*
> *compensation committee or an independent nominating function.*

22.     According to its 2018 Proxy Statement, defendant Zuckerberg has the sole power to elect or remove any director from Facebook's Board, as he controls a majority (53.3%) of Facebook's total voting shares. Zuckerberg directs and controls Facebook's business and is personally responsible for the damages caused by his individual and controlled entities' misconduct as set forth herein. Facebook and its related "fact-checker" entities are also sued under principles of alter ego and respondeat superior liability.

23.     Defendant Factcheck.org is a Project of The Annenberg Public Policy Center of the University of Pennsylvania. The Annenberg Public Policy Center is located at 202 S. 36th St., Philadelphia, PA 19104-3806. Factcheck.org uses its perch in the city associated with liberty to help put a thin veneer of false objectivity through its "factcheck" furthering Facebook's censorship, predation, and Constitutional deprivations on behalf of, and in agency with, Facebook's government overseers to avoid losing its monopoly or immunity from libel and defamation. https://www.factcheck.org/

24.     Defendant The Poynter Institute for Media Studies ("Poynter"), and its wholly

owned subsidiary Politifact, are Florida non-profit organizations which Facebook has engaged as

additional "fact-checkers" to flag selected content on HAN's Facebook page as "false

information," insert oppositional articles in its place on HAN's page, and divert users from the

HAN users' own content on that false basis. Facebook is a major donor to both Poynter and

Politifact.[8]  In addition Poynter manages the International Fact-Checking Network which is a

unit of the Poynter Institute "dedicated to bringing together fact-checkers worldwide.  Its

"factcheck" pieces further Facebook's censorship predation and Constitutional deprivations on

behalf of, in agency with Facebook's government overseers to avoid losing its monopoly or

immunity from libel and defamation. https://www.poynter.org/

25.     Leadstories.Com is owned by Lead Stories LLC, whose registered agent is the

Sanders Law Firm located at 31 North Tejon St., Suite 405, Colorado Springs, CO 80903.

Leadstories churns out "factcheck" and "hoax-alert" pieces, many of which are false,

unsupported or "red herrings," and further Facebook's censorship, predation, and Constitutional

deprivations on behalf of, in agency with Facebook's government overseers to avoid losing its

monopoly or immunity from libel and defamation. https://leadstories.com/hoax-alert/

26.     The Facebook and corporate and individual Defendants conspired with one

another, and others as yet unknown at Facebook, or elsewhere (the "Doe Defendants") in an

informal enterprise (the "content management enterprise") to accomplish their common

purposes. Each of them was acting within the course and scope of that conspiracy, agency,

---

[8] Largest funders of Poynter, POYNTER (last updated June 2020),
https://www.poynter.org/major-funders/ ; Who pays for PolitiFact?, POLITIFACT (last updated
June 2020), https://www.politifact.com/who-pays-for-politifact

partnership, or joint venture. The acts and conduct of each of the Defendants were known to and authorized by, or ratified by, the other Defendants.

27.    The informal enterprise operated by Defendants had an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage, and from Facebook, Science Feedback, Poynter, and Leadstories.com, , which are joined as corporate Defendants. The informal enterprise operated within one or both of those related structures as an "enterprise" with a common purpose, structure or organization, and open-ended lifespan necessary to accomplish their joint purposes to defraud HAN, destroy its reputation, and blunt the impact of its public health education and advocacy efforts.

## IV.    ALLEGATIONS

### A.    Facebook establishes a monopoly on the public square.

28.    Facebook states its mission is to "Give people the power to build community and bring the world closer together." It claims that its products empower more than 3 billion people around the world to share ideas, offer support and make a difference with 100 billion messages shared per day. 180 million+ businesses use its apps to connect with customers and grow.  100 billion+ messages shared everyday help people stay close even when they are far apart. 1 billion+ stories shared everyday help people express themselves and connect. [9]

29.    As observed by New York University Professor Scott Galloway, a "key safeguard for society is diversity of media/viewpoints, checks and balance...[and people should be concerned by] the notion that one set of algorithms, controlled by one person who cannot be

---

[9] https://about.fb.com/company-info/

removed from office" would have a significant influence over the platform through which billions of Facebook users around the world consume information every day.[10]

30.     From June 23, 2008 through June 22, 2020, Facebook acquired 84 companies while the public square itself was acquired.[11]

31.     With the cumulative popularity of Facebook, WhatsApp, Messenger, and Instagram, Facebook dominates the global social media landscape. All four of those apps have more than 1 billion users each. There are only two other "1 billion user" social media apps on Earth: YouTube, which is owned by Google, and WeChat, which until recently was owned by China. [12]



Most popular social networks worldwide as of July 2020, rank (in millions)

---

[10] https://www.cnbc.com/2019/08/09/scott-galloway-why-mark-zuckerberg-is-dangerous.html

[11] Jerold Nadler, Chairman, of the Majority Staff Report and Recommendations, Subcommittee on Antitrust, Commercial and Administrative Law, Committee of the Judiciary, issued "The Investigation of Digital Markets" (2020) page 422. https://fm.cnbc.com/applications/cnbc/resources/editorialfiles/2020/10/06/investigation_of_competition_in_digital_markets_majority_staff_report_and_recommendations.pdf (checked November 11, 2020).

[12] https://www.statista.com/statistics/272014/global-social-networks-ranked-by-number-of-users/

32.     Even more important for its monopoly power in the social network market is Facebook's influence over developing news stories through Facebook Stories.[13]

Facebook Stories daily active users vs. other Stories apps



33.     Congress has determined that in the United States geographic market, Facebook has monopoly power in the relevant social networking product market.13F13F[14] As alleged, *supra*, Facebook enjoys high barriers to entry and, as experienced by Plaintiffs, its platform is virtually impossible to abandon. There are no reasonable substitutes for Facebook.[15]

> *Facebook has monopoly power in the market for social networking.[16] According to internal documents produced by Facebook to the Committee, it has high reach, time-spent, and significantly more users than its rivals in this market. Despite significant changes in the market—such as the advent of mobile devices, applications, and operating systems—Facebook has held an unassailable position in the social network market for nearly a decade, demonstrating its monopoly power. Facebook's monopoly power is*

---

[13] https://www.businessofapps.com/data/facebook-statistics/#1

[14] See Investigation of Competition in Digital Markets, Majority Staff Report and Recommendations ("House Report"), Subcommittee on Antitrust, Commercial, and Administrative Law of the Committee on the Judiciary, at 18 (emphasis added), October 6, 2020, available at https://kl.link/3jGISfK at page 12, 134. Facebook's monopoly power is set forth on pages 133-174.

[15] House Report, at 91.

[16] Social Networks are websites (and accompanying mobile applications) that: (1) facilitate users of a given network finding, interacting, and networking with other people either whom the users already know or to whom they are connected through others they already know online; and (2) provide users with additional substantive features beyond the ability to communicate with other users and share multimedia.

*firmly entrenched and unlikely to be eroded by competitive pressure from new entrants or existing firms. Documents produced during the investigation by Facebook, including communications among its senior executives on market strategy, as well as a memorandum by a senior data scientist and economist at Facebook, support the conclusion that Facebook's monopoly is insulated from competitive threats. The social network market has high entry barriers—including strong network effects, high switching costs, and Facebook's significant data advantage—that discourage direct competition by other firms to offer new products and services. Facebook has also maintained and expanded its dominance through a series of acquisitions of companies it viewed as competitive threats, and selectively excluded competitors from using its platform to insulate itself from competitive pressure. Together, these factors have tipped the social networking market toward a monopoly.* [17]

34.     Defendant Facebook enjoys high barriers to entry and as experienced by Plaintiffs, its platform is virtually impossible to abandon. This is not just because there is no other competitor to go to—they will testify there is not and that they actually attempted to launch an unsuccessful exodus under withering censorship—it is because Plaintiffs and all users unknowingly entered into a long term service agreement with Facebook to create content and endure around the clock surveillance, none of whom will leave Facebook for the same reasons, and they can now lose their content at any time if they do not comply with Facebook's imposition of government censorship.

**B.     Facebook acquires access to user content through terms of service[18] that are made possible by its monopoly and through a scheme of concealing the material terms of its financial arrangement with Plaintiffs and users**

35.     What is never mentioned in Facebook user agreements and promotions about free membership, is that content has immense value. Anyone signing up for Facebook could not have

---

[17] House Report, at 133, Social networks are websites (and accompanying mobile applications) that: (1) facilitate users of a given network finding, interacting, and networking with other people either whom the users already know or to whom they are connected through others they already know online; and (2) provide users with additional substantive features beyond the ability to communicate with other users and share multimedia.

[18] Facebook Terms of Service, https://www.facebook.com/terms.php (last accessed: December 3, 2020).

known upon entering the Facebook agreement that on October 1, 2020, Facebook would establish new retroactive terms and assert ownership and the right to separate users from their content and to seize their accounts, including family photos, conversations etc.

> ~~You can use your privacy settings to limit how your name and profile picture may be associated with commercial, sponsored, or related content (such as a brand you like) served or enhanced by us.~~ *You give us permission to use your name, and profile picture, content, and information in connection with commercial, sponsored, or related* ~~that~~ *content (such as a brand you like) served or enhanced by us,* ~~subject to the limits you place~~. *This means, for example, that you permit a business or other entity to pay us to display your name and/or profile picture with your content or information, without any compensation to you. If you have selected a specific audience for your content or information, we will respect your choice when we use it.*[19]

36.   Notwithstanding Defendant Facebook's change in terms above, which breaches its contract with Plaintiff and all users, Facebook still advertises its services in a way that most users would take to mean that they are getting the services for "free."[20]

---

[19] https://www.facebook.com/legal/terms. The language that is marked out indicates the old language v. the new language.

[20] https://www.facebook.com/help/186556401394793/9 (checked October 21, 2020).

**Does it cost money to use Facebook?**

→ Share Article

No, we don't charge you to use Facebook. Instead, we charge advertisers to show ads on the Facebook family of apps and technologies. This helps us make Facebook available to everyone without charging people for access to it.

**When using Facebook, keep in mind:**

- You need Internet access to use Facebook from your computer, mobile phone or tablet, and your Internet provider may charge you for this access. Learn more about data charges and connecting to Facebook on your mobile phone or tablet.

- Using some Facebook features, such as text message notifications, may also lead to charges from your mobile provider.

- If you add your payment information to Facebook, you can do things like make purchases from businesses, send money to friends, support creators on Facebook and purchase ads on Facebook.

  - If you make a purchase on Facebook, we may earn a commission or transaction fee from that activity.

  - You can also make purchases through Facebook for games, apps and other items.

Note: Facebook doesn't sell your information, and we don't share information that personally identifies you (information such as your name or email address that by itself can be used to contact you or identifies who you are) unless you give us permission.

Learn more about your information on Facebook and how we decide what ads to show you.

37.     Facebook falsely promises it does not "charge" users even though all users clearly incur "obligations" that Facebook does not adequately disclose, even now in its newly restated terms. Plaintiffs and all Facebook users were fraudulently and retroactively stripped of an array of rights, some of them crucial Constitutional rights. Facebook claimed to provide consumers greater value in return for consumers' data, but Facebook instead took that data without providing adequate compensation to its users constituting Constitutional and antitrust injury.

38.     Through its deception, Facebook prevented competition on the merits, and as a result of that reduction in competition, users received less value for their data than they would have received in some form absent the reduction. When agreeing to Facebook's Terms of Service, consumers agree to give up things of material value. Facebook then sold its users' information, and attention to third parties, including advertisers.  But for Facebook's anticompetitive conduct, which has substantially reduced, if not eliminated competition, consumers would have had more choices in the social network market. Absent Facebook's anticompetitive conduct, Facebook would have had to provide consumers increased value, that is

quantifiable in measurable units, in return for consumers' data.  Otherwise, consumers would have given their data and attention to other platforms, which would have provided consumers increased value.  Consumers would have received the fair market value for their data and attention.  That value was artificially decreased by Facebook's anticompetitive conduct.

39.   Absent Defendant Facebook's anticompetitive conduct which has eliminated, competition, consumers would have benefitted from more robust competition in terms of non-price attributes such as data privacy practices and social media platform quality.  Users could have benefitted from Facebook's social media network without having to surrender as much personal data to Facebook and other third parties that use Facebook for app development or targeted advertising.  Similarly, users could have benefitted from competition that would have resulted in Facebook or its alternatives offering higher-quality services, such as interoperability between platforms and portability of users' data.



40.     Facebook's stated Community Standards Policy is patently false:

REITERATING OUR COMMITMENT TO VOICE

The goal of our Community Standards has always been to create a place for expression and give people a voice. This has not and will not change. Building community and bringing the world closer together depends on people's ability to share diverse views, experiences, ideas and information. We want people to be able to talk openly about the issues that matter to them, even if some may disagree or find them objectionable. In some cases, we allow content for public awareness which would otherwise go against our Community Standards – if it is newsworthy and in the public interest. We do this only after weighing the public interest value against the risk of harm and we look to international human rights standards to make these judgments.

Contrary to this stated policy, Facebook does not allow customers a place to "talk openly" even if some may disagree, rather it disallows content that its government overseers find objectionable while recording and claiming total dominion over everything.

**C. Facebook uses its monopoly to surveil users and seize total dominion over the creation, storage, and access of content on its platform**

41.     Consumers have standing to sue for quality reductions. [21]

42.     Facebook inflated its value by hiding quality reduction information from its users when they signed up for services under false pretenses. A user, by signing up for "free," entered a complex financial and legal arrangement with concealed material terms.  Facebook always intended to do what it did in October 2020 when it claimed total dominion of all content stored on Facebook's platform and claimed the right to separate users from their content to furthered its "Special Immunities."  Plaintiffs are captives of Facebook's monopoly having now created extensive content under false pretenses. Plaintiffs' cannot leave for a competitor because

[21] See AREEDA & HOVENKAMP, ¶¶ 345, 502, note 26 (stating that "clearly a consumer has standing to sue a cartel that reduces quality of the product that the consumer purchased").

Facebook has no true competitors and there is no way to port content for transfer. Having learned that their content no longer belongs to them, Plaintiffs are fearful to engage in free expression that might violate Facebooks alleged "community standards" that are confusing and constantly changing. Faced with the possibility of losing contact with each other, Plaintiffs and other Facebook users who would switch to another social media platform or network may choose not to do so because of these high switching costs.[22]

43.     Plaintiffs did not acquiesce to this antitrust harm of diminished value and quality reductions[23] that flow from Defendant's surveillance. Defendant Facebook and  its executives engaged in extensive lulling, misrepresentations and outright false statements.[24]  For example, Barry Schnitt, a Facebook spokesman, allayed concerns by falsely claiming that the Facebook "like" button, was not social plug-in data for advertising, and Facebook may use received data to catch bugs in its software and improve service.[25] This was proven to be untrue as Facebook entire system has migrated to a surveillance system even when Facebook users are not using Facebook.[26]

---

[22] See Dina Srinivasan, The Antitrust Case Against Facebook: A Monopolist's Journey Towards Pervasive Surveillance In Spite of Consumers' Preference for Privacy, 16:1 Berkeley Bus. L. J. 39, 87 (2019).

[23] See generally, https://www.justice.gov/opa/speech/assistant-attorney-general-makan-delrahim-delivers-remarks-antitrust-new-frontiers

[24] https://www.computerweekly.com/feature/Facebooks-privacy-U-turn-how-Zuckerberg-backtracked-on-promises-to-protect-personal-data. https://www.ftc.gov/news-events/press-releases/2011/11/facebook-settles-ftc-charges-it-deceived-consumers-failing-keep (prior links checked 11/20/2020).

[25] Declan McCullagh, Facebook 'Like' Button Draws Privacy Scrutiny, CNET.COM (June 2, 2010), https://www.cnet.com/news/facebook-like-button-draws-privacy-scrutiny/ (checked 11/20/2020).

[26] Arnold Roosendaal, Facebook Tracks and Traces Everyone: Like This! (Tilburg L. Sch. Legal Studs. Res. Paper Ser. No. 03/2011, Nov. 30, 2010), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1717563 (link checked 11/20/2020).

44.     In same month as the last significant competitor's exit (Google Orkut), Facebook

regaled in perfection of its monopoly power:

> In June of 2014, Facebook announced it would leverage its code presence on third-party
> applications to track consumers, enabling it to surveil the specific online behavior of this
> country's citizens despite widespread preference to the contrary. Facebook would do
> precisely what it had spent seven years promising it did not and would not do, and finally
> accomplished what the previous competitive market had restrained it from doing. With a
> relatively quick software update, Facebook would leverage the code on third-party sites
> and apps used to deliver other Facebook products—Like buttons, Login buttons,
> conversion tracking pixels, retargeting pixels, and the Facebook software development
> kit— for the additional new purpose of tracking users. In a previously competitive
> market, Facebook was not able to get away with this qualitative degradation. Now
> Facebook could significantly degrade its quality because consumers no longer had
> alternative social networks to turn to. But now Facebook changed course and announced
> that the data derived from tracking consumers would augment Facebook ad targeting,
> attribution, and measurement. In other words, this deterioration of privacy would be
> directly related to increased revenue and profits. First, Facebook would use data from
> this commercial surveillance to enhance its ad targeting algorithms, which meant that
> Facebook ads could be more targeted and reach a larger relevant advertising base than
> those of other ad sellers in the market—such as The New York Times or Hearst. Second,
> data from commercial surveillance would allow Facebook to get paid for more
> advertising through increased attribution.[27]

45.     When Plaintiffs made attempts to limit tracking by deleting cookies (or resetting a

mobile device's advertising identifier) Facebook negated these efforts.[28] When Plaintiffs and

users downloaded ad-block software, Facebook also developed ad-blocking workarounds.[29]

These are merely two examples in a myriad of deceptive behaviors and invasive encroachments

---

[27] Dina Srinivasan, The Antitrust Case Against Facebook: A Monopolist's Journey
Towards Pervasive Surveillance In Spite of Consumers' Preference for Privacy, 16:1 Berkeley
Bus. L. J. 39, 87 (2019).

[28] See Chris Jay Hoofnagle, Ashkan Soltani, Nathaniel Good, & Dietrich J. Wambach,
Behavioral Advertising: The Offer You Can't Refuse, 6 HARV. L. & POL. REV. 273, 277
(2012).

[29] Facebook only had to block ads on desktop, because Facebook had already found way
to serve ads in mobile apps that could not be touched by ad blockers. Mike Isaac, Facebook
Blocks Ad Blockers, but It Strives to Make Ads More Relevant, N.Y. TIMES (Aug.
9,2016),https://www.nytimes.com/2016/08/10/technology/facebook-ad-blockers.html (checked
11/18/2020).

on Plaintiffs privacy. These actions were accompanied by false rationalizations and comforting assurances by Defendants to the frogs in the pot, that 1984-esque censorship schemes on behalf of the government overseers were really to eliminate "misleading information" and promote safety.

### D.  Defendant Facebook works to garner favor with its governmental overseers

46.     In the days following the 2016 election, Facebook withstood withering criticism from opinion leaders and traditional media for its perceived effect on the election outcome.[30] This New York Times article followed a PBS Newshour that asked,  "[whether]fake news influence[d] the outcome of Election 2016? How can you be sure the news you consume is true?"

> *The proliferation of fake news sources on social media has raised questions about the duty of sites like Facebook and Twitter to screen content and distinguish fact from fiction. Throughout 2016, false stories about the election were widely circulated by a variety of websites purporting to be legitimate. An analysis by Buzzfeed News revealed that many of these stories actually received more engagement — measured by the total number of comments, reactions and shares an article receives online — than those from real news sites like The New York Times and The Washington Post.[31]*

47.     Based on information and belief and on the public record, this filtered into a multitude of threats from Congress from those who felt betrayed by the 2016 election outcome and Defendant Facebook responded by increasing its censorship to protect its Special Immunities. Defendant Mark Zuckerberg stated, "I regret ridiculing fears over Facebook's effect

---

[30] https://www.nytimes.com/2016/11/14/technology/facebook-is-said-to-question-its-influence-in-election.html (checked 11/20/2020).
[31] https://www.pbs.org/newshour/extra/daily-videos/why-is-it-important-for-news-sources-to-be-trustworthy/?gclid=EAIaIQobChMI2MK9rKj96wIVDY_ICh3vigVMEAMYASAAEgK32vD_BwE  (checked 11/20/2020).

on election, "describing his change of heart as Facebook provided advertising content to Congress.[32]

48.     In December 2016, Facebook started its third-party fact-checking program,[33] working with "IFCN-certified" fact-checkers around the world to rate and review the accuracy of content on the platform for anyone violating its ad policy or community standards policies.[34] The certification process and constellation of factcheckers is managed by Defendant Poynter.[35]

49.     On March 28, 2018, ABC NEWS reported: "Congress turns up heat on Facebook after allegations of data harvesting Congress wants scrutiny of safeguards meant to protect user data."[36] Rumors also swirled about monopoly enforcement.[37]

### E.   Facebook expands "curation" protocols that promote Mandatory Vaccine Policy, and the COVID-19 pandemic response became a pretext to promote new vaccines, new drugs and to suppress free expression

50.     In February 2019, government overseer, Democratic Congressman Adam Schiff (D-CA), threatened to introduce legislation to remove Facebook's Section 230 immunity unless it implemented algorithms to "distinguish" and suppress "vaccine misinformation" and advertising. CDC and the WHO then collaborated at length with Defendant Facebook to suppress

---

[32] https://www.theguardian.com/technology/2017/sep/27/mark-zuckerberg-facebook-2016-election-fake-news (checked 11/20/2020).
[33] Facebook partners with fact-checking organizations to begin flagging fake news (Dec. 15, 2016) https://www.theverge.com/2016/12/15/13960062/facebook-fact-check-partnerships-fake-newshttps://www.facebook.com/journalismproject/programs/third-party-fact-checking (checked 11/28/2020).
[34] https://www.facebook.com/communitystandards/.
[35] https://ifcncodeofprinciples.poynter.org/?fbclid=IwAR33zaOQnD2U-n44JdQlk5pW8QYpYZHX-IgKDZi401GgvwSkMl3tL05ap5c.
[36] https://abcnews.go.com/Politics/congress-turns-heat-facebook-allegations-data-harvesting/story?id=53861995 (checked 11/20/2020).
[37] https://www.wsj.com/articles/the-antitrust-case-against-facebook-google-amazon-and-apple-1516121561 (checked 11/20/2020).

vaccine safety speech with a "warning label" and other notices that appear to flag alleged disinformation, but in reality, censor valid and truthful speech, including speech critical of those agencies and their policies. It was also well known that Facebook had attracted antitrust enforcement scrutiny.[38]

51.     By January 2020, Plaintiffs and other U.S. citizens began making Facebook informational posts about the COVID-19 pandemic.  Facebook, seeking to ingratiate itself with government overseers who had previously threatened its Section 230 status, imposed speech restrictions on U.S. citizens including any discussion regarding the necessity and efficacy of vaccines, the dissemination of alternative COVID-19 treatment therapies, and general criticisms regarding the pandemic response and the impartiality of medical professionals and elected state officials.

52.     In March 2020, it became clear that a cheap, available, and safe option, HCQ and zinc, existed, that if used early could prevent the expansion of the pandemic. By April 2020, many experienced physicians opined that HCQ functioned as a prophylaxis and that Ivermectin[39] was possibly even more efficacious.   In May 2020, Plaintiffs formed HAN to discuss the efficacy of COVID-19 treatments. Since that time, Plaintiffs administering and using HAN, but also using their personal accounts and accessing other newsgroups, were repeatedly silenced and censored by Defendants from discussing the efficacy of these COVID-19 off-patent treatments many of which are generally available. For example, it has been generally known for many years

---

[38] https://www.wsj.com/articles/ftc-antitrust-probe-of-facebook-scrutinizes-its-acquisitions-11564683965 (checked 11/20/2020).
[39] An FDA-approved broad spectrum anti-parasitic agent.
https://www.sciencedirect.com/science/article/pii/S0166354220302011.

that Vitamin D is remarkably effective at preventing severe reactions to Corona viruses.[40] HAN members discussed this supplement. While promoting this basic supplement could have saved tens of thousands of lives, Dr. Anthony Fauci, one of the lead members of the Trump administration's White House Coronavirus Task Force addressing the COVID-19 pandemic in the United States, didn't mention it until mid-September 2020, when the American death toll had crested above 200,000.[41]

> **F. Defendant's violated Plaintiffs' constitutional rights to discuss the existence of off-patent prophylaxis and treatments on the public square and to spotlight the systemic corruption and ineffectual pandemic response**

53.     In early May 2020, HAN was formed as a public forum for the purpose of: 1) discussing the value of  HCQ and Ivermectin to the American people as safe and off-patent solutions to prevent unnecessary deaths associated with the pandemic;  2) to discuss the massive effort to develop and impose a mandatory and potentially dangerous vaccines as well as the development and promotion of untested and inefficacious medications and treatment options for COVID-19;  3) determine the source of greatest health care system in the world's inability to properly respond to the pandemic; and 4) promote free expression.  Media inattention to these systemic failures left the Plaintiffs' to rely on their own research and evaluation, discussion, and dissemination of information in this developing area. As social media platforms restricted access to certain forms of thought and promote others, in particular Facebook's aggressive censorship of the sharing of information, the Plaintiffs' conviction and sense of obligation and duty to their fellow citizens became a burning and unquenchable duty. Plaintiffs and other HAN users quickly

---

[40] https://c19study.com/d.
[41] https://www.cnbc.com/2020/09/14/supplements-white-house-advisor-fauci-takes-every-day-to-help-keep-his-immune-system-healthy.html (checked November 5, 2020).

began advocating for open and honest public debate on the efficacy and safety of the courses of treatment advocated by WHO and the CDC. HAN helped the public navigate the "clutter" of the internet age by posting reliable and up-to-date content for its web traffic viewers. Specifically, HAN published articles on its page's multiple times per day or more, which described the state of the current scientific research, new technologies, and vaccine information.

54.     Plaintiffs, HAN, and its users, quickly identified emerging bodies of research from respected physicians and researchers that were struggling to be heard. Plaintiffs and other HAN users were not surprised to learn that thousands of physicians and researchers agreed with an emerging consensus that was developing nowhere faster than on HAN's pages.  Plaintiffs and HAN users could quickly read through a few days of posts and draw their own conclusions based on scientific articles presented, that were often at variance with WHO and CDC opinions.  In fact, CDC and WHO guidance was so flawed and seemingly compromised that HAN users, consistent with a developing consensus in the United States, began to have reasonable doubts about whether information disseminated by WHO or the CDC could be safely relied upon.

55.     HAN's user group also prominently features a "Popular Topics in Posts" section down its right-hand column with hyperlinks to 36 headers, that include "Bad Faith Curation," "Vaccines,"  "HCQ Efficacious," "Doctor Intimidation," "Potential Crimes: Corruption/Fraud," "Fauci Resign," "Find  Doctor," and "Ivermectin Efficacious," as examples.  Users began to collect information and research around themes to create and preserve the historical record and to provide one place where desperate Americans come to learn about medical research and where they might receive treatments from licensed physicians.

56.      On or about May 2020, one or more HAN administrators agreed to Facebook's Terms to create the group and has since actively maintained its Facebook group. HAN did so to

permit like-minded Facebook users to reach and make its online lifesaving posts widely accessible.  HAN has a current Facebook community of approximately 4,300 followers. HAN users upload articles or video posts to/from their own pages, directly from other platforms to its Facebook page on a frequent basis, along with other articles or video posts, and hyperlinks to HAN's archived articles of interest to its community. A follower or visitor to HAN's Facebook page can readily search the "posts" archive and retrieve all of HAN users' present and past articles concerning, conflicts, errors, and omissions by the various Facebook government overseers. Until the capability was removed by Facebook in August 2020, HAN users also shared directly to their personal Facebook pages from the HAN platform. It also seems that back articles have been removed.

57.     As set forth infra, HAN did not use its Facebook page to post any content that breached Facebook's terms or community standards or was otherwise "unlawful, misleading, discriminatory or fraudulent." [42]

58.     Under Section 1 of its adhesion contract Terms, Facebook describes its products and services to include, inter alia, "[to] empower you to express yourself and communicate about what matters to you" and one of those ways to "express yourself" is "adding content to your profile." Of its many reserved rights, Facebook notably does not retain the right to create or add its own content to a user's page, except for a specified reservation for "ads, offers, and other sponsored content [. . .] which [o]ur partners pay us to show [] to you." In Section 3(1), Facebook reiterates that the user "own[s] the content that [the user] create[s] and share[s] on Facebook[.] [. . .] and nothing in these Terms takes away the rights that [user] have to [their] own

---

[42] Facebook Terms of Service, https://www.facebook.com/terms.php  at ¶ 3(2)(1).

content." In Section 4(3), Facebook reiterates that "[w]e do not control or direct what people and others do or say, and we are not responsible for their actions or conduct (whether online or offline) or any content that they share (including offensive, inappropriate, obscene, unlawful and other objectionable content.").

59.     With respect to "harmful conduct," Facebook's Terms permit it to "detect misuse of [its] Products, harmful conduct towards others and situations where [it] may be able to help support or protect [its] community." Facebook retains limited rights, e.g., "offering help, removing content, blocking access to certain features, disabling an account or contacting law enforcement[.] [and] shar[ing] data with other Facebook companies when [it] detect[s] misuse or harmful conduct[.]" Here, too, Facebook does not reserve or retain the right to create its own content on a user's page. [43]

60.      Facebook's Terms purport to limit Facebook's liability "to the fullest extent permitted by applicable law."[44] The "applicable law" is California Civil Code section 1668, which establishes that "[a]ll contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

61.     Plaintiffs discussed the disturbing turn of events on the HAN Facebook cite as it happened—the proper function of the public square--but Facebook, anxious to please its government overseers who controlled its Special Immunities suppressed Plaintiffs' efforts to discuss and share these concerns.   Determined to help fellow Americans become more informed, they sought to share information on the public square to save American lives.  AS outlined in

---

[43] Id. at ¶¶ 1, 3(2)(3).
[44] Id. at ¶ 4(3).

detail below, Defendants blocked them, censored them, threatened them with confiscation of their content or bans and prevented them from making reasonable use of the public square.

62.     Defendants fraudulent scheme to misrepresent, censor, and exclude users' viewpoints on COVID-19 pandemic response are predatory acts to infringe on Plaintiff's Constitutional rights and further its monopoly through collusion and in agency with government overseers.

63.     Since May 2020 Defendants have falsely denigrated HAN and its members that sought to publish information that conflicted with the government overseers distorted and false "reality" through  "warning labels" on a multitude of informational posts, which convey a false imputation of dishonesty on anyone making such a post. Since May 2020, when HAN was created and prior to that on Plaintiffs personal pages and in other newsgroups, Defendants and affiliated "fact-checkers" (their Orwellian term) have published "false information" tags on HAN's page and Facebook's users pages, which materially misrepresent the accuracy of HAN's and users' content.

64.     Plaintiffs' seek a potent remedy as antitoxin to Facebook's toxic use of the "known lie [which is] at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected." *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964) ("calculated falsehood [is] no essential part of any exposition of ideas"); *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting) ("The ultimate good desired is better reached by free trade in ideas -- … the best test of truth is the power of the thought to get itself accepted in the competition of the market"). In short, has established a monopoly over the public square and now seeks to impose a toxic mix of its views and the views of legislators that award it special privileges under U.S. law.

65.     In *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735-36 (2017), Justice

Kennedy wrote of the potential harm that users of social media sites like Facebook can do, but

his words ring true of the "mastermind" of that platform:

> In short, social media users employ these websites to engage in a wide array of protected
> First Amendment activity on topics "as diverse as human thought." [. . .] While we now
> may be coming to the realization that the Cyber Age is a revolution of historic
> proportions, we cannot appreciate yet its full dimensions and vast potential to alter how
> we think, express ourselves, and define who we want to be. [. . .] the Court must exercise
> extreme caution before suggesting that the First Amendment provides scant protection for
> access to vast networks in that medium. [. . .] *For centuries now, inventions heralded as
> advances in human progress have been exploited by the criminal mind. New
> technologies, all too soon, can become instruments used to commit serious crimes.* [. . .]
> So it will be with the Internet and social media.

> *Id*. at 1735-36 (emphasis added).

Now comes this case to fulfill Justice Kennedy's prediction, but with an unexpected twist. One

of the titans of the internet age has exploited that new technology as an instrument to commit

fraud and censorship. Fraud and censorship that helped cause unnecessary mass death in

squelching the First Amendment rights and conducting illegal Fourth and Fifth Amendment

searches and seizures of any Plaintiff who sought to blunt the death toll of Americans. Even if

Plaintiffs could abandon Facebook's public square now that competition has been eliminated,

coercing them to abandon their content also strips their content of all privacy protections and

Constitutional protections. Any Facebook user who shares characteristics with 1984's

protagonist, Winston, faces a similar future unless this monopoly power is blunted.

## V.     DEFENDANT'S SCHEMES TO DEFRAUD

**A. Overview of Pre-Pandemic Censorship Conditions Regarding Vaccines Policy
and Defendant's Agency with the Government.**

66.     On or about February 14, 2019, Facebook's agreement with legislators and enforcers began. On that date, in just the latest imposition on Facebook of Congressional will, Rep. Adam Schiff wrote a public letter to defendant Zuckerberg "[a]s a Member of Congress who is deeply concerned about declining vaccination rates around the nation," pointedly asking that Facebook implement algorithms to identify, censor and remove so-called "vaccine misinformation."[45] The term "vaccine misinformation" (as Rep. Schiff intended, and Facebook implemented it) is a euphemism for any expression of skepticism toward government and industry pronouncements about vaccine safety and efficacy, regardless of whether that expression is true or not. The term "vaccine misinformation" does not, for example, include erroneous, misinformed, or fraudulent statements made by pharmaceutical companies, or the CDC, to promote vaccines.

67.     On information and belief, Zuckerberg met personally with Rep. Schiff subsequently to discuss, inter alia, Facebook's response to Rep. Schiff's February 14, 2019 public letter and press release. At the same time and subsequently, in his role as Chairman of the House Intelligence Committee, Rep. Schiff stated publicly that Congress could or should "make changes to" the law that does not currently hold social media companies liable for third party content on their platforms.[46] Rep. Schiff told reporters that, "if the social media companies can't exercise a proper standard of care when it comes to a whole variety of fraudulent or illicit content, then we have to think about whether that immunity still makes sense. These are not

---

[45] Schiff Sends Letter to Google, Facebook Regarding Anti-Vaccine Misinformation, News/Press Releases, CONGRESSMAN ADAM SCHIFF (Feb. 14, 2019), https://schiff.house.gov/news/press-releases/schiff-sends-letter-to-google-facebook-regarding-anti-vaccine-misinformation (checked 10/2/2020).

[46] See, e.g., Hearing by Congress on "deepfakes" and artificial intelligence [Video], GUARDIAN NEWS (June 13, 2019), https://www.youtube.com/watch?v=lArPEDS0GTA (checked 11/20/2020).

nascent industries or companies that are struggling for viability; they're now behemoths, and we need them to act responsibly."[47]

68.  A case similar to this one has been filed by the Children's Health Defense (CHD) (Robert Kennedy Jr.) against Facebook[48] alleging that the course of action by Rep. Schiff actively encouraged Facebook to act in concert with the CDC and WHO to avoid any legislative rollback of the "service provider" immunity from liability under the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c)(1). On March 7, 2019, Monika Bickert, Facebook's Vice President for Global Policy Management, issued an online press release stating that:

> We are working to tackle vaccine misinformation on Facebook by reducing its distribution and providing people with ***authoritative information*** on the topic. We are starting by taking a series of steps:

> We will reduce the ranking of groups and Pages that spread misinformation about vaccinations in News Feed and Search. These groups and Pages will not be included in recommendations or in predictions when you type into Search.

> When we find ads that include misinformation about vaccinations, we will reject them. We also remove related targeting options, like "vaccine controversies." For ad accounts that continue to violate our policies, we may take further action, such as disabling the ad account.

> We won't show or recommend content that contains misinformation about vaccinations on Instagram Explore or hashtag pages.

> We are exploring ways to share educational information about vaccines when people come across misinformation on this topic.

---

[47] K. Waddell, A new attack on social media's immunity, AXIOS (June 13, 2019), https://www.axios.com/social-mediaimmunity-section-230-f15ac071-32e9-4e33-81e6-4c7ebadaea5e.html.

[48] Children's Healthcare Defense (CHD) v. Facebook, et. al 3:20-cv-05787 (2020). https://digitalcommons.law.scu.edu/cgi/viewcontent.cgi?article=3303&context=historical (checked 11/11/2020).

\*\*\*\*[49]

69.     On September 4, 2019, the WHO Director General issued a public statement that it "welcomes the commitment by Facebook to ensure that users find facts about vaccines across Instagram, Facebook Search, Groups, Pages and forums where people seek out information and advice. Facebook will direct millions of its users to WHO's accurate and reliable vaccine information in several languages, to ensure that vital health messages reach people who need them the most. The WHO and *Facebook have been in discussions for several months to ensure people can access authoritative information on vaccines and reduce the spread of inaccuracies on Facebook and Instagram*."[50]

70.     At all times relevant hereto, the United States was a member of the WHO, a United Nations specialized agency. Notably, under Article 71 of its Constitution, the WHO may only consult and cooperate with non-governmental national organizations with the consent of the Government concerned. Basic Documents, WORLD HEALTH ORGANIZATION (49th Ed. 2020).[51] Based on information and belief, this safeguard was put in place specifically to protect Constitutional rights of American citizens and Defendants unilaterally abandoned this obligation.

---

[49] Combatting Vaccine Misinformation, FACEBOOK, https://about.fb.com/news/2019/03/combatting-vaccine-misinformation/ (last visited 11/15/2020) (emphases added).

[50] Vaccine Misinformation: Statement by WHO Director-General on Facebook and Instagram, WORLD HEALTH ORGANIZATION (Sept. 4, 2019), https://www.who.int/news-room/detail/04-09-2019-vaccine-misinformation-statement-by-who-director-general-on-facebook-and-instagram (checked 11/20/2020) (emphases added).

[51] https://apps.who.int/gb/bd/pdf_files/BD_49th-en.pdf#page=1 (checked 11/11/2020).

71.     The same day, September 4, 2019, that the WHO publicly lauded its close collaboration with Facebook to "ensure people can access authoritative information [] and reduce the spread of inaccuracies" and put a warning and a referral link to CDC on CHD's page. [52]

72.     Both before and after September 4, 2019, Facebook also implemented a "factchecking" campaign regarding vaccines in coordination with the CDC and WHO, designed to materially misrepresent information about vaccines. Thus, Facebook killed two birds with one stone: Facebook delivered what Rep. Schiff had forcefully requested — the "vaccine misinformation" campaign — which in turn would help it achieve the continued preservation of its desired Section 230 immunity. At the same time, Rep. Schiff's demand provided Facebook with cover for its own ulterior business motives, and pretext to launch its own fraudulent scheme to cause reputational harm and financial loss to anyone questioning mandatory vaccine programs and vaccine efficacy.  CHD and any critics of CDC and WHO pandemic response or anyone who provided criticism of U.S. and state government agents that Facebook deemed would be beneficial to avoid enforcement action of stripping of its qualified immunity.

73.     In perpetrating its fraud scheme, Facebook's modus operandi from its public square monopoly perch is to treat any information that does not advance the CDC and WHO policy goals of maintaining or increasing vaccination rates as "false," "fake," "misinformation," or "hoax," irrespective of its objective truth or the fact that it constitutes or qualifies as opinion. In this way Facebook set the foundation for treating even the view that parents have a right to informed consent, one of the most fundamental ethics in medicine, as censorable "misinformation." Any information related to the risks of vaccination, no matter how well-

---

[52] *CHD v. Facebook,* page 20.

grounded in science, is labeled and censored as "misinformation." Facebook trained its technical means and methods of identifying and eliminating all such content under the banner of "falsity." By contrast, Facebook broadly incorporates and promotes the CDC and WHO's policy pronouncements on these issues as established "fact."[53]

74.    Merriam-Webster's Dictionary defines "misinformation" as "incorrect or misleading information," and defines "information" as "(1) knowledge obtained from investigation, study, or instruction; (2) intelligence, news; (3) facts, data." Information, Merrian-Webster.com.45F45F[54] Facebook's charge that Plaintiffs content is "false information" conveys to third-party users that it is demonstrably, provably false.

75.    Facebook has a right "to control its own product, and to establish the terms with which its users, application developers, and advertisers must comply in order to utilize this product." *Sambreel Holdings LLC v. Facebook, Inc*., 906 F. Supp. 2d 1070, 1076 (S.D. Cal. 2016). But, here, even Facebook cannot avoid liability for provable injury to Plaintiffs' property rights, intangible assets and Constitutional Rights based on fraud and misrepresentation. See, e.g., *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1166 (9th Cir. 2008) (en banc) (service provider may be liable where it makes answering discriminatory questions a condition for doing business on its site). It fraudulently brands true information as false, as a tribute to and in service to its government overseers.  Facebook pursued a scheme designed to eliminate objective truth and replace it with a universe of "truth," that in many instances was patently false, but was created within narrow parameters set by the government overseers.

---

[53] Combatting Vaccine Misinformation, FACEBOOK, supra, https://about.fb.com/news/2019/03/combatting-vaccine-misinformation.
[54] https://www.merriam-webster.com/dictionary/information (last accessed Aug. 20, 2020).

76.     On or about May 2020, Facebook began covertly to demote and/or ban content ("shadow-ban") that Plaintiffs posted, administered, or moderated on HAN's Facebook page, effectively limiting its visibility and reach. Facebook owns a patent on social media shadow banning.[55] The patent describes the mechanism by which shadow banning is accomplished. In one embodiment, the social networking system blocks banned comments by analyzing the text of the comments. For example, if a comment includes a profane word, as provided in a list of banned words, the social networking system will not display the comment to other users of the social networking system.

77.     Additionally, in one embodiment, Facebook also performs a "sentiment analysis" to identify whether a comment includes sentiment that is banned under Facebook's community standards. Finally, Facebook's patent permits it to train a machine learning classifier to block comments based on Facebook content moderators' actions of manually deleting comments or unblocking comments in the online forum. In one embodiment, the blocked comments are not displayed to the wider community of Facebook users. However, the blocked comments are displayed to the commenting user and his or her friends within the social networking system. As such, Facebook's software creates a simulacrum in which the "offending" user — here HAN and/or its posters — is not aware that their comment or content is not displayed to other users of the forum. Since May 2020, Facebook has utilized this deceptive scheme in order to covertly

---

[55] See United States Patent No. 10,356,024, Kanter et al. (Moderating content in an online forum), USPTO Patent Full-Text and Image Database, UNITED STATES PATENT AND TRADEMARK OFFICE (Jul 16, 2019), http://patft.uspto.gov/netacgi/nph-Parser?Sect2=PTO1&Sect2=HITOFF&p=1&u=/netahtml/PTO/search-bool.html&r=1&f=G&l=50&d=PALL&RefSrch=yes&Query=PN/10356024 (last accessed 11/20/2020).

limit or block HAN's content while misrepresenting the visibility and reach of that content to HAN itself, and misrepresenting the totality of HAN's content to all third-party users.

78.     At an April 17, 2020, CNN "Global Town Hall," Zuckerberg boasted that "we work with independent fact-checkers [] and warning labels work. We know that because 95% of the time when someone sees a piece of information that has a fact-check on it, they don't click through and consume that information."[56]

79.      Indeed, Facebook has used "A/B testing" (testing users' response to variants) to achieve its intended psychological effect on user behavior. Essentially, similar demographic test-groups are shown two (or more) different behavior modification mechanisms, and the most effective mechanism is chosen based on statistical results in terms of which variant achieves the desired user behavior.[57]

80.     The "whistleblower" also described Facebook's use of "troll scores" that were assigned to accounts and used to assess what punitive actions it would take against the accountholder. There is no accountability or accountholder recourse since Facebook compiles its punitive "troll scoring" without the holder's knowledge.[58]

81.     The "whistleblower" also revealed Facebook's use of a "deboosting" score, which it uses to "deboost" content produced by the accountholder's page. Facebook deployed a similar,

---

[56] Entire CNN April 16 coronavirus town hall, supra, https://www.cnn.com/videos/business/2020/04/17/entire-april-16-coronavirus-townhall-part-5-sot-vpx.cnn.

[57] About A/B Testing, Business Help Center, FACEBOOK FOR BUSINESS) https://www.facebook.com/business/help/1738164643098669?id=445653312788501 (last accessed Nov. 17, 2020).

[58] Anonymous – Facebook, PROJECT VERITAS (Apr. 6, 2020). https://www.projectveritas.com/news/anonymous-facebook/. (last accessed Nov. 17, 2020).

if not the same algorithm, to limit the visibility and reach of HAN content and Facebook users

who used HAN and other disliked newsgroups. As explained by the whistleblower and

screenshots obtained by Project Veritas, the ActionDeboostLiveDistribution tag is designed to

"deboost" content produced by the pages it is attached to, specifically suppressing the

distribution of livestreams from that page. A current Facebook employee confirmed to Project

Veritas that the code could reduce a "video's visibility in news feeds, remove sharing features,

and disable interactive notifications."

82.     The "whistleblower's" account elaborates upon newspaper and magazine articles

about internal and top-down biases in Facebook's content control processes. A "Wired"

magazine article reported on Facebook's use of a custom algorithm — "Click Gap" —

specifically to limit the spread of whatever Facebook terms "fake news." Facebook deployed a

similar, if not the same algorithm, to damage HAN and other newsgroups, by covertly limiting

the visibility and reach of its content. An April 18, 2019 "Wired" article explains: "Click-Gap,

which Facebook is launching globally today, is the company's attempt to limit the spread of

websites that are disproportionately popular on Facebook compared with the rest of the web. If

Facebook finds that tons of links to a certain website are appearing on Facebook, but few

websites on the broader web are linking to that site, Facebook will use that signal, among others,

to limit the website's reach."[59]

83.     A CNET article reported that Facebook planned to use "updated machine

learning" to detect more potential "hoaxes" and send them to third-party "fact-checkers."

---

[59] Facebook Is Changing News Feed (Again) to Stop Fake News, WIRED (Apr. 10,
2019), https://www.wired.com/story/facebook-click-gap-news-feed-changes/ (last accessed Nov.
17, 2020).

Facebook used the same or similar machine learning systems to detect and flag CHD content for sending to Facebook's "fact-checker" affiliates[60] and it did the same to HAN and its users.

84.     The Doe Defendants comprise, inter alia, members of an enterprise with or within Facebook working directly to label, suppress, and censor vaccine and COVID-19 related content on HAN's Facebook and Plaintiffs' user pages. The enterprise operates under the direct supervision and control of Defendant Facebook's corporate leadership and Zuckerberg. It includes individual Facebook officers or employees (known only to Facebook) responsible for key design elements that enable widespread AI-driven "fact-check" content suppression and manipulation. The enterprise manipulates technical processes to "shadow ban" HAN, i.e., deceive Plaintiffs as to the reach and visibility of content on its Facebook page, and prevent its content from being disseminated. The enterprise also exploits internal marketing and psychometric data to "sandbox" users, i.e., selectively hide content from users based on their psychological profile, and ward off the possibility that alternative content may influence their views. "Sandbox" is an apt term for isolating users in an echo chamber of like-minded viewpoints where existing views are reinforced, and alternative or opposing ideas are not considered.

85.     Facebook shows HAN's content to some of HAN's already- "decided" users, but Facebook does not show it to any other "undecided" or "opposed" users. Thus, Facebook seeks to rigidify users' positions on matters of public concern, and foreclose public debate, or any possibility of the societal "ultimate good [] reached by free trade in ideas," (see *Abrams v. United*

---

[60] R. Cheng, Facebook will use machine learning to fight fake news, CNET (Aug. 3, 2017), https://www.cnet.com/news/facebook-will-use-machine-learning-to-fight-fake-news/ (last accessed November 20, 2020).

*States*, 250 U.S. at 630 (Holmes, J., dissenting)), while concealing its methods and effects. Facebook, with the government's assistance, blocks content critical of the CDC, WHO, elected officials it likes and that protect Facebook and even its officials. The First Amendment protects against this new "privatized" form of governmental censorship. This is also a classic method of fraud concealment: if Plaintiff does not know what Defendants are telling or showing third parties, Plaintiff is less likely to sue. See, e.g., *Bridge v. Phoenix Bond & Indem. Co., 553* U.S. 639 (2008) ("suppose an enterprise that wants to get rid of rival businesses mails misrepresentations about them to their customers and suppliers, but not to the rivals themselves.").

86.     On December 27, 2018, New York Times reporter Max Fisher wrote that, based on his review of Facebook internal documents, Facebook's "closely-held rules" for moderating content on its website had "numerous gaps, biases and outright errors." Fisher characterized those errors as a byproduct of the over- and under-inclusive nature of binary rules when applied to "highly complex issues," plus the highly time-sensitive ("eight to 10 seconds per post") workload constraint Facebook puts on the decisions at issue. He quoted Facebook officer Bickert as saying, "we have billions of posts every day, we're identifying more and more potential violations using our technical systems. At that scale, even if you're 99 percent accurate, you're going to have a lot of mistakes" (emphasis added). (Here, Facebook's wrongdoing is deliberate, a form of decision-making which Bickert's reference to "mistakes" eludes.) Fisher reported that, "By telling moderators to follow the rules blindly, Facebook hopes to guard against bias and to

enforce consistency." But "Facebook has little visibility into the giant outsourcing companies, which largely police themselves, and has at times struggled to control them."[61]

87.     Fisher further reported that, "[t]hough Facebook says its focus is protecting users, the documents suggest that other concerns come into play. [For example, Pakistan related] guidelines warn moderators against creating a "PR fire" by taking any action that could "have a negative impact on Facebook's reputation or even put the company at legal risk. [. . .] And its decisions often skew in favor of governments, which can fine or regulate Facebook."[62]

88.     On May 16, 2020, New York Times reporters Mike Isaac, Sheera Frenkel and Cecilia Kang wrote in their article "Now More Than Ever, Facebook Is a 'Mark Zuckerberg Production'" that:

> [A]t Facebook, for more than a decade, Mark Zuckerberg was a product guy's product guy. In practice, this meant [. . .] he was comfortable delegating in areas that interested him less keenly — including [. . .] the realm of Facebook policy around what kind of speech was and was not permitted. Those subjects fell into a specific category: Too important to ignore, but not exactly what a young billionaire wants to spend all of his time on.
>
> [After the 2016 election] Mr. Zuckerberg resolved to take control of the global superpower in which he already dominated the voting. [In July 2018,] Mr. Zuckerberg called a meeting with his top lieutenants. [. . .] Mr. Zuckerberg said he would be making more decisions on his own, based on his instincts and vision for the company. [. . . ] Mr. Zuckerberg also began to participate more directly in meetings that had previously been Ms. Sandberg's domain — from the nitty-gritty of taking down *disinformation campaigns*, to winding philosophical discussions on how Facebook ought to handle *political ads*. [. . .] Other board disagreements, specifically around political advertising and the ***spread of misinformation***, always ended with Mr. Zuckerberg's point of view

---

[61] M. Fisher, Inside Facebook's Secret Rulebook for Global Political Speech, NEW YORK TIMES (Dec. 27, 2018) https://www.nytimes.com/2018/12/27/world/facebook-moderators.html (last accessed 11/20/2020).
[62] Id.

winning out. [. . .] To replace [departing board members], Mr. Zuckerberg picked [ . . .] Peggy Alford, the former chief financial officer of the Chan Zuckerberg Initiative.[63]

89.     In April 2019, Facebook contracted with Science Feedback,[64] a French organization which Facebook funds, that "fact-checked" HAN's content, and directed Science Feedback to deploy Facebook's circular WHO and CDC definitions of "vaccine misinformation" and "Corona-19 misinformation."  Science Feedback is wholly dependent upon Facebook, both financially and editorially. On information and belief, neither Facebook nor Science Feedback makes any genuinely independent effort to check the veracity of the censored or labeled HAN content. Instead, Facebook created a classification system that provides Science Feedback with a limited set of nine pre-populated classifications to apply to a posting:[65]

    • False
    • Partly False
    • True
    • False Headline
    • Not Eligible
    • Satire
    • Opinion
    • Prank Generator

90.     Apparently, if Science Feedback decides that an article is not "false," "partly false," or "false headline" but falls into any of the other six classifications above, Facebook does

---

[63] Mike Isaac, Sheera Frenkel & Cecilia Kang, Now More Than Ever, Facebook Is a 'Mark Zuckerberg Production,' NEW YORK TIMES (May 16, 2020), https://www.nytimes.com/2020/05/16/technology/zuckerberg-facebook-coronavirus.html(emphases added) (last accessed 11/20/2020).
[64] https://sciencefeedback.co/science-feedback-partnering-with-facebook-in-fight-against-misinformation/.
[65] Not Related Fact-Checking on Facebook, Business Help Center, FACEBOOK FOR BUSINESS, https://www.facebook.com/help/publisher/182222309230722 (last accessed Nov.20, 2020).

not display (or does not prominently display) a link to the "See Why" window or to Science Feedback's oppositional article.

91.     Under this arrangement, Facebook pays Science Feedback to classify content, and Facebook flags content for Science Feedback to evaluate and classify as part of their partnership. Science Feedback is paid by Facebook to find false stories, and here willfully marked Plaintiffs content as "false" or "partly false" in order to generate traffic to its website through the warning and link, and to further its contractual partnership with Facebook. The "fact-checking" system Facebook created encourages this type of mislabeling. The Science Feedback fact-checkers have an obvious incentive to categorize a post as "False" rather than an accurate but less damaging classification of "Opinion," because that is the only way Facebook will insert the clear warning with a prominent link to Science Feedback's oppositional article. Facebook deceives its users by materially misrepresenting that its "fact-checkers" are "independent," contractually or editorially. Significantly, the arrangement also permits Facebook and Science Feedback to create categorical exemptions from "fact-checking" where it suits Zuckerberg's political or other biases, e.g., the "opinion" exemption for climate science deniers. [66]

92.     As to each of the HAN and HAN-user articles and video posts, which Facebook and Science Feedback, or Poynter/Politifact labeled "False Information" or "Partly False Information," see supra, Science Feedback and Politifact's opposition articles show, at most, that the specific matter asserted was the opinion of its authors on fully-disclosed limited facts, not that it was a "false" or "partly false" statements of fact. Nevertheless, Science Feedback designated the articles and videos as "False" or "Partly False," not "Opinion." Facebook then

---

[66] Emily Atkin, Facebook creates fact-checking exemption for climate deniers, supra, https://heated.world/p/facebook-creates-fact-checking-exemption.

proceeded to gray out the articles and videos and placed its warnings over them. By using

Facebook's pre-populated options to mislabel the articles and videos, Science Feedback and

Facebook intentionally tell the public that Plaintiffs are presenting false information, when they

know that the information presented is, at most, opinion and not false fact.

**B.  To curry favor with its Government Overseers, Facebook expands its Vaccine Censorship program into a Pandemic Vaccines and New Drugs program**

**1.      In January 2020, HCQ is a cheap, available drug that has safely treated 800 million people over 65 years under FDA approval that infectious diseases experts deem to be efficacious as a prophylaxis and cure for the emerging new Coronavirus (COVID-19)**

**a.      COVID-19**

93.      Coronaviruses are a group of RNA viruses that cause diseases

in mammals and birds. In humans and birds, they cause respiratory tract infections that can range

from mild to lethal. Mild illnesses in humans include some cases of the common cold (which is

also caused by other viruses, predominantly rhinoviruses), while more lethal varieties can

cause SARS, MERS, and COVID-19. In cows and pigs they cause diarrhea, while in mice they

cause hepatitis and encephalomyelitis. There are a myriad of viruses and developing effective

vaccines is complicated by a host of factors including the that they constantly mutate.[67]

94.      RNA viruses constitute an important threat to human health around the globe.

Several RNA viruses are pandemic and infect hundreds of millions around the world leading to

the death of millions of people every year. These viruses include the human immunodeficiency

virus (HIV), hepatitis C virus (HCV), Ebola virus, Zika virus, respiratory syncytial virus (RSV),

influenza viruses, yellow fever virus, dengue virus, rhinoviruses (common cold), human T-

---

[67] https://www.americanscientist.org/article/viruses-and-vaccines-a-basic-flowchart-of-viral-families (last accessed Nov. 20, 2020).

lymphotropic virus type 1 (HTLV-I), poliovirus, and measles virus. Currently, no vaccine or specific treatment is available for many of these viruses and some of the available vaccines and treatments are not highly effective. [68]

95.     The COVID-19 Pandemic developed around the preexisting Facebook effort to undermine critics of mandatory vaccine policy, and Facebook doubled down on its scheme in helping the government promote vaccine policy, exaggerate the need for vaccines and "new" drugs and they censored speech that was inconvenient to these goals.  As the United States moved to its extreme pandemic footing, urged on by conflicted, corrupted and compromised "expert" opinion, Facebook identified new and expanding areas of bad faith censorship depriving Plaintiffs and other Facebook users of their constitutional rights.

**On Facebook and Instagram:** We remove COVID-19 related misinformation that could contribute to imminent physical harm. We've removed harmful misinformation since 2018, including false information about the measles in Samoa where it could have furthered an outbreak and rumors about the polio vaccine in Pakistan where it risked harm to health aid workers. Since January, we've applied this policy to misinformation about COVID-19 to remove posts that make false claims about cures, treatments, the availability of essential services or the location and severity of the outbreak. We regularly update the claims that we remove based on guidance from the WHO and other health authorities. For example, we recently started removing claims that physical distancing doesn't help prevent the spread of the coronavirus. We've also banned ads and commerce listings that imply a product guarantees a cure or prevents people from contracting COVID-19.

96.     On January 30, 2020, Facebook "said in a blog post that it would remove content about the virus 'with false claims or conspiracy theories that have been flagged by leading global health organizations and local health authorities,' saying such content would violate its ban on misinformation leading to 'physical harm.' **** Fact-checking initiative PolitiFact said misinformation about the virus online included hoaxes about its source, its spread, and how to

---

[68] Immune Responses to RNA viruses, Journal of Immunology Research, Volume 2018 https://www.hindawi.com/journals/jir/2018/5473678/ (last accessed Nov. 20, 2020).

treat it, as well as false conspiracies about its connection to biological warfare and the Chinese government."[69]

97.     On January 31, 2020, Facebook increased its policing (and content creation) to placate its government overseers concerned about its effects on an upcoming election where it announced that it would now flag context and direct users to WHO-approved content.[70]

> We will also soon begin showing messages in News Feed to people who previously engaged with harmful misinformation related to COVID-19 that we've since removed, connecting them with accurate information," Zuckerberg said in a post.
>
> The new alert is a concession to critics who have long called for Facebook to "correct the record" by telling users about posts it later removes or labels as false. The company previously resisted those proposals, arguing that drawing attention to dubious claims can inadvertently fuel their spread.
>
> The notifications, which will start appearing in the coming weeks, will direct people to a World Health Organization list of common myths about the virus and encourage them to "help friends and family avoid false information," Facebook said.
>
> The alerts will not inform users they are receiving the nudge because they had previously liked, reacted, or commented on false posts, nor will they debunk specific claims.

### b.     Hydroxychloroquine ("HCQ")

98.     HCQ sold under the brand name Plaquenil among others, is a medication approved for use by the FDA since 1955 to prevent and treat malaria in areas where malaria remains sensitive to chloroquine. HCQ followed development of chloroquine (CQ) and both are derived from quinine. Quinine was first isolated in 1820 from the bark of a cinchona tree, which

---

[69] As coronavirus misinformation spreads on social media, Facebook removes posts https://www.reuters.com/article/us-china-health-facebook-idUSKBN1ZV388 (last accessed. 20, 2020).

[70] Facebook to notify users who have engaged with harmful COVID-19 posts https://www.reuters.com/article/us-health-coronavirus-facebook/facebook-to-notify-users-who-have-engaged-with-harmful-COVID-19-posts-idUSKCN21Y1YB (last accessed Nov. 20, 2020).

is native to Peru. Other uses for HCQ include treatment of rheumatoid arthritis, lupus, and porphyria cutanea tarda. It is taken by mouth, often in the form of Hydroxychloroquine sulfate.[71] Prior to March 2020, when multiple HCQ studies involving incompetence or deploying research fraud were released, the professional concerns about safety centered on obscure retina damage cause by long term use and high dosages. In late 2019, when COVID-19 was emerging from Wuhan, infectious disease doctors suspected early that chloroquine might prevent or blunt a pandemic.[72]

99.    In January 2020, HCQ would have been suspected to function as an efficacious treatment for COVID-19 since its derivative quinine had been used to great effect for similar viruses since 1889 for the Russian flu and for the Spanish Flu of 1918:



---

[71] "Hydroxychloroquine Sulfate Monograph for Professionals". The American Society of Health-System Pharmacists. 20 March 2020. https://web.archive.org/web/20200320234847/https://www.drugs.com/monograph/hydroxychloroquine-sulfate.html (last accessed Nov.20, 2020).
[72] https://www.who.int/publications/i/item/infection-prevention-and-control-of-epidemic-and-pandemic-prone-acute-respiratory-infections-in-health-care P. 33-35.



months by taking these tablets when they feel a cold coming on. The tonic and laxative effect of Laxative Bromo Quinine Tablets

box of Laxative Bromo Quinine has identified it as the first and original cold and grip tablet. Price 30c.
PARIS MEDICINE CO., ST. LOUIS, U.S.A.

The beneficial effect of Laxative Bromo Quinine is very different from others.

LAXATIVE
**BROMO QUININE**
TABLETS

*E.W.Grove*

Be sure you are protected remember the box.

THE WORLD'S LARGEST SELLING COLD AND GRIP TABLET

La Ronde des Médecins et des Potards.

---

Feb. 7, 1920]        MEDICAL    RECORD.        235

never ending quarrel between forms of government; between one generation and the next succeeding to it, and between the ancients and the moderns.

REFERENCES.

1. Gargantua, Chapter xviii, Note 5, Edition Abel Lefranc.
2. Gargantua, Chapter xxi.
3. Gargantua, Chapter xix.
4. Gargantua, Chapter xxxviii.
5. Gargantua, Chapter iv.
6. Gargantua, Chapter xxxviii.
7. Gargantua, Chapter v.
8. Book III, Chapter xxviii.
9. Epistle to James Smith by Robert Burns.
10. Pantagruel, Book II, Chapter xxx.
11. Gargantua, Chapter xxii.
322 GEARY STREET.

INFLUENZA.

A CONFIRMATORY REPORT UPON THE ABORTIVE ACTION OF QUININE DIHYDROCHLORIDE.

BY WATERS F. BURROWS, M.D.,

AND

ELLIOTT C. BURROWE, M.D.

NEW YORK.

SINCE our preliminary report upon the specific treatment of influenza with quinine dihydrochloride (MEDICAL RECORD, Dec. 21, 1918), a large number of cases have been injected. This salt of quinine was selected because it was easily obtainable in ampoules and but slightly irritating. In every case injected a rapid and uncomplicated recovery has resulted, excluding in this series only those which had developed marked pneumonic signs, in which latter instances, with but one exception, there had evidently been a prodromal stage during which the injection should have been made.

Recalling that but one injection is required to cause the disappearance of the influenza symptoms it seems evident that the treatment is specific to the same degree that antitoxin, used early, is a specific for diphtheria. However, it is probable that the quinine solution acts by increasing the body defenses rather than through neutralization of a toxin. A later communication will deal with this phase of the problem.

The treatment is equally effective at all ages. The youngest injected was four years, the oldest sixty-three. The injections have been made on the first to the sixth day of the disease and also in cases where definite pneumonia existed. The absence of a specific action upon the secondary pneu-

fore the third day of the average case while the pulse rate is around 100 and the respirations still under 26.

We use a 10 per cent. solution of quinine dihydrochloride. For the adult the dose is 15 to 22 grains given but once and at one time. At least ⅓, often ½, and occasionally the entire dosage is given intravenously. The remainder is injected into the biceps muscles. For young children 7 to 10 grains is the dose. There may be a general tingling sensation and warmth during the injection; sometimes a slight chilly feeling, a transitory pallor if given too rapidly, or nausea.

In conclusion we may state the further course of the uncomplicated influenza case which has received one injection. Within a very short time the entire picture is changed from one of evident illness to one of convalescence. The following day the temperature is about 100° and the patient is well about forty-eight hours following the injection. The irritating cough, if present, may persist for some time and the appetite may but slowly return.

17 EAST THIRTY-EIGHTH STREET.

## Medicolegal Notes.

Payment of Assistant Who Administers Anesthetic.—The North Dakota Supreme Court holds that in surgery the proper administration of an anesthetic is an essential part of the operation, for which a surgeon is commonly paid an adequate fee, which includes the minor fee of an assistant. When he employs an assistant the presumption is that he agrees to pay him, unless the contrary appears from express words or conditions. Chief Justice Christianson dissented, being of opinion that the law does not imply any promise on the part of an attending physician to pay the doctor administering the anesthetic at operations. He quoted Garney v. Stadler, 67 Wis., 512, 516, 20 N. W. 787, 789, as follows: "We think we are justified in assuming that it is quite exceptional for the members of that [the medical] profession to undertake the treatment of their patients on special contracts by which they are to be paid a sum in gross, and by which they bind themselves personally with their patients to pay for any needed assistance in the proper treatment of the case."—Semple v. Kings (N. Dak.), 172 N. W. 817.

Expert Testimony as to Permanency of Injuries.—In a personal injury action objection was made to the admission of opinion evidence of a doctor as to the permanency of the plaintiff's injuries, and that he would never again be able to pursue his occupation of coal miner. The court held the objection was without merit. Proper elements of damages in such cases are the nature of the injuries, and whether permanent or only temporary. Who is better qualified to speak on this subject than an attending physician and surgeon? That such evidence of a medical expert based on actual knowledge of the facts or facts proven by others is admissible is supported by the great weight of author-

100.     There are many pathways that quinine, chloroquine, which is stronger, and HCQ, which is strongest--act on RNA viruses, but infectious disease doctors know that its most

effective when combined with zinc and when it provided early, prior to the virus gaining a foothold on the host, and prior to the creation of a "cytokine storm" that causes infection and pneumonia. It is this generalized mode of function that allows it to be efficacious regardless of mutation. In short, HCQ short circuits the cytokine storm and allows the host to shed the virus prior to gaining a foothold. HCQ, the refined, more potent version of quinine, was "off-patent," so it did not attract pharmaceutical investment, but, because it was so dramatically effective against corona viruses, it attracted grant funding and scientific research interest.

101.    In 2003, it was noted that HCQ exerts antiviral effects, inhibiting the replication of several viruses including members of the flaviviruses, retroviruses, and coronaviruses noting that HCQ has immunomodulatory effects, suppressing the production/release of tumour necrosis factor α and interleukin 6, which mediate the inflammatory complications of several viral diseases.[73]

102.    In 2004, an in vitro study, indicated CQ efficacy for SARS-CoV-1 IC50 of CQ for antiviral activity (8.8) that was significantly lower than cytostatic activity CC50 (261.3), selectivity index of 30. IC50 for inhibition of SARS-CoV in vitro approximates the plasma concentrations of HCQ reached during treatment of acute malaria. HCQ may be considered for immediate use in the prevention and treatment of SARS-CoV infections.[74]

---

[73] Savarino et al., Lancet Infect. Dis., doi:10.1016/S1473-3099(03)00806-5 (Peer Reviewed) (Theory) Effects of chloroquine on viral infections: an old drug against today's diseases.

[74] Keyaerts et al., Biochem. Biophys. Res. Comm., 323:1, 8 October 2004, doi:10.1016/j.bbrc.2004.08.085 (Peer Reviewed) (In Vitro) In vitro inhibition of severe acute respiratory syndrome coronavirus by chloroquine.

103.    In 2005, an in vitro study, SARS-CoV-1, found that HCQ has strong antiviral effects on SARS CoV infection when cells treated either before or after exposure, suggesting prophylactic and treatment use. Describes three mechanisms by which the drug might work and suggests it may have both a prophylactic and therapeutic role in coronavirus infections. Chloroquine is a potent inhibitor of SARS coronavirus infection and spread. "We report, however, that chloroquine has strong antiviral effects on SARS-CoV infection of primate cells. These inhibitory effects are observed when the cells are treated with the drug either before or after exposure to the virus, suggesting both prophylactic and therapeutic advantage." [75]

104.    In 2006, the 2003 paper was updated furthering the hypothesis of HCQ inhibiting SARS replication in two in-vitro studies. HCQ affected an early stage of SARS replication. [76]

> Our hypothesis that chloroquine might inhibit replication of the SARS coronavirus has been confirmed in two independent in-vitro studies. Researchers at the Belgian Catholic University of Leuven found that chloroquine inhibited SARS coronavirus replication with a 50% effective concentration of 8·8 (SE 1·2) μmol/L, within the range of blood concentrations achievable during antimalarial treatment.7 The dose inducing 50% cytostatic activity was much higher (261·3 [14·5] μmol/L). Time-of-addition experiments indicated that chloroquine affected an early stage of SARS coronavirus replication.7 Researchers at the Centers for Disease Control and Prevention (Atlanta, GA, USA) reported potent anti-SARS coronavirus effects of chloroquine in vitro, attributable to a deficit in the glycosylation of the SARS coronavirus receptor ACE2.8 Again, the antiviral drug concentrations were not cytotoxic. If animal models confirm these results, chloroquine might represent a valuable therapeutic option if SARS re-emerges.
>
> The broad spectrum antiviral effects of chloroquine deserve particular attention in a time in which the world is threatened by the possibility of a new influenza pandemic, and the availability of effective drugs would be fundamental during evaluation of an effective vaccine. The effect of chloroquine against replication of Orthomyxoviridae has long been known. Inhibitory effects of chloroquine on both type A and B influenza viruses have been described. We are currently investigating the inhibitory effect of chloroquine on the

---

[75] Vincent et al., Virol. J. 2:69, 2005, doi:10.1186/1743-422X-2-69 (Peer Reviewed) (In Vitro); https://pubmed.ncbi.nlm.nih.gov/16115318/.

[76] Savarino et al., Lancet Infect. Dis., doi:10.1016/S1473-3099(06)70361-9 (Peer Reviewed) (In Vitro) New insights into the antiviral effects of chloroquine.

*H5N9/A/chicken/Italy/9097/97 avian influenza virus, recently isolated from poultry in Italy. Depending on the viral challenging doses and the methods adopted to detect the antiviral effects, the inhibitory concentrations fell within the 0·5–10 μmol/L range—ie, clinically achievable in plasma during malaria treatment (LDT, AS, ID, RC, and AC, unpublished data). If these effects are confirmed, chloroquine would deserve to be tested against the H5N1 type A avian influenza virus, currently a matter of serious concern for public health.*

105.    In 2008, CQ was found to significantly decrease viral replication of HCoV-229E at concentrations lower than in clinical usage.[77] CQ affects the activation of p38 mitogen-activated protein kinase (MAPK) and extracellular signal-regulated kinase (ERK). p38 MAPK inhibitor, SB203580, inhibits CPE induced by HCoV-229E infection and viral replication. Inhibition of human coronavirus 229E infection in human epithelial lung cells (L132) by chloroquine: Involvement of p38 MAPK and ERK.

106.    In 2009 and 2014 there were three animal studies showing CQ efficacy. In 2014 there was also a CQ inhibits SARS-CoV, MERS-CoV, and HCoV-229E-GFP replication in the low-micromolar range.[78] Screening of an FDA-Approved Compound Library Identifies Four Small-Molecule Inhibitors of Middle East Respiratory Syndrome Coronavirus Replication in Cell Culture. Finally, in 2017 there was an important animal study that presented a method for quantification of HCQ in mouse blood and tissues. This shows a lung concentration significantly higher than other organs, and about 30 times the blood concentration.[79] Simultaneous

---

[77] Kono et al., Antiviral Research, 77:2, February 2008, 150-152, 10.1016/j.antiviral.2007.10.011 (Peer Reviewed) (In Vitro).

[78] de Wilde et al., Antimicrobial Agents and Chemotherapy, Jul 2014, 58:8, 4875-4884, doi:10.1128/AAC.03011-14 (Peer Reviewed) (In Vitro).

[79] Chhonker et al., Journal of Chromatography B, Analytical Technologies in the Biomedical and Life Sciences, 22 Nov 2017, 1072:320-327 doi:10.1016/j.jchromb.2017.11.026 (Peer Reviewed).

quantitation of HCQ and its metabolites in mouse blood and tissues using LC-ESI-MS/MS: An application for pharmacokinetic studies.

107.    The Plaintiffs provide the information contained in paragraphs 98 to 106 not to show that HCQ functions as a prophylaxis and a cure for COVID-19 (which it does as proven reviewing the now 194 studies, 129 peer reviewed *supra*).  This information is submitted only for the purpose of showing that given the state of mind and state of the research regarding HCQ and CQ in January 2020.  Based on information and belief, any reasonable "expert" in this space would have immediately suspected HCQ would be extremely efficacious, that it would be cheap, available, and safe and that it **would likely have prophylaxis and curative properties and had the potential of averting a pandemic**. In all likelihood, any reasonable expert would have no basis for having anything close to those expectations regarding Remdesivir that received lightning-fast FDA approval and is now the required FDA protocol drug.  In any event, it would be eminently reasonable for Facebook users like Plaintiffs to recognize the potential efficacy of HCQ, the dangerous and non-efficacious qualities of Remdesivir, and to want to engage in constitutionally protected free expression about these issues on the public square.

108.    In addition two NIH-NIAID physicians, Dr. Anthony Fauci and H. Clifford Lane,[80] M.D. share four patents involving Immunologic enhancement with intermittent interleukin-2 therapy.[81] Dr. Lane's curriculum vitae and his published works[82] reflects expertise on HIV, immune activation, ARD, etc. Dr. Fauci's publishing shows extensive overlap, with his

---

[80] https://www.niaid.nih.gov/research/clifford-lane-md?fbclid=IwAR0mQGT_cJdz0Ff1veiLDnmNlnprf5qhp7u4f9DtzGi1todp0WaW2pE1tp8 (last accessed Nov. 20, 2020)

[81] Id.

[82] https://www.sciencedirect.com/search?authors=clifford%20lane&show=100 (last accessed Nov. 20, 2020)

research  falling to vaccines.[83] Both are positioned well to comprehend the Covid-19 disease

state and the possible application of HCQ to it, but there is no research either seem to have done

on HCQ.[84] They are also leading experts on HIV, were well versed on Ebola and Remdesivir

trials,  and must have known in a theoretical sense at least, about HCQ's general anti-

inflammatory responses to cytokine storms among HIV patients and even its prophylaxis

qualities.[85] Based on information and belief they also knew about Remdesivir's shortcomings

and checkered past.

> **2. How did HCQ, a cheap, available drug that has safely treated 800 million people over 65 years under FDA approval since 1955--become a dangerous drug in less than a year with a laundry list of newly emerging and dangerous side effects?**

109.     Compared to the 2019 Drugs.Com innocuous description of HCQ,[86] its current

November 5, 2020 description[87] includes a scary cardiac warning:

---

[83] https://www.sciencedirect.com/search?authors=anthony%20fauci (last accessed Nov. 20, 2020).

[84] https://www.sciencedirect.com/search?qs=hydroxychloroquine&authors=clifford%20lane&show=100
https://www.sciencedirect.com/search?qs=hydroxychloroquine&authors=anthony%20fauci&show=100.

[85] Piconi, et. al, Hydroxychloroquine drastically reduces immune activation in HIV-infected, antiretroviral therapy–treated immunologic nonresponders, IMMUNOBIOLOGY| (SEPTEMBER 22, 2011) https://ashpublications.org/blood/article/118/12/3263/28846/Hydroxychloroquine-drastically-reduces-immune (last accessed Nov. 20, 2020).

[86] https://web.archive.org/web/20190207012311/https://www.drugs.com/hydroxychloroquine.html (last accessed Nov. 20, 2020).

[87] https://www.drugs.com/hydroxychloroquine.html (last accessed Nov. 20, 2020).

# Important Information

**Hydroxychloroquine can cause dangerous effects on your heart**, especially if you also use certain other medicines including the antibiotic azithromycin (Z-Pak). **Seek emergency medical attention if you have fast or pounding heartbeats and sudden dizziness (like you might pass out).**

110.   The December 2019 Wikipedia description of HCQ states that it was **built over 65 years**[88] and on the WHO's "List of Essential Medicines as the *safest and most effective* medicines needed in a health system (bold and italics added).  It references a longstanding, well known side effect of macular toxicity but people taking 400mg per day have negligible risk. Risks go up when doses are above 1,000 mg per day and when course of treatment exceeds 5 years.

111.   The October 25, 2020 Wikipedia HCQ description—**less than a year later** adds now a parade of scary side effects that spontaneously **erase history:**

Hydroxychloroquine, sold under the brand name **Plaquenil** among others, is a medication used to prevent and treat malaria in areas where malaria remains sensitive to chloroquine. Other uses include treatment of rheumatoid arthritis, lupus, and porphyria cutanea tarda. It is taken by mouth, often in the form of hydroxychloroquine sulfate.[2] Hydroxychloroquine is being studied to prevent and treat coronavirus disease 2019 (COVID-19), but all clinical trials conducted during 2020 found it is ineffective and may cause dangerous side effects.[3][4][5][6]

Common side effects may include vomiting, headache, changes in vision, and muscle weakness.[2] Severe side effects may include allergic reactions, vision problems, and heart problems.[2][7] Although all risk cannot be excluded, it remains a treatment for rheumatic disease during pregnancy.[8] Hydroxychloroquine is in the antimalarial and 4-aminoquinoline families of medication.[2]

Hydroxychloroquine was approved for medical use in the United States in 1955.[2] It is on the World Health Organization's List of Essential Medicines.[9] In 2017, it was the 128th most commonly prescribed medication in the United States, with more than five million prescriptions.[10][11] The speculative use of hydroxychloroquine for COVID-19 threatens its availability for people with established indications.[4]

---

88

https://web.archive.org/web/20200107234307/https://en.wikipedia.org/wiki/Hydroxychloroquine (accessed Nov 20, 2020).

## Adverse effects

The most common adverse effe[...] [tooltip: with chloroquine, hydroxychloroquine and azithromycin in the management of SARS-CoV-2 infection". *CMAJ*. **192** (17): E450–E453. doi:10.1503/cmaj.200528 . PMC 7207200 . PMID 32269021 .] ...common adverse effects include itching and headache.[4] The most serious adverse effects affect the [...] ...fter hydroxychloroquine use is discontinued.[2] Serious reported neuropsychiatric adverse effects [...] ...culty sleeping, hallucinations, psychosis, catatonia, paranoia, depression, and suicidal thoughts.[4] In rare situations, hydroxychloroquine has been implicated in cases of serious skin reactions such as Stevens–Johnson syndrome, toxic epidermal necrolysis, and Drug reaction with eosinophilia and systemic symptoms.[4] Reported blood abnormalities with its use include lymphopenia, eosinophilia, and atypical lymphocytosis.[4]

For short-term treatment of acute malaria, adverse effects can include abdominal cramps, diarrhea, heart problems, reduced appetite, headache, nausea and vomiting.[2] Other adverse effects noted with short-term use of Hydroxychloroquine include low blood sugar and QT interval prolongation.[3] Idiosyncratic hypersensitivity reactions have occurred.[4]

For prolonged treatment of lupus or rheumatoid arthritis, adverse effects include the acute symptoms, plus altered eye pigmentation, acne, anemia, bleaching of hair, blisters in mouth and eyes, blood disorders, cardiomyopathy,[3] convulsions, vision difficulties, diminished reflexes, emotional changes, excessive coloring of the skin, hearing loss, hives, itching, liver problems or liver failure, loss of hair, muscle paralysis, weakness or atrophy, nightmares, psoriasis, reading difficulties, tinnitus, skin inflammation and scaling, skin rash, vertigo, weight loss, and occasionally urinary incontinence.[2] Hydroxychloroquine can worsen existing cases of both psoriasis and porphyria.[2]

Children may be especially vulnerable to developing adverse effects from hydroxychloroquine.[2]

### Eyes

*Main article: Chloroquine retinopathy*

One of the most serious side effects is retinopathy (generally with chronic use).[2][16] People taking 400 mg of hydroxychloroquine or less per day generally have a negligible risk of macular toxicity, whereas the risk begins to increase when a person takes the medication over five years or has a cumulative dose of more than 1000 grams. The daily safe maximum dose for eye toxicity can be computed from a person's height and weight.[19] Macular toxicity is related to the total cumulative dose rather than the daily dose. Regular eye screening, even in the absence of visual symptoms, is recommended to begin when either of these risk factors occurs.[20]

| Chemical and physical data | |
| --- | --- |
| CAS Number | 118-42-3 ✓ |
| PubChem CID | 3652 |
| IUPHAR/BPS | 7198 |
| DrugBank | DB01611 ✓ |
| ChemSpider | 3526 ✓ |
| UNII | 4QWG6N8QKH |
| KEGG | D08050 ✓ |
| | C07043 ✓ |
| ChEBI | ChEBI:5801 ✓ |
| ChEMBL | ChEMBL1535 ✓ |
| CompTox Dashboard (EPA) | DTXSID8023135 |
| ECHA InfoCard | 100.003.864 ✓ |
| Formula | $C_{18}H_{26}ClN_3O$ |
| Molar mass | 335.88 g·mol⁻¹ |
| 3D model (JSmol) | Interactive image |
| SMILES | [show] |
| InChI | [show] |

✗✓ (what is this?)  (verify)

112. The October 25, 2020 Wikipedia HCQ description also included a frightening new political supplement:

### Misinformation versus science

Beginning in March 2020, US President Donald Trump began promoting hydroxychloroquine to prevent or treat COVID-19, citing small numbers of anecdotal reports.[48] Trump stated in June that he was taking the drug as a preventive measure,[49] stimulating unprecedented worldwide demand and causing shortages of hydroxychloroquine for its prescribed purpose of preventing malaria.[48]

After issuing an emergency use authorization for physicians to use the drug to treat hospitalized people with severe COVID-19 infection, the US Food and Drug Administration withdrew the authorization in June after finding hydroxychloroquine was unlikely to be effective and had serious side effects.[50] During ensuing months, additional studies found the drug was not effective.[51] and in late July, Anthony Fauci stated, "We know that every single good study — and by good study I mean randomized controlled study in which the data are firm and believable — has shown that hydroxychloroquine is not effective in the treatment of COVID-19."[6]

## Research

### COVID-19

*See also: Chloroquine § Chloroquine_and_COVID-19, Surgisphere § COVID-19, COVID-19 drug development § Chloroquine_and_hydroxychloroquine, COVID-19 drug repurposing research § Hydroxychloroquine, Trump administration communication during the COVID-19 pandemic § Chloroquine and hydroxychloroquine, and Didier Raoult § COVID-19*

There is no strong scientific evidence to support the use of hydroxychloroquine for preventing or treating coronavirus disease 2019 (COVID-19).[3][43][52][53] While its use is not approved by the FDA for COVID-19 treatment, from April to June 2020, there was an emergency use authorization for its use in the United States,[54] and it has been used off label for potential treatment of the disease.[55] On 24 April 2020, citing the risk of "serious heart rhythm problems", the FDA posted a caution against using the drug for COVID-19 "outside of the hospital setting or a clinical trial".[56] On 15 June, the FDA revoked its emergency use authorization, stating that it was "no longer reasonable to believe" that the drug was effective against COVID-19 or that its benefits outweighed "known and potential risks".[50][57][58][59]

On 29 May 2020, the European Medicines Agency (EMA) published a list of references of observational studies of chloroquine and hydroxychloroquine in people with COVID-19.[60]

A randomized, double-blind, placebo-controlled study of hydroxychloroquine in 821 participants found that it did not treat COVID-19 infection, although the study had limitations.[61][62] In June, use of hydroxychloroquine in the UK RECOVERY Trial was discontinued when an interim analysis of 1,542 treatments showed it provided no mortality benefit over 28 days to people hospitalized with severe COVID-19 infection.[51]

### Timeline

On 17 March 2020, Didier Raoult announced in an online video that a trial involving 24 patients from southeast France supported the claim that hydroxychloroquine and azithromycin were effective in treating for COVID-19.[63] On 20 March, he published a preliminary report of his study online in the *International Journal of Antimicrobial Agents*.[64] A later peer review found the study was "irresponsible."[65]

On 17 March 2020, the AIFA Scientific Technical Commission of the Italian Medicines Agency expressed a favorable opinion on including the off-label use of chloroquine and hydroxychloroquine for the treatment of COVID-19.[66]

During a press briefing on 19 March 2020, Donald Trump, the President of the United States, promoted the drugs chloroquine and hydroxychloroquine as a potential treatment for COVID-19.[67][68] Trump claimed that chloroquine had been "approved very, very quickly" by the US Food and Drug Administration (FDA) while discussing treatments for COVID-19. The FDA later said it had not given approval for the drug to be used in treatment of COVID-19.[69] but was now allowing chloroquine under



U.S. President Donald Trump says he has been taking hydroxychloroquine.

Show all

On 3 June 2020, the WHO announced it would resume its global trial of hydroxychloroquine, after its data safety monitoring committee found there was no increased risk of death for COVID-19 patients taking it.[92]

On 4 June 2020, an article about the treatment of COVID-19 patients using hydroxychloroquine with or without macrolides that had been published in *The Lancet* on 22 May 2020, was retracted by its authors. Before its retraction it had claimed that hospitalized COVID-19 patients treated with hydroxychloroquine or chloroquine (with or without a macrolide) did not benefit from the treatment, but instead were at greater risk of death. However, since its publication questions were raised about the accuracy of the data used in the article, prompting a third party review which resulted in the retraction of the article from the journal.[63][84][85]

On 5 June 2020, Peter Horby, Professor of Emerging Infectious Diseases and Global Health in the Nuffield Department of Medicine, University of Oxford, and chief investigator for a randomised trial on hydroxychloroquine, said: "the *RECOVERY Trial* has shown that hydroxychloroquine is not an effective treatment in patients hospitalised with COVID-19".[93]

On 15 June 2020, the FDA revoked the emergency use authorization for hydroxychloroquine and chloroquine.[50][94][56][59] The FDA also updated the fact sheets for the emergency use authorization of remdesivir, to warn that using chloroquine or hydroxychloroquine with remdesivir may reduce the antiviral activity of remdesivir.[95]

### 3. Plaintiffs hoped to use the social network to share information, and potentially life-saving health information with fellow Americans.

113.     On January 11, 2020, Moderna and Fauci's vaccine teams were already embedded after Stéphane Bancel, the company's CEO stated that: "[w]hen we started this back on Jan. 11, partnering with the team of Dr. Tony Fauci, we were hoping to get in the clinic in the summer." Phase I clinical trials started on March 16, 2020  and he later referenced working long days…and collaborating closely with the NIH and FDA.[89] Undoubtedly, the lightning-fast response for the development of a new vaccine that was unprecedented and that, even with record setting timeline economies, would deliver a solution long after it was needed, but was it needed?

114.     On January 13, 2020, France designated HCQ "poison" and removed it from all pharmacies. Quite a turnabout of events for the "indispensable WHO medication" that most readily available and among the safest drug that could be used to blunt or eliminate the pandemic immediately *because it had all the approvals*.

---

[89] What you need to know about four potential COVID-19 vaccines (May 12, 2020) https://thehill.com/policy/healthcare/public-global-health/497218-what-you-need-to-know-about-four-potential-covid-19-vaccines (last checked Dec 8, 2020).



115.    The next day the WHO began dispensing information that seemed to be erroneous to the Plaintiffs and based on Chinese disinformation propagated by the WHO. This was strange because it was the exact opposite advice one would expect and, if it is true, why was Dr. Fauci's team already developing a vaccine?



**3. Facebook, as an agent of government, and to protect its Special Immunities, ensured Plaintiffs could not collaborate and share information, and kept lifesaving "off patent" treatments from Americans.**

**a. While "off-patent" HCQ is tragically ignored, "on-patent" Remdesivir gets attention unwarranted by any efficaciousness claims.**

116.    Prior to the pandemic hitting the United States, Gilead Life Sciences touted that

"by working in collaboration with both academic institutions and U.S. government agencies,

[was] able to bring together disease experts to help expand knowledge of the antiviral profile of

Remdesivir against emerging viruses, including Ebola, SARS, Marburg, and MERS through in

vitro studies and in vivo studies in animal models. Testing of Remdesivir against the virus that

causes COVID-19 is ongoing. * * * * In January 2020, when a new pneumonia-like illness in

China was identified as a coronavirus, Gilead moved quickly to determine whether Remdesivir

could play a role in responding to the growing public health threat that subsequently became

known as COVID-19. Gilead's preclinical data suggested that testing Remdesivir against

COVID-19 should take place immediately." [90]

> • Gilead's team of virologists quickly generated the preclinical data to characterize Remdesivir's activity against the new COVID-19 virus and to determine the potential benefit of further testing.
>
> • In January 2020, Gilead provided Remdesivir to the China CDC to test the compound against isolates of the virus that causes COVID-19 through their independent antiviral assays. Gilead provided Remdesivir to U.S. academic institutions in February 2020 for similar testing. Results are expected soon.
>
> • In February 2020, Gilead began supporting multiple clinical trials to evaluate the safety and efficacy of Remdesivir as a potential treatment for COVID-19.

---

[90] Development of Remdesivir (Gilead Life Sciences)  https://www.gilead.com/-/media/gilead-corporate/files/pdfs/COVID-19/gilead_rdv-development-fact-sheet-2020.pdf (last visited Nov. 20, 2020).

> • Gilead donated study drug and provided scientific input
> for two clinical trials coordinated by the China-Japan
> Friendship Hospital in China, which began enrolling patients
> in early to mid- February.[91]

To its credit, and included in its promotional materials, Gilead admitted that Remdesivir had

performed poorly in an extensive Ebola study[92] and an Independent Monitoring Board had

suspended its use.[93]

117.    On February 4, 2020, pursuant to Section 564(b)(1)(C) of the Act, the Secretary

of the Department of Health and Human Services (HHS) determined that there is a public health

emergency that has a significant potential to affect national security or the health and security of

United States citizens living abroad, and that involves the virus that causes COVID-19.[94]

> **b.    The New England Journal of Medicine Rushes to Publish a Remdesivir
> "study" Based on One Remdesivir Patient, a French Study Vanishes, and
> NIH Rushes Remdesivir Trials**

118.    On the same day it was reported that Gilead's Remdesivir, ***based on the***

***experience of one patient in Seattle***, would enter trials for COVID-19 treatment,   "*Gilead*

*Sciences has partnered with Chinese health authorities to conduct a randomised Phase III*

---

[91]Id.

[92] Mulanga et. al, A Randomized, Controlled Trial of Ebola Virus Disease Therapeutics https://www.nejm.org/doi/full/10.1056/NEJMoa1910993 (last visited Nov. 20, 2020).

[93] Independent Monitoring Board Recommends Early Termination of Ebola Therapeutics Trial in DRC Because of Favorable Results with Two of Four Candidates, NIH (August 12, 2020) https://www.niaid.nih.gov/news-events/independent-monitoring-board-recommends-early-termination-ebola-therapeutics-trial-drc?fbclid=IwAR1g64OWc9l4UyWX4rXzAU4kPGBiUvVTx4VjwUYYpGaVrFSehVmz1-jzu0Q.

[94]  85 FR 7316; 7316-7317 Document 2020-02496 https://www.federalregister.gov/documents/2020/02/07/2020-02496/determination-of-public-health-emergency (last visited Nov. 20, 2020).

*clinical trial to assess the use of antiviral drug candidate Remdesivir(GS-5734)*[95] for the potential treatment of coronavirus (italics added). The company originally developed the drug to treat the Ebola virus, but it was found to be ineffective. It's clear why its claimed that preclinical tests have revealed that the drug may help treat the new 2019-nCoV virus.[96]

119.   From January 24 to March 4, 2020 a Remdesivir study began in France with *extremely poor results* that were not published until June 26, 2020.[97] At best we can say this negative Remdesivir experience received little attention.

120.   On March 5, 2020, NEJM rushed "First Case of 2019 Novel Coronavirus in the United States" to print.[98]  Although Dr. Fauci and others made calls for randomized, double blind studies in the case of HCQ—*that had full FDA approvals for decades—* a quickly published paper in NEJM based on one patient's experience, seemed to serve as a clarion call to form up around this untested drug. There was "no antiviral data for Remdesivir that show[ed] activity against 2019-nCoV at this time…."[99]

### c.  Lackluster China Remdesivir Studies Suspended or Aborted Reducing Statistical Power

---

[95] https://www.gilead.com/news-and-press/press-room/press-releases/2020/2/gilead-sciences-initiates-two-phase-3-studies-of-investigational-antiviral-remdesivir-for-the-treatment-of-covid-19 (Feb 26, 2020)(last visited Nov. 20, 2020.

[96] https://www.clinicaltrialsarena.com/news/company-news/gilead-coronavirus-Remdesivir-trial/ (last visited Nov. 20, 2020).

[97] Dubert, et. al, Case report study of the first five COVID-19 patients treated with Remdesivir in France, IJID, June 26, 2020. https://www.sciencedirect.com/science/article/pii/S1201971220305282 (last visited Nov. 11, 2020)

[98] Holshue et. al, First Case of 2019 Novel Coronavirus in the United States, NEJM (January 31, 2020) https://www.nejm.org/doi/full/10.1056/NEJMoa2001191 (last visited Nov. 11, 2020).

[99] https://www.clinicaltrialsarena.com/news/company-news/gilead-coronavirus-Remdesivir-trial/ (last visited Nov. 20, 2020).

121.    Also in January 2020, the first randomized, placebo-controlled, double-blind

study in severe COVID-19 was released, (NCT04257656)[100] In the efficacy analysis, time to

clinical improvement was similar between groups (median 21 days in the Remdesivir group

versus 23 days with placebo; hazard ratio [HR]: 1.23 [95% confidence interval (CI): 0.87–1.75]).

Mortality at 28 days was also similar between groups (22 [14%] died in the Remdesivir group

versus 10 [13%] with placebo). SARS-CoV-2 RNA loads were not reduced with Remdesivir

compared to placebo. *The trial was suspended*. As such, suspension permitted the statistical

power to be reduced from a planned 80% to 58%, and the study remained inconclusive.

122.    On February 5, 2020, a phase 3 randomized, quadruple-blind, placebo-controlled

clinical trial was registered at Capital Medical University, with the goal to determine safety and

efficacy of Remdesivir in patients with mild to moderate SARS-CoV-2 infection

(NCT04252664). *This study was cancelled*.[101]

**d.      Remdesivir Trials Flop, yet Top CDC Officials Focus on Remdesivir and Vaccines with No Mention of HCQ**

123.    On February 13, 2020, the WHO was notified by International Research Affairs,

NIH National Institute of Allergy and Infectious Diseases (NIAID), that Dr. Lane would not be

accompanying a mission to China because he was "in transit to Japan where he has been asked to

assist with rapid implementation of a study of the drug Remdesivir as a therapeutic intervention

---

[100] Wang Y, Zhang D, Du G, et al. Remdesivir in adults with severe COVID-19: a randomised, double-blind, placebo-controlled, multicentre trial. Lancet. 2020 doi: 10.1016/S0140-6736(20)31022-9; https://clinicaltrials.gov/ct2/show/NCT04257656 (last visited Nov. 20, 2020).
[101] ClinicalTrials.gov. Mild/Moderate 2019-nCoV Remdesivir RCT. https://clinicaltrials.gov/ct2/show/NCT04252664.

for COVID-19, within the context of the current cases in that country." The WHO was notified that "[d]ue to the importance of this study, Dr. Lane may not be available to participate in the WHO Mission."[102]

124.    On February 19, 2020, the WHO's Micheal J. Ryan scoped the international experts' meetings forming up Coronavirus response. From the outset, the pandemic was a means to further vaccine development and policy:

> *Dear colleagues*
> *I have updated the Issues for your consideration and input today. Your views on:*
>
> *1. What is your view on the latest epidemiology on virus transmission and severity in affected countries?*
> *2. In your view should "Containment" remain the core response goal at this stage?*
> *3. What data will be critically needed from affected countries in order to guide decisions on response strategy?*
> *4. What are the emerging issues/challenges across domains that you see as important?*
> *5. How can we ensure speed of action/implementation and financing of three major pillars that require funding;*
> > *a. National preparedness in countries with high risk/vulnerability*
> > *b. The broad range R&D priorities identified at the recent R&D Blueprint meeting in Geneva*
> > *c. Prioritization, development, testing, scale up and equitable access of vaccines?[103]*
> *6. What should be the priorities for the 1-2 weeks?*
>
> *7. Any other Issues you see as important?*

---

[102] https://www.judicialwatch.org/wp-content/uploads/2020/10/DCNF-v-HHS-Production-Oct-2020-01149.pdf (page 23). This decision seems to have been overruled by Dr. Fauci. "With respect to the email below, which you may have seen, I just talked to Dr. Fauci and there must have been some communication mix up about Cliff (Dr. Lane). **Cliff Lane is absolutely going to China as part of the WHO team (if invited).**" (bold in original, Id. at p. 22) (last visited Nov. 20, 2020).
[103] https://www.judicialwatch.org/wp-content/uploads/2020/10/DCNF-v-HHS-Production-Oct-2020-01149.pdf (highlight added, page 8) (last visited Nov. 20, 2020).

125.    Based on information and belief, WHO, CDC, FDA and NIAD had a pandemic for which it had a likely prophylaxis and vaccine in the form of HCQ. Instead, they focused on Remdesivir that had failed after extensive testing for Ebola, failed in China, and was failing in France. Moreover, the opportunity COVID-19 afforded to the development of vaccines and vaccine policy caused less invasive options to be withheld from top elected officials. These options included early intervention with drugs like HCQ and Ivermectin that could have significantly blunted or even averted the pandemic.

### e. Facebook Agrees to an Official Truth Policy to Appease its Government Overseers

126.    On February 14, 2020, amidst a flurry of informal reports that the White House is unhappy with the WHO, Defendant Zuckerberg, at a meeting attended by Facebook, Amazon, Twilio, Dropbox, Alphabet's Google, Verizon, Salesforce, Twitter and YouTube reach a consensus regarding "WHO shared information with the group about its response to the coronavirus:"

> *The major topic of discussion was how the companies are working down to tamp down the spread of misinformation.* WHO's Andy Pattison, who flew to Silicon Valley for the event, said the "tone is changing," as Big Tech is now starting to step up to combat fake news about the coronavirus. Pattison said he *offered at the meeting to help the companies fact check* information they or their users post, rather than relying on third parties. [104]

127.    On March 5, 2020, Defendant Zuckerberg announced that he was providing "unlimited" free advertising to WHO. "We're giving the world health organization as many free ads as they need for their Coronavirus response along with other in-kind support," stated Zuckerberg. No concern was expressed that this might increase panic.

---

[104] Facebook, Amazon, Google and more met with WHO to figure out how to stop coronavirus misinformation (Jan. 23, 2020) https://www.cnbc.com/2020/02/14/facebook-google-amazon-met-with-who-to-talk-coronavirus-misinformation.html (last visited Nov. 20, 2020).

Now all the users world health organization will search on Facebook about the deadly disease will get a pop-up that will direct the readers to the WHO website. It will promote the right information, and the misinformation spread about the disease will be controlled. Apart from it, Mark Zuckerberg also ensured that they would take appropriate actions to remove hoax or misleading information related to Covid19." [105]

128.   On March 13, 2020, Facebook announced it was making a $10 million payment to the CDC.[106]  This followed another $10 million "donation.[107]

129.   Based on information and belief these issues regarding "misinformation" and WHO control of the pandemic response was discussed by Defendant's with members of Congress Congressman Schiff and other members of Congress on an on-going basis and was a method for receiving direction, maintaining control and censorship of the public square.[108]

130.   On March 17, 2020, a day after reporting Facebook was funding the CDC, it was reported that the U.S. government and the tech industry, including Facebook, was discussing ways to use smartphone location data to combat coronavirus.  The U.S. government was in active talks with Facebook, Google and a wide array of tech companies and health experts about how they can use location data gleaned from Americans' phones to combat the novel coronavirus,

---

[105] Mark Zuckerberg gives Free WHO Ads about Coronavirus on Facebook (Mar. 2, 2020) https://streakshot.com/technology/mark-zuckerberg-gives-free-who-ads-about-coronavirus-on-facebook (last visited Nov. 20, 2020).

[106] Facebook Twitter https://twitter.com/Facebook/status/1238497232237686785?s=20 (Mar. 13, 2020) (last visited Nov. 20, 2020).

[107] In October, it was reported that Defendant Zuckerberg and his wife paid $350 million to the Center for Tech and Public Life that provided funding for "get out the vote" efforts in key battleground states and significantly benefited the DNC.$10 million of these funds went to Philadelphia and Pennsylvania. Zuckerberg Drops an Additional $100 Million into 'Safe Elections' Project that Looks Like a Democrat GOTV Effort (Oct. 18, 2020). https://www.breitbart.com/2020-election/2020/10/18/zuckerberg-drops-additional-100-million-safe-elections-project-looks-like-democrat-gotv-effort/ (last visited Nov. 20, 2020)

[108]  Dozens of Facebook lobbyists tied to members of Congress, investigation shows (Nov. 20, 2019) https://www.theguardian.com/technology/2019/nov/20/dozens-of-facebook-lobbyists-tied-to-members-of-congress-investigation-shows  (last visited Dec 3, 2020).

including tracking whether people are keeping one another at safe distances to stem the

outbreak.[109]

    131.    On March 27, 2020, it was announced that Mark Zuckerberg was teaming with

Bill Gates (Gates Foundation) to try to find a drug to treat COVID-19.[110]

> *The $25 million from Zuckerberg could help develop a drug for a virus that currently has no cure and lacks a vaccine, despite scientists' urgent global effort to develop both. Philanthropists are hoping to either create and distribute a new treatment alongside pharmaceutical companies, or to repurpose an existing drug, even one that may already have regulatory approval…. It's not known what types of treatments exactly the Gates-Zuckerberg push will test.* ***Some leaders in the tech community, such as Larry Ellison, have tried to push unproven drugs for treating COVID-19, such as chloroquine and HCQ, that have been used to treat malaria. Gates has said that his team has been studying these but had not yet decided.*** *(emphasis added).*

    132.    On March 30, 2020, WHO launched COVID-19 health alert service with

Facebook and WhatsApp that basically converted the public square  from "crowdsourcing the

truth," into an "official truth platform" under definitions and standards imposed by international

government bodies. The WHO and CDC launched the world on its latest foray into incompetent,

conflicting and often wrong advice regarding masks:

> *Protecting healthcare workers.* ***Don't use masks*** *unless you are caring for a sick person at home, to allow critical equipment to be used by the right people. Stick to local guidelines to avoid spreading the virus and putting additional pressures on the healthcare system.*
>
> \*\*\*\*

---

[109] U.S. government, tech industry discussing ways to use smartphone location data to combat coronavirus  (March 17, 2020) https://www.washingtonpost.com/technology/2020/03/17/white-house-location-data-coronavirus/.

[110] Mark Zuckerberg is teaming up with Bill Gates to try to find a drug to treat coronavirus (Mar. 27, 2020) https://www.vox.com/recode/2020/3/27/21196421/coronavirus-mark-zuckerberg-priscilla-chan-drug-treatment-bill-gates-zuckerberg-initiative (last visited Nov. 20, 2020).

*Multiple vaccines are in development, according to WHO officials, and the first trials have begun just 60 days after the genetic sequence was first shared by China. Officials warned, however, that it would be some time before the vaccine could be fully distributed. It must be properly tested and deemed safe, for one. But then, as Ryan noted, it must be manufactured and distributed at scale so everyone has access. "The world is not protected until everyone is protected". he said (italics provided).* [111]

### f. HCQ was Universally Cited as a Treatment Protocol until Supported by President Trump

133.     To understand the Presidential tweet that put the Plaintiffs and their quest to determine truth at odds with Facebook and its government overseers, one must understand that the tweet just expressed actual, uncorrupted conventional expertise, albeit suppressed expertise. Indeed, the week prior, the WHO had sensibly issued a treatment protocol oriented around HCQ:

---

[111] WHO launches COVID-19 health alert service with Facebook and WhatsApp - Updates from Friday's WHO briefing (Mar 20, 2020) https://www.weforum.org/agenda/2020/03/whatsapp-facebook-health-service-coronavirus-fridays-who-briefing/ (last visited Nov. 20, 2020).



Please see the World Health Organization Interim Guidance for Clinical management of severe acute respiratory infection (SARI) when COVID-19 disease is suspected (last updated March 13, 2020).

134.    Prior to that, on March 13, 2020, James M. Todaro, MD, and Gregory J. Rigano, penned An Effective Treatment for Coronavirus (COVID-19). This paper was widely credited (or blamed) for proposing chloroquine and hydroxychloroquine as an effective treatment against COVID-19. Based on information and belief, someone, perhaps Google, "memory holed" this document and it was eventually blocked by Google on March 20, 2020. [112]

_____

[112] Google Removed Key Papers and Videos on HCQ, Science Defies Politics July 2, 2020 https://defyccc.com/google-deleted-covid19-cure-paper/ (last checked Dec 6, 2020). Based on information and belief, the undersigned attorney stumbled on strange data anomalies of unknown origin and purpose: "hydroxychloroquine" and "hydroxychloroquine and coronavirus" around Google searches. To safeguard this information, we provide link to a safely stored adobe

135.     Google's YouTube also removed Didier Raoult's presentation of his HCQ+AZM treatment, published on YouTube on March 16, and embedded in the website of the medical institute which he heads. The video was removed by March 29 with the message "Video unavailable. This video contains content from Canal Plus, who has blocked it on copyright grounds." It had accumulated more than 1.4 million views before that.[113]

136.     YouTube removed other videos about Hydroxychloroquine based COVID-19 treatment.[114] The Effective Treatment for Coronavirus paper (as updated by March 18) cited the successful use of chloroquine in China and hydroxychloroquine in South Korea for COVID-19 patients, in vitro experiments by Didier Raoult's IHU, and CDC publications.  Google blocked access to and/or deleted this paper on March 20, 2020 – the day after President Trump mentioned chloroquine as potentially effective drug against COVID-19. When Trump spoke, at least one significant clinical trial of HCQ+AZ for COVID-19 was completed. The reporting article (Hydroxychloroquine and azithromycin as a treatment of COVID-19: results of an open-label non-randomized clinical trial  by Philippe Gautret et al., Didier Raoult's IHU) has been peer reviewed and accepted by the prestigious International Journal of Antimicrobial Agents. President Trump or his advisors probably knew about this paper.[115]

137.   On March 20, 2020, in a press conference Plaintiffs cite as a moment when they suspected systemic corruption, Dr. Fauci engaged in faint praise of HCQ:[116]

---

PDF of the information. It seems to show almost impossible lack of interest in the United States regarding the HCQ prophylaxis and cure.
[113] Id.
[114] Id.
[115] Id.
[116] https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-c-oronavirus-task-force-press-briefing/ (last visited Nov. 20, 2020)

THE PRESIDENT:  We're not so far away, I'll tell you.  We're not very - we're not very far away.

Q    And to Dr. Fauci A, if I could.  Dr. Fauci - this was explained yesterday - there has been some promise with [Hydroxychloroquine] as potential therapy for people who are infected with coronavirus.  Is there any evidence to suggest that, as with malaria, it might be used as a prophylaxis against COVID-19?

DR. Fauci A:  No.  **The answer is no.  And the evidence that you're talking about, John, is anecdotal evidence.  So as the Commissioner of FDA and the President mentioned yesterday, we're trying to strike a balance between making something with a potential of an effect to the American people available, at the same time that we do it under the auspices of a protocol that would give us information to determine if it's truly safe and truly effective. But the information that you're referring to specifically is anecdotal; it was not done in a controlled clinical trial.  So you really can't make any definitive statement about it.**

THE PRESIDENT:  I think, without saying too much, I'm probably more of a fan of that than - maybe than anybody.  But I'm a big fan, and we'll see what happens.  And we all understand what the doctor said is 100 percent correct.  It's early.  But we've - you know, **I've seen things that are impressive.  And we'll see.  We're going to know soon.  We're going to know soon - including safety. But, you know, when you get to safety, this has been prescribed for many years for people to combat malaria, which was a big problem.  And it's very effective.  It's a strong - it's a strong drug.  So we'll see.**

Q    **It was also fairly effective against SARS.**

THE PRESIDENT:  **It was a very - it was, as I understand that.  Is that a correct statement - it was fairly effective on SARS?**

DR. Fauci A:  **John, you've got to be careful when you say "fairly effective."  It was never done in a clinical trial.  They compared it to anything.  It was given to individuals and felt that maybe it worked.  So -**

Q    But was there anything to compare it to?

DR. Fauci A:  Well, that's the point.  Whenever you do a clinical trial, you do standard of care versus "standard of care plus the agent you're evaluating.  That's the reason why we showed, back in Ebola, why particular interventions worked.

Q    Mr. President, about the possible therapies yesterday, Mr. President, you said that they were for, quote, "immediate delivery."  Immediate.  We heard it from doc- -

THE PRESIDENT:  **Yeah, well, we were ordering - yes, we have millions of units ordered. Bayer is one of the companies, as you know.  A big company.  A very big, very great company. Millions of units are ordered, and we're going to see what happens.  We're going to be talking to the governors about it, and the FDA is working on it right now.**

*The advantage is that it has been prescribed for a totally different problem, but it has been described [sic] for many years, and everybody knows the levels of - the negatives and the positives.  But I will say that I am a man that comes from a very positive school when it comes to, in particular, one of these drugs.*  And we'll see how it works out, Peter.

*I'm not - I'm not saying it will, but I think that people may be surprised.  By the way, that would be a game changer.  But we're going to know very soon.  But - but we have ordered millions of units.  It's being ordered from Bayer, and there is another couple of companies also that do it.*

*Q    For clarity, Dr. Fauci A said there is no magic drug for coronavirus right now, which you would agree.  I guess, on this issue then -*

*THE PRESIDENT:  Well, you know, I think we only disagree a little bit.*

*Q    - so let me just ask, though: Is it possible that - sorry.*

*THE PRESIDENT:  I disagree.  Maybe and maybe not.  Maybe there is, maybe there isn't.  We have to see.  We're going to know.  We're going to know soon….*

*We're going know very soon.  And I can tell you the FDA is working very hard to get it out.  Right now, in terms of malaria, if you wanted, you can have a prescription.  You get a prescription.  And by the way - and it's very effective.  It works.*

On March 21, 2020, President Trump tweeted about HCQ:



138.    On March 22, a video about Dr. Zelenko and his HCQ+AZM+Zn treatment for COVID-19 was posted on YouTube. It was removed within a couple of weeks "for violating community standards."[117]

_____

[117] Id.

139.    To evaluate the President's and Dr. Fauci's read on the current state of the

research, there remain snapshots in the public record that memorialize how reasonably

competent and unconflicted infectious disease physicians were evaluating the state of the

evidence. For instance, a March 26, 2020 PowerPoint by Dr. Ryan Dare, Infectious Diseases at

University of Arkansas (UAMS) compared HCQ and Remdesivir on slides 39-51. At that time,

HCQ and Remdesivir are already in the UAMS COVID-19 protocol (slide 60) and you can see

the HCQ and Remdesivir comparison on page 61. Remdesivir causes liver failure and HCQ

rarely causes eye issues, stomach issues and a heart side effect. [118]

140.    This heart side effect emerged out of thin air and three days later, on March 29,

2020, the American College of Cardiology issued "Ventricular Arrhythmia Risk Due to

Hydroxychloroquine-Azithromycin Treatment For COVID-19." [119] The paper, in a way that was

immensely helpful to Remdesivir and vaccine champions, evaluated unreasonable heart

concerns, [120] split COVID-19 patients into in-patient and out-patient classes, and recommended

that HCQ be restricted to a clinical trial setting or heavy monitoring to be imposed. In the

absence of clinical data or research studies that reflected a legitimate coronary concern, this

"research paper" paved the way for mass death and provided cover for corrupt taxpayer funded

---

[118] Ryan Dare, MD, COVID-19 Pandemic: What We Know to Date
(Mar 26, 2020) https://uamshealth.com/coronavirus/wp-
content/uploads/sites/13/2020/03/COVID-GR-032620.pdf (last visited Nov. 20, 2020)
      [119] https://www.acc.org/latest-in-cardiology/articles/2020/03/27/14/00/ventricular-
arrhythmia-risk-due-to-hydroxychloroquine-azithromycin-treatment-for-covid-19 (last visited
Nov. 24, 2020)
      [120] Enclosed is a list of well over 100 drugs that cause prolong QT that received little or
no press attention during the same time period
https://crediblemeds.org/pdftemp/pdf/CombinedList.pdf

experts to sabotage HCQ [121] based on illusory coronary concerns when, in reality, the concern

was only documented in rare cases involving long term HCQ use and in overdosing of HCQ. [122]

141.    A 2016 paper (prior to the research record being corrupted to promote

Remdesivir) describes just how rare cardiac events were in regard to the use of HCQ. [123] It was

one case study in continual use for two years for Lupus Erythematosus:

> The patient had been treated with Hydroxychloroquine for two years prior to
> presentation." The patient already had mild QT prolongation which was caused by
> withdrawing HCQ and adding another drug, after the patient had taken 200-400 mg once
> or twice per day for two years:
> *The decrease in QT interval observed in this patient is likely multifactorial due to
> discontinuation of the offending agent HCQ and the use of mexiletine. Mexiletine is a
> class IB antiarrhythmic that acts by blocking sodium channels shortening the plateau
> phase of the myocardial action potential thereby hastening repolarization rates with
> resultant shortening of QT interval duration.*

For purposes of display, to lay out the historical record in this court filing and to drop

breadcrumbs for any taxpayer funded investigative agency that is still committed to rooting out

research fraud: prophylaxis HCQ treatments typically may involve only 200-400 mg HCQ per

week. Treatment protocols on first Covid-19 symptoms total 1,200 mg over 5 days.  Based on

information and belief, this cardiac issue that was inflamed beyond all recognition was not the

medical concern driving the attention. The medical concern was HCQ's ability to prevent the

---

[121] Ventricular Arrhythmia Risk Due to Hydroxychloroquine-Azithromycin Treatment For COVID-19 (Mar 26, 2020) https://www.acc.org/latest-in-cardiology/articles/2020/03/27/14/00/ventricular-arrhythmia-risk-due-to-Hydroxychloroquine-azithromycin-treatment-for-covid-19 (last visited Nov. 20, 2020)

[122] Long QT and Hydroxychloroquine; A Poorly Recognised Problem In Rheumatology Patients, American College of Rheumatology (2013) https://acrabstracts.org/abstract/long-qt-and-Hydroxychloroquine-a-poorly-recognised-problem-in-rheumatology-patients/ (last visited Nov. 20, 2020)

[123] Life Threatening Severe QTc Prolongation in Patient with Systemic Lupus Erythematosus due to HCQ Case Reports in Cardiology (2016) https://www.hindawi.com/journals/cric/2016/4626279/ (last visited Nov. 20, 2020)

virus or immediately shed the virus and it was used as a pretext to deny Americans life-saving drugs.

142.     On March 23, 2020, Rick Bright PhD, the director of Biomedical Advanced Research and Development (BARDA), received notice that Secretary Azar was directing BARDA to establish a Nationwide Expanded Access Investigational New Drug (IND) protocol for CQ/HCQ. This was for an aggressive program of physician-directed early outpatient use of HCQ shown by multiple studies to bring a COVID-19 outbreak under some degree of control.

143.     The following day, March 24, 2020, Janet Woodcock MD, FDA's Director of the Center for Drug Evaluation and Research, in direct violation of the COVID-Task Force Directive issued by Secretary Azar, recommended that BARDA submit an application for an EUA instead of an Expanded Access IND protocol. Based on information and belief this was highly unusual behavior and Woodcock and Bright drafted and submitted this filing to the FDA.

144.     On March 25, 2020, with both China Remdesivir tests sidelined, an NIH clinical trial began enrolling hospitalized adults with COVID-19 in Nebraska. "We urgently need a safe and effective treatment for COVID-19. Although Remdesivir has been administered to some patients with COVID-19, we do not have solid data to indicate it can improve clinical outcomes," said NIAID Director and U.S. Coronavirus Task Force member Anthony S. Fauci, M.D. "A randomized, placebo-controlled trial is the gold standard for determining if an experimental treatment can benefit patients." [124]

g.     **President Trump Raises Official Concerns about WHO**

---

[124] www.National Institutes of Health.gov/news-event s/news-releases/nih-clinical-trial-Remdesivir-treat-COVID-19-begins (last visited Nov. 20, 2020).

145.    On March 26, 2020, President Trump publicly aired concerns about the WHO.[125]

That same day, Brigham and Women's Hospital, the sponsoring research institution for the

subsequently withdrawn *Lancet* HCQ research fraud study, announced:

> This week, Brigham and Women's Hospital began enrolling patients in two clinical trials
> for Gilead's antiviral medication *Remdesivir*. The Brigham is one of multiple clinical trial
> sites for a Gilead-initiated study of the drug in 600 participants with moderate
> coronavirus disease (COVID-19) and a Gilead-initiated study of 400 participants with
> severe COVID-19.[126]

146.    On March 27, 2020, the Secretary of HHS declared that circumstances exist

justifying the authorization of emergency use of drugs and biologics during the COVID-19

outbreak, pursuant to section 564 of the Act, subject to terms of any authorization issued under

that section.[127]


147.    On March 28, 2020, FDA authorized the emergency use of HCQ and chloroquine

supplied from the Strategic National Stockpile to treat adults and adolescents who weigh 50 kg

or more and are hospitalized with COVID-19 for whom a clinical trial is not available, or

participation is not feasible.[128]

---

[125] WHO 'very much' sided with China on coronavirus: Donald Trump (March 26, 2020)
https://economictimes.indiatimes.com/news/international/world-news/who-very-much-sided-with-china-on-coronavirus-donald-trump/articleshow/74824311.cms?from=mdr (last visited Nov. 20, 2020).

[126] TWO REMDESIVIR CLINICAL TRIALS UNDERWAY AT BRIGHAM AND WOMEN'S HOSPITAL https://archive.is/ATkFJ  (last visited Nov. 20, 2020).

[127] 85 FR 18250, 18250-18251 2020-06905
https://www.federalregister.gov/documents/2020/04/01/2020-06905/emergency-use-authorization-declaration (last visited Nov. 20, 2020).

[128] Pharmacovigilance Memorandum (March 19, 2020)
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2020/OSE%20Review_Hydroxychloroquine-Cholorquine%20-%2019May2020_Redacted.pdf (last visited Nov. 20, 2020).

148.    On March 29, 2020, the FDA (Woodcock's Division) issued its EUA for CQ/HCQ. The EUA stated that "hospitalized patients were likely to have a greater prospect of benefit (compared to ambulatory patients with mild illness)." The data showed that the exact opposite was true. This was a mistake that would soon destroy the lifesaving outpatient use of HCQ as part of the National Pandemic Plan. The FDA had grossly overstepped the available clinical data when it issued its EUA. HCQ should be given within the first 4-5 days of the first onset of symptoms to outpatients, not hospitalized patients in the more severe secondary phase of COVID. South Korea had discovered this **in mid-February** and they **knew this in China** and **France**.

149.    According to his own whistleblower complaint, Dr. Bright, although not a physician or an epidemiologist, had expressed his indignation because of his exclusion from the decision-making process for HCQ. Unauthorized, he went to the press where he explained his inaccurate views of HCQ and its side effects. His whistleblower complaint is a tragic recounting of how countless Americans were culled as he obstructed efforts to save lives through early use CQ and HCQ. This included packing COVID-19 victims in nursing homes in New York and New Jersey by misled governors

---

*... Bright sounded the alarm about the shortage of critical supplies, such as masks, respirators, swabs, and syringes that were necessary to combat COVID-19. In response, HHS political leadership leveled baseless criticisms against him and sidelined him because of his insistence that the Trump administration address these shortages and invest in vaccine development as well. Dr. Bright continued to speak out about the inevitable devastation that would be wrought by this virus at a time President Trump and his administration were intentionally lying to the American people about the serious threat posed by COVID-19 to the public health and safety. Dr. Bright refused to be silenced by the retaliation to which he was subjected and continued to be an outspoken critic of the Administration's response to the pandemic. He vociferously objected to the Administration's insistence that BARDA fund chloroquine and hydroxychloroquine, potentially dangerous drugs that were recklessly promoted as a panacea by those with political connections and by President Trump himself. Within days of Dr. Bright opposing the broad use of these drugs because they lack scientific*

> *merit, and within days of objecting to the Trump administration's plan to "flood" New York and New Jersey with these drugs, Secretary Azar removed Dr. Bright as BARDA ....*[129]

Throughout April, numerous studies showing the positive effects of HCQ in COVID continued to be published and suppressed in large part with the assistance of Facebook and Defendant Zuckerberg who was developing a drug in competition to HCQ. So now Zuckerberg kept people away from the cure to protect his Special Immunities and to eliminate a competitor to a new COVID-19 drug he was developing.[130]

150.     On April 3, 2020, Dr. Fauci appeared on a news program and continued plugging Remdesivir while he plunged a dagger deep into the life-saving potential of HCQ and kept strangely silent on off-patent solutions like famotidine, ivermectin, zinc or Vitamin D that he knew keep patients out of hospitals:

> *That was not a very robust [Hydroxychloroquine] study, replied Fauci, a member of the White House coronavirus task force. He also pointed out that while there's still a possibility of a "beneficial effect," the scale and strength of the evidence is not "overwhelmingly strong."*
>
> *But getting back to what you said just a moment ago that 'X percent'—I think you said 37 percent—of doctors feel that it's beneficial. We don't operate on how you feel. We operate on what evidence is, and data is," he continued. "So although there is some suggestion with the study that was just mentioned by Dr. Oz—granted that there is a suggestion that there is a benefit there—I think **we've got to be careful that we don't make that majestic leap to assume that this is a knockout drug**[131]*

---

[129] THIRD ADDENDUM TO THE COMPLAINT OF PROHIBITED PERSONNEL PRACTICE AND OTHER PROHIBITED ACTIVITY BY THE DEPARTMENT OF HEALTH AND HUMAN SERVICES SUBMITTED BY DR. RICK BRIGHT https://int.nyt.com/data/documenttools/rick-bright-complaint-addendum/396e3155e456d727/full.pdf (last visited Nov. 20, 2020).
[130] Id.
[131] Dr. Fauci Shuts Down 'Fox & Friends' on Coronavirus Cure: 'We Don't Operate on How You Feel' https://www.thedailybeast.com/dr-fauci-shuts-down-fox-and-friends-on-coronavirus-cure-says-we-dont-operate-on-how-you-feel To plaintiffs this was a bizarre pattern

151.   Plaintiffs took President Trump's March positive statement about HCQ with great optimism. U.S. doctors' prescriptions peaked in March 2019 at ~230,000.[132] Plaintiffs immediately recognized the corrosive effect governmental "experts" had as a host of measures were unleashed through fraud and artifice to make the life-saving drug HCQ rare and inaccessible.

FIGURE 2. Estimated new retail prescriptions of hydroxychloroquine or chloroquine dispensed, by prescriber category* — United States, January–June, 2019–2020



---

of behavior. US public health agency officials must have known about zinc (https://www.who.int/elena/titles/zinc_pneumonia_children/en/) and to his day we only see Fauci making a passing reference to Vitamin D (https://www.cnbc.com/2020/09/14/supplements-white-house-advisor-fauci-takes-every-day-to-help-keep-his-immune-system-healthy.html) There may be a reasonable explanation for these anomalies, but that's the point of government protecting the public square from monopoly. Dr. Fauci himself seems to have made his own "majestic leap" for Remdesivir. (prior links last visited Nov. 20, 2020)
      [132] Hydroxychloroquine and Chloroquine Prescribing Patterns by Provider Specialty Following Initial Reports of Potential Benefit for COVID-19 Treatment — United States, January–June 2020 (Sep 20, 2020)
https://www.cdc.gov/mmwr/volumes/69/wr/mm6935a4.htm#suggestedcitation (last visited Nov. 20, 2020)

152.    On February 28, 2020, an editorial was released by CDC and NIAD in the NEJM

entitled "COVID-19 — Navigating the Uncharted," authored by Dr. Fauci, among others. [133] The

editorial stated: "… the overall clinical consequences of COVID-19 may ultimately be more akin

to those of a severe seasonal influenza." The authors, who included Dr. Fauci, stated that

influenza has a case fatality rate (CFR) of approximately 0.1 percent. One person in a thousand

who gets it badly, dies. But based on information and belief, the quoted CFR for influenza *was*

*ten times too low* – the authors meant to reference the Infection Fatality Rate (IFR) of common

influenza was 0.1 percent and mistakenly referenced CFR. This was their fatal – quite literally –

mistake.  The mistake was compounded.

153.    On March 3, 2020, the WHO's Dr. Tedros Adhanom Ghebreyesus referenced a

COVID-19 death rate of 3.4%. This dramatic overstatement dovetailed with Dr. Fauci's

overestimate and undoubtedly fostered panic in Congress and among state elected officials and it

forced a controversial shutdown.  Eventually, the WHO belatedly reversed itself on the need for

a shutdown. [134] The panic that the WHO promoted made it virtually impossible for any

responsible voices to consider the significant health costs and deaths from other causes that

would be caused by a shut down.

154.    On March 11, 2020, Dr. Fauci and other experts went to Congress, stating that

COVID-19's CFR was likely to be about one percent meaning that one person would die from a

hundred who fell seriously ill. As time has passed, this has proved to be grossly inflated. At this

---

[133] Fauci, Lane, et. al, Covid-19 — Navigating the Uncharted (Mar 26, 2020)
https://www.nejm.org/doi/full/10.1056/NEJMe2002387?query=RP  (last visited Nov. 20, 2020).
[134] Coronavirus Outbreak (COVID - 19): WHO Update (3 March
2020)https://www.youtube.com/watch?v=-kk-DrTCRAY&feature=youtu.be (last visited Nov.
20, 2020).

Congressional meeting, they compared the likely impact of COVID-19 to common flu. [135]  But they again used the wrong CFR for influenza, the one referenced in the February 28, 2020 NEJM editorial, infra, of 0.1 percent, or one in a thousand. The CFR referenced for common flu in that editorial was ten times too low. Suddenly, matching up the one percent CFR of COVID-19 with the incorrect 0.1 percent CFR of flu. COVID-19 was going to be ten times as deadly as common flu. [136] Anyone wanting to bring this to the public's attention on Facebook risked reprimand or bans and notice that suppressing posts reducing would serve to quell panic. Facebook's monopoly was used to stimulate panic and foster hopelessness.

155.    Following Dr. Fauci's Congressional testimony, on March 13, 2020, the WHO's Director-General Ghebreyesus outlined six steps for countries to take, regardless of its size or scenario, to fight the virus, but he never mentions his own HCQ treatment protocol (paragraph 133). Notice that nowhere is the importance of pushing HCQ or other off-patent solutions mentioned that could at this time have averted the pandemic; its unprecedented and ineffective behavioral sacrifices [137]

*1. Expand, train and deploy your public health force.*

*2. Implement a system to find every suspected case.*

*3. Ramp up testing capacity and availability.*

*4. Identify and adapt key facilities you will use to treat and isolate patients.*

---

[135] Did a Math Error Lead to the Never-Ending COVID-19 Lockdowns? (Sep 9, 2020) https://pjmedia.com/news-and-politics/stacey-lennox/2020/09/09/did-a-math-error-lead-to-the-never-ending-covid-19-lockdowns-n908436?fbclid=IwAR3lQJxCLbgklnN18p24qiWIO1WiVTglQzfBFPVMYEROPB_ei43wlRYvEOg (last visited Nov. 20, 2020).

[136] Id.

[137] 6 steps every country must take now to prevent coronavirus deaths: WHO Director-General (Mar 26, 2020) https://www.weforum.org/agenda/2020/03/todays-who-briefing-eaa3d34289/ (last visited Nov. 20, 2020).

*5. Develop a clear plan to quarantine contacts.*

*6. Refocus the whole of government on suppression and containing COVID-19.*

This WHO plan was imposed on Facebook users as "official truth" echo chamber by government overseers who oversaw legislation and protected Facebook's Special Immunities.

156.     On March 16, 2020, it was reported that the CDC (with help from FDA) inexplicably prevented the purchase of coronavirus test kits[138] from Germany, China, WHO, etc., and failed to produce a valid test kit themselves. The result was that during January and February, U.S. cases could not be tested, and for several months thereafter insufficient and unreliable test kits made it impossible to track the epidemic and stop the spread. Although beyond the scope of this complaint, CDC bungled testing that contributed to mass confusion.[139] Test kits for some time were unreliable and routinely gave false positives.[140]

157.     By March 17, 2020, Dr. Fauci, perhaps realizing his death rate testimony before Congress exaggerated the danger, told USA Today that Americans should worry more about the

---

[138] How U.S. coronavirus testing stalled: Flawed tests, red tape and resistance to using the millions of tests produced by the WHO (Mar 16, 2020) https://www.washingtonpost.com/business/2020/03/16/cdc-who-coronavirus-tests (last visited Nov. 20, 2020).

[139] INTERNAL HHS INVESTIGATION FINDS CDC'S EARLY TEST KITS WERE 'CONTAMINATED' (June 20, 2020) https://www.healthleadersmedia.com/covid-19/internal-hhs-investigation-finds-cdcs-early-test-kits-were-contaminated (last visited Nov. 24, 2020)

[140] False-positive COVID-19 results: hidden problems and costs (Dec 1, 2020). https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30453-7/fulltext Coronavirus Antibody Tests: Can You Trust the Results? (Apr 24, 2020_ https://www.nytimes.com/2020/04/24/health/coronavirus-antibody-tests.html (links last visited Dec 3, 2020).

flu than about coronavirus, the danger of which was "just miniscule" as he advised everyone to

"skip masks." [141]

158.   On April 20, 2020, Facebook announced that it would "Remove Content

Organizing Protests Against Stay-at-Home Orders," Zuckerberg says. When George

Stephanopoulos asked if this fits Facebook's "harmful misinformation" designation:

> We do classify that as harmful misinformation and we take that down," Zuckerberg said. "At the same time, it's important that people can debate policies so there's a line on this, you know, more than normal political discourse. I think a lot of the stuff that people are saying that is false around a health emergency like this can be classified as harmful misinformation. [142]

159.   "The social media giant is allowing the groups to operate Facebook event pages

in some states, while taking down content in others." [143]  A spokesperson for the company told

The Hill it is taking its cue from state governments on whether to remove pages and factoring in

federal guidelines on social distancing. "But a company spokesperson said Facebook is doing its

part by taking down event pages in states like California, Nebraska and New Jersey after

consulting with governors about their stay-at-home orders." [144] We reached out to state officials

to understand the scope of their orders, not about removing specific protests on Facebook," The

---

[141] Top disease official: Risk of coronavirus in USA is 'minuscule'; skip mask and wash hands (Feb 17, 2020) https://www.usatoday.com/story/news/health/2020/02/17/nih-disease-official-anthony-fauci-risk-of-coronavirus-in-u-s-is-minuscule-skip-mask-and-wash-hands/4787209002/ (last visited Nov. 20, 2020).

[142] Facebook Will Remove Content Organizing Protests Against Stay-at-Home Orders, Zuckerberg Says Posts and pages calling for users to disobey social distancing measures qualify as "harmful misinformation," exec says (April 20, 2020) https://www.thewrap.com/facebook-will-remove-posts-coronavirus-stay-at-home/ (last visited Nov. 20, 2020).

[143] Facebook faces new challenge with coronavirus protesters (April 21, 2020) https://thehill.com/policy/technology/493793-facebook-faces-new-challenge-with-coronavirus-protesters (last visited Nov. 20, 2020).

[144] Id.

spokesperson said, "We remove the posts when gatherings do not follow the health parameters established by the government and are therefore unlawful."[145]

160.    Meanwhile, WHO proxies like the Ted Rogers School of Management at Ryerson University, funded by the Canadian government, was marginalizing, and demonizing any American citizens that dared question official WHO and CDC authority. On April 21, 2020 it published: "Hospitals Around the World are Being Targeted by Conspiracy Theorists:"[146]

> Since March 28, conspiracy theorists…aka "coronavirus deniers" have been using the hashtag #FilmYourHospital to encourage people to visit local hospitals to take pictures and videos to "prove" that the COVID-19 pandemic is an elaborate hoax.
>
> The premise for this conspiracy theory rests on the baseless assumption that if hospital parking lots and waiting rooms are empty then the pandemic must not be real or is not as severe as reported by health authorities and the media.
>
> ****
>
> At the Ryerson University Social Media Lab, some of our research investigates how misinformation propagates across different social media platforms. One of the first steps when examining trending topics on social media is to look for signs of "social bots" — social media accounts designed to act on Twitter and other platforms with some level of autonomy — and "coordinated inauthentic behaviour" which may include coordinated activities that attempt to artificially manipulate conversations to make them appear more popular than they are.
>
> These two forms of social manipulation, when left unchecked, can skew the conversation, manufacture anger where there is none, suppress opposition or dampen debate. These tactics may undermine our ability as citizens to make decisions and reach consensus as a society.
>
> This new conspiracy campaign against the media and public health officials, with hospitals and medical staffs caught in the middle, started on March 28 with a simple tweet by a Twitter user @22CenturyAssets posing a question: "#FilmYourHospital Can this become a thing?

---

[145] Id.

[146] Hospitals Around the World are Being Targeted by Conspiracy Theorists (April 21, 2020) https://covid19misinfo.org/2020/04/21/hospitals-around-the-world-are-being-targeted-by-conspiracy-theorists/ (last visited Dec. 5, 2020).

161.    On April 13, 2020, "Remdesivir with IV Administration Alone is Unlikely to

Achieve Adequate Efficacy and Pulmonary Delivery should be Investigated in COVID-19

Patients" by  Duxin Sun, PhD, was accepted by the AAPS Journal, "An Official Journal of the

American Association of Pharmaceutical Scientists." [147] It was not published until May 26, 2020,

under an entirely misleading new title to conceal  Remdesivir's lack of potential and to blunt

negative criticism. [148]  While the new title concealed the paper's conclusion that Remdesivir was

not effective for COVID-19  the NIH COVID-19 Treatment Panel issued its original (April 21)

Guidelines putting untested and ineffective Remdesivir ahead of already proven HCQ & HCQ +

Azithromycin  treatment. [149]

162.    On April 24, 2020, a non-peer reviewed, flawed Veteran's Administration study

appeared on the internet. [150] It was followed by another non-peer reviewed paper a few weeks

later that described a flawed HCQ toxic-dose Brazil study. [151] This created a huge media storm

and it triggered the FDA to work on a "Black Box" safety warning for HCQ without the

objective study of either of these non-peer reviewed papers which were later debunked. [152] The

---

[147] https://pharmacy.umich.edu/sites/default/files/Sun%20COVID-19%20AAPSJ%20Accepted-4-13-2020.pdf (last visited Nov. 20, 2020).
[148] Remdesivir for Treatment of COVID-19: Combination of Pulmonary and IV Administration May Offer Additional Benefit  (May 26, 2020). https://link.springer.com/article/10.1208/s12248-020-00459-8 (last visited Nov. 20, 2020)
[149] Remdesivir with IV Administration Alone is Unlikely to Achieve Adequate Efficacy and Pulmonary Delivery should be Investigated in COVID-19 Patients (April 13, 2020) https://pharmacy.umich.edu/sites/default/files/Sun%20COVID-19%20AAPSJ%20Accepted-4-13-2020.pdf (last visited Nov. 20, 2020).
[150] Outcomes of hydroxychloroquine usage in United States veterans hospitalized with Covid-19 (Apr. 23, 2020 https://www.medrxiv.org/content/10.1101/2020.04.16.20065920v2 (last visited Nov. 20, 2020).
[151] Small Chloroquine Study Halted Over Risk of Fatal Heart Complications (Apr. 12, 2020) https://www.nytimes.com/2020/04/12/health/chloroquine-coronavirus-trump.html (last visited Dec. 4, 2020).
[152] FDA cautions against use of hydroxychloroquine or chloroquine for COVID-19 outside of the hospital setting or a clinical trial due to risk of heart rhythm problems (Jul 1, 2020)

involvement of Janet Woodcock MD in this FDA decision is suspect because of her previous

actions with BARDA Director Rick Bright over the previously issued EUA.

163.    On April 29, 2020, it was reported that:

Hospitalized patients with advanced COVID-19 and lung involvement who received Remdesivir recovered faster than similar patients who received placebo, according to a preliminary data analysis from a randomized, controlled trial involving 1063 patients, which began on February 21. The trial (known as the Adaptive COVID-19 Treatment Trial, or ACTT), sponsored by NIAID, part of the National Institutes of Health, is the first clinical trial launched in the United States to evaluate an experimental treatment for COVID-19.

An independent data and safety monitoring board (DSMB) overseeing the trial met on April 27 to review data and shared their interim analysis with the study team. Based upon their review of the data, they noted that Remdesivir was better than placebo from the perspective of the primary endpoint, time to recovery, a metric often used in influenza trials. Recovery in this study was defined as being well enough for hospital discharge or returning to normal activity level.

*This is **the first clinical trial** in the United States to evaluate an experimental treatment for COVID-19, the respiratory disease first detected in December 2019 in Wuhan, Hubei Province, China. The first trial participant is an American who was repatriated after being quarantined on the Diamond Princess cruise ship that docked in Yokohama, Japan and volunteered to participate in the study. The study can be adapted to evaluate additional investigative treatments and to enroll participants at other sites in the U.S. and worldwide. (italics and bold added)* [153]

164.    Also, on April 29, 2020, *The Lancet* finally published the suspended China

study: [154]

---

https://www.fda.gov/drugs/drug-safety-and-availability/fda-cautions-against-use-hydroxychloroquine-or-chloroquine-covid-19-outside-hospital-setting-or (last visited Dec. 4, 2020).

[153] NIH clinical trial shows Remdesivir accelerates recovery from advanced COVID-19 (Apr. 29, 2020) https://www.nih.gov/news-events/news-releases/nih-clinical-trial-shows-Remdesivir-accelerates-recovery-advanced-COVID-19 (last visited Nov. 20, 2020).

[154] Remdesivir in adults with severe COVID-19: a randomised, double-blind, placebo-controlled, multicentre trial (May 16, 2020) https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)31022-9/fulltext (last visited Nov. 20, 2020).

Between Feb 6, 2020, and March 12, 2020, 237 patients were enrolled and randomly assigned to a treatment group (158 to Remdesivir and 79 to placebo); one patient in the placebo group who withdrew after randomisation was not included in the ITT population. Remdesivir use was not associated with a difference in time to clinical improvement (hazard ratio 1·23 [95% CI 0·87–1·75]). Although not statistically significant, patients receiving Remdesivir had a numerically faster time to clinical improvement than those receiving placebo among patients with symptom duration of 10 days or less (hazard ratio 1·52 [0·95–2·43]). Adverse events were reported in 102 (66%) of 155 Remdesivir recipients versus 50 (64%) of 78 placebo recipients. Remdesivir was stopped early because of adverse events in 18 (12%) patients versus four (5%) patients who stopped placebo early.

165.    On April 29, 2020, Dr. Fauci perplexingly characterized the data from this coronavirus drug trial testing for Remdesivir as "quite good news" and sets a new standard of care for COVID-19 patients. [155] This was despite the results being so poor—poor in the sense that Remdesivir did not save a single life. Dr. Fauci obfuscated and concealed the truth by changing the endpoint of the study to hide the fact that everyone on it still died. [156] Meanwhile, in Managed Health Care Executive, the authors got the "drift." [157]

---

[155] Dr. Anthony Fauci says Gilead's Remdesivir will set a new 'standard of care' for coronavirus treatment (Apr. 29, 2020) https://www.cnbc.com/2020/04/29/dr-anthony-fauci-says-data-from-Remdesivir-coronavirus-drug-trial-shows-quite-good-news.html (last visited Nov. 20, 2020).

[156] Gilead supersizes Remdesivir trials, changes primary endpoint (Apr. 9, 2020) https://www.fiercebiotech.com/biotech/gilead-supersizes-Remdesivir-trials-changes-primary-endpoint (last visited Nov. 20, 2020).

[157] Remdesivir: Fauci Thumbs Up, Lancet Study Thumbs Down (Apr. 29, 2020) https://www.managedhealthcareexecutive.com/view/remdesivir-fauci-thumbs-lancet-study-thumbs-down (last visited Nov. 20, 2020).

# Remdesivir: Fauci Thumbs Up, Lancet Study Thumbs Down

April 29, 2020
Peter Wehrwein





166.    On April 30, 2020, Dr. Fauci mischaracterized the results of the Remdesivir study saying that patients have a 31% increased chance of recovering and getting out of the hospital. This was false. Dr. Fauci made no effort to correct the falsehood which dramatically exaggerated the Remdesivir results. [158]

167.    On May 1, 2020, the FDA issued a "Black Box" label for HCQ stating it should only be taken in the hospital or as part of a formal study due to reports of "serious heart rhythm problems." It made no distinction between early and late stage COVID-19 patients and it made no mention that the COVID-19 virus itself was affecting the heart in about 15% of late cases to cause irregular and sometimes fatal heart rhythms. The FDA was trying to attribute this to HCQ use. This warning was from Janet Woodcock's FDA Division.

168.    Despite the lackluster Remdesivir results referenced above (no effect on morbidity), the FDA on the same day astonishingly issued an EUA for emergency use of

---

[158] Dr. Anthony Fauci: Remdesivir Is 'A Very Important First Step' In Fighting Coronavirus | TODAY (Apr. 30, 3030) https://www.youtube.com/watch?v=sjhMfvv8l0Y&feature=youtu.be&t=23 (last visited Nov. 20, 2020).

Remdesivir for the treatment of hospitalized patients with severe COVID-19.  In order to receive

that designation, it had to be certified that there "***is no adequate, approved, and available***

***alternative to the emergency use of Remdesivir for the treatment of COVID-19***." (bold italics

added). Since CQ/HCQ and Ivermectin were seen at that time as having preventative and

curative effects, the EUA was prohibited from being granted.  The "US Pandemic Strategy" was

gone and **the doctrine now was to keep early infected patients quarantined at home without**

**treatment until they became so ill that they had to be admitted to a hospital.** Once in

hospital they might be given HCQ which would not work well because the patients were now too

ill, but even then, there was a disturbing pattern where zinc was omitted.

169.    On May 1, 2020, Dr. William A. Haseltine, put truth to an even bigger "big lie"

glossed over in the China *Lancet* Remdesivir study:[159]

> There is an interesting line in the Chinese study on Remdesivir that has gone almost
> entirely overlooked, one that introduces an interesting, and potentially serious,
> conundrum. The authors of the study wrote that "*Remdesivir did not result in significant*
> *reductions in SARS-CoV-2 RNA loads or detectability in upper respiratory tract or*
> *sputum specimens in this study....*"
>
> In short, what the authors are saying here is that Remdesivir—an antiviral drug that is
> supposed to work by stopping the virus from replicating—did nothing to actually stop the
> virus from replicating. Patients who received Remdesivir had the same viral load as those
> who didn't. [160]

---

[159] Remdesivir: A Non-Antiviral Antiviral Drug? (May 1, 2020)
https://www.forbes.com/sites/williamhaseltine/2020/05/01/remdesivir-a-non-antiviral-antiviral-drug/?sh=6c1bce4554fc (last visited Nov. 20, 2020).
[160] While plaintiffs are not physicians, this seemed consistent with poor anti-viral
function regarding Ebola and it seems to correspond with slide 40 of Dr. Dare's slide deck. Ryan
Dare, MD, COVID-19 Pandemic: What We Know to Date
(Mar 26, 2020) https://uamshealth.com/coronavirus/wp-content/uploads/sites/13/2020/03/COVID-GR-032620.pdf (last visited Nov. 20, 2020).

So the fact that the drug didn't work as it was designed to work and it was such a failure that they had to adjust the endpoint of the study to mask the fact that Remdesivir epically failed in that *it never saved a single life*, did not stop the officials overseeing health care policy of the United States in laying a golden carpet at Gilead's feet while kicking Americans to the curb.

170.    A May 2, 2020 report that "Gilead Lobbying Rose as Interest In COVID-19 Treatment Climbed"[161] suggested one answer to the preoccupation with a drug that didn't work:

Gilead Sciences, the drugmaker behind the experimental COVID-19 treatment Remdesivir, spent more on lobbying Congress and the administration in the first quarter of 2020 than it ever has before, according to federal filings.

The pharmaceutical company spent $2.45 million on lobbying in the first three months of the year, a 32% increase over the $1.86 million it spent in the first quarter of 2019.

The first quarter is also when Congress drafted and passed the Coronavirus Aid, Relief and Economic Security Act, which contained numerous provisions affecting the pharmaceutical industry, including funding for the development of vaccines and treatments in response to the pandemic.

Early drafts of the legislation included a provision stipulating that COVID-19 vaccines, drugs and tests be affordable if they were developed with taxpayer funds. But the final bill included additional language that undercut that requirement.

The data shows that remdisivir has a clear-cut, significant, positive effect in diminishing the time to recovery" from COVID-19, said Anthony Fauci, director of the National Institute for Allergy and Infectious Diseases, about a study his institute sponsored. He said the drug would become "the standard of care."

The same day, however, a study by Chinese researchers published in *The Lancet* found Remdesivir didn't do better than a placebo when treating seriously ill COVID-19 patients on such measures as survival and time to clinical improvement.

---

[161] https://www.npr.org/sections/health-shots/2020/05/02/849149873/gilead-lobbying-rose-as-interest-in-COVID-19-treatment-climbed (last visited Nov. 20, 2020).

171.   On May 12, 2020, the NIH panel recommended against clinically proven HCQ + Azithromycin treatment. [162]

172.   The Henry Ford System was collecting data on patients in their early use HCQ study and on May 16, 2020, submitted its early-use HCQ study for publication. It *showed a major effect with a 51% reduced COVID-19 mortality* when given to early hospitalized patients. NEJM rejected this pioneering study without review. (Janet Woodcock, M.D. at the FDA, is also on the Editorial Board of the NEJM). The Ford paper was then submitted to the International Journal of Infectious disease.

173.   On May 22, 2020, the corrupt "*Lancet* Study" on HCQ was published: "Large study finds drug Trump touted for COVID-19 is linked to greater risk of death and heart arrhythmia." [163]

> For the new study, researchers analyzed data from more than 96,000 patients with confirmed COVID-19 from 671 hospitals on six continents. All were hospitalized from late December to mid-April and had died or been discharged by April 21. Just under 15,000 patients were treated with HCQ or chloroquine, or one of those drugs combined with an antibiotic.
>
> All four of those treatments were linked with a higher risk of dying in the hospital. About one in 11 patients in the control group -- who got none of the drugs -- died in the hospital. About one in six patients treated with chloroquine or HCQ alone died in the hospital. About one in five treated with chloroquine and an antibiotic died and almost one in four treated with HCQ and an antibiotic died.
>
> Researchers also found that serious heart arrhythmias were more common among patients receiving any of the four treatments. The largest increase was among the group treated

---

[162] Potential Antiviral Drugs Under Evaluation for the Treatment of COVID-19 (May 12, 2020) NIH https://web.archive.org/web/20200523074936/https://www.covid19treatmentguidelines.nih.gov/antiviral-therapy/ (last visited Nov. 20, 2020).

[163] Large study finds drug Trump touted for Covid-19 is linked to greater risk of death and heart arrhythmia, CNNHealth (May 22, 20202) https://www.cnn.com/2020/05/22/health/Hydroxychloroquine-coronavirus-lancet-study/index.html (last visited Nov. 20, 2020).

> with HCQ and an antibiotic; 8% of those patients developed a heart arrhythmia,
> compared with 0.3% of patients in the control group.
>
> Dr. David Boulware, an infectious disease expert with the University of Minnesota who
> is also studying HCQ as a COVID-19 treatment, said the study reinforces that the drug
> "probably has no benefit and likely has some increased risk of mortality" for coronavirus
> patients.

174.    *The Lancet* Study on HCQ was patently false. [164] Dr. Fauci leapt on the bad news and made the media rounds to kill a drug that by any comparison was far superior to remdisivir. [165] Some of those plotting to advance the vaccine agenda sought to sideline the adoption of HCQ as the main remedy for COVID-19.

175.    On May 22, 2020 Janet Woodcock was transferred to the FDA Commissioner's Office for Operation Warp Speed after she had pushed an EUA for remdisivir instead of IDA and then derailing the use of HCQ with a "Black Box" warning.  Woodcock's deputy, Patrizia Cavazzoni was assigned as Acting Director of Center for Drug Evaluation Research (CDER). [166]

176.    On May 25, 2020, a new WHO HCQ study emerged, this time in the United Kingdom. It was not until later that the world learned that researchers overdosed patients with HCQ and engaged in other forms of research fraud. [167]  But still, the off-patent solution that could have prevented the pandemic and had been used safely for 70 years was halted:

---

[164] Anti-HCQ Paper in *The Lancet* Uses Fake Data (May 23, 2020) https://defyccc.com/anti-hcq-paper-in-the-lancet-uses-fabricated-data/ (last visited Nov. 20, 2020).

[165] Fauci: Science shows hydroxychloroquine is not effective as a coronavirus treatment (May 27, 2020) https://www.cnn.com/2020/05/27/politics/anthony-fauci-Hydroxychloroquine-trump-cnntv/index.html (last visited Nov. 20, 2020).

[166] FDA shuffles longtime division head, Janet Woodcock, to focus exclusively on Covid-19 vaccine project (May 22, 2020) https://www.statnews.com/2020/05/22/woodcock-operation-warp-speed/ (last visited Nov. 20, 2020).

[167] http://www.francesoir.fr/politique-monde/oxford-recovery-et-solidarity-overdosage-two-clinical-trials-acts-considered (Jun 26, 2020) Oxford, Recovery et Solidarity: Overdosage in

The [WHO] announced on Monday that it temporarily halted the study of HCQ as a potential COVID-19 treatment in its "Solidarity Trial," due to safety concerns. The WHO's decision was made after an observational study, published last week in the medical journal *The Lancet*, described how seriously ill COVID-19 patients who were treated with HCQ and chloroquine were more likely to die or develop irregular heart rhythms. ""The Executive Group has implemented a temporary pause of the HCQ arm within the Solidarity Trial while the safety data is reviewed by the Data Safety Monitoring Board," WHO Director-General Tedros Adhanom Ghebreyesus told reporters at a news briefing." [168]

177.    As Facebook was hitting new heights in terms of enforcing speech controls through its bots, artificial intelligence, human mods and factchecking to impose a false reality on the public square that it deployed using its monopoly to benefit its government overseers, Defendant Zuckerberg was touting a new oversight board that all observers noticed was imposing on U.S. citizens international standards of human rights while displacing Americans of their constitutional rights.

> *Great expectations surround Facebook's Oversight Board, an audacious experiment in platform self-regulation, with its first 20 members announced on May 6. It was a milestone in Facebook's response to compelling calls for greater accountability and transparency. The board evokes constitutional law notions in various ways: its original conceptualization by Mark Zuckerberg as "almost like a Supreme Court;" its power to deliver "binding decisions," as well as "policy advisory statements;" the institution-building language and framework of its charter and bylaws; and the fact that its initial membership encompasses six constitutional lawyers, including three specialists in American constitutional law, with two serving as co-chairs.*

---

two clinical trials with acts considered criminal? (last visited DEC 4, 2020). This was used as a rationale to stop HCQ testing for the Recovery Trial.  "This is not a treatment for COVID-19. It doesn't work," Martin Landray, an Oxford University professor who is co-leading the RECOVERY trial, told reporters. "This result should change medical practice worldwide. We can now stop using a drug that is useless." UK halts trial of hydroxychloroquine as 'useless' for COVID-19 patients. (June 5, 2020) https://www.reuters.com/article/us-health-coronavirus-hydroxychloroquine/uk-halts-trial-of-hydroxychloroquine-as-useless-for-covid-19-patients-idUSKBN23C1YM  (last visited Dec 6, 2020).

[168]  WHO pauses trial of hydroxychloroquine as coronavirus treatment amid safety concerns (May 25, 2020) https://www.cnbc.com/2020/05/25/coronavirus-whos-solidarity-trial-is-pausing-tests-for-Hydroxychloroquine-amid-safety-concerns.html (last visited Nov. 20, 2020).

*Such "constitutional features" exist against a backdrop of approaches to content moderation by Facebook and other platforms that so far have been "undergirded by American free speech norms." Facebook's creation of the board suggests a clear and conscious turn from such a U.S. constitutional-law paradigm towards an international human rights approach in content moderation by the world's most powerful social media company. But the nature and degree of this shift depend on how the board, in delivering its decisions within the confines of its jurisdiction, will interpret the relationship between Facebook's community standards and values, on the one hand, and international human rights standards, encompassing international treaty law and non-binding standards, on the other.* [169]

178.     On May 27, 2020, a Google search would have yielded the following results

which reflect nothing less than the wholly successful effort by pharmaceutical companies,

government agencies and social media platforms like Facebook to portray a false "reality:"



---

[169] Facebook's Oversight Board: A Meaningful Turn Towards International Human Rights Standards? (May 20, 2020) https://www.justsecurity.org/70234/facebooks-oversight-board-a-meaningful-turn-towards-international-human-rights-standards/ (last visited Nov. 20, 2020).

179.     Meanwhile, it turns out that Dr. Fauci, together with NIH Director Francis Collins created the U.S. COVID-19 Strategy.  They wrote this paper to detail their plan.[170]  They convinced President Trump to mobilize government pharmaceutical companies and academia to go all in on a vaccine. Had President Trump known HCQ was unfairly sabotaged would the vaccine program have been so aggressively supported?

180.     On June 4, 2020, The UK "Recovery" trial ended its HCQ testing reporting no benefit.  The Recovery HCQ arm was very similar to, but not part of, the international conglomeration of clinical trials.   In-hospital mortality of the 1542 patients receiving HCQ was 25.7%, or 396 deaths, about 10% higher than those receiving standard care, a non-significant difference. Later reanalysis of this UK study actually shows an HCQ benefit equal to that of Dexamethasone, a steroid that was lauded by Dr, Fauci as a major breakthrough in COVID-19 treatment. The Recovery trial Study Protocol[171] noted that it is funded in part by the Wellcome Trust and the Bill and Melinda Gates Foundation, and by UK government agencies.  When the Recovery Protocol provided the doses of HCQ used on a post that has been erased, Twitter users began to notice a dosing problem, with hashtag #Recoverygate. The HCQ dosing regimen used in the Recovery trial was 12 tablets during the first 24 hours (800mg initial dose, 800 mg six hours later, 400 mg 6 hrs. later, 400 mg 6 hours later), then 400 mg every 12 hours for 9 more days.  This is **2.4 grams** during the first 24 hours, and a cumulative dose of 9.2 grams over 10

---

[170] Corey et. al, A strategic approach to COVID-19 vaccine R&D (May 29, 2020) https://science.sciencemag.org/content/368/6494/948 (last visited Nov. 20, 2020).
[171] RANDOMISED EVALUATION OF COVID-19 THERAPY (RECOVERY) https://www.recoverytrial.net/files/protocol-archive/recovery-protocol-v6-0-2020-05-14.pdf/@@download (last visited Nov. 20, 2020).

days. Even more disturbing than this, babies weighing 5 kg could be given a dose of 300 mg

HCQ in the first 24 hours in the Recovery trial, which is 233 mg of the base, nearly 4 times

the recommended maximum. [172]The Recovery trial used **1.86 grams** HCQ base (equal to 2400

mg of HCQ) in the first 24 hours for treatment of already very ill, hospitalized COVID-19

patients, a potentially lethal dose.  The Canadian and Norwegian trials used 2,000 mg of HCQ,

or **1.55 grams** of HCQ base in the first 24 hours. Each trial gave patients a cumulative dose

during the first 24 hours that, when given as a single dose, has been documented to be lethal.

(The drug's half-life is about a month, so the cumulative amount is important.) [173]  There were a

wealth of indicators that the Recovery Trial was framed to ensure that HCQ could not shine

(control groups with healthier patients, withhold zinc, make only late use), and the potential that

the physicians actually overdosed the study participants.

181.    On June 5, 2020, *The Lancet* Study was tentatively withdrawn. [174]

182.    On June 6, 2020, the WHO reversed its mandate on mask use now declaring that

masks work. After previously arguing that there was not enough evidence to say that healthy

people should wear masks, WHO Director-General Ghebreyesus now said that "in light of

evolving evidence, the WHO advises that governments should encourage the general public to

---

[172] Up To Date: Hydroxychloroquine: Drug information (no date)
https://www.uptodate.com/contents/hydroxychloroquine-drug-information?sectionName=Pediatric&topicId=8541&search=plaquenil&usage_type=panel&anchor=F180880&source=panel_search_result&selectedTitle=1~148&kp_tab=drug_general&display_rank=1#F180880 (last visited Nov. 20, 2020)
[173] WHO "Solidarity" and UK "Recovery" Clinical Trials of Hydroxychloroquine using Potentially Fatal Doses, Age of Autism (June 3, 2020)
https://www.ageofautism.com/2020/06/who-solidarity-and-uk-recovery-clinical-trials-of-Hydroxychloroquine-using-potentially-fatal-doses.html (last visited Nov. 20, 2020)
[174] *The Lancet* Retracts Hydroxychloroquine Study (June 4, 2020)
https://www.webmd.com/lung/news/20200605/lancet-retracts-Hydroxychloroquine-study (last visited Nov. 20, 2020)

wear masks where there is widespread transmission and physical distancing is difficult, such as on public transport, in shops or in other confined or crowded environments."[175]

183.    On June 15, 2020, the FDA Revoked EUA for Chloroquine and HCQ premised on the EUA for late use and alleging that it had cardiac concerns:

> *Today, the U.S. Food and Drug Administration (FDA) revoked the emergency use authorization (EUA) that allowed for chloroquine phosphate and HCQ sulfate donated to the Strategic National Stockpile to be used to treat certain hospitalized patients with COVID-19 when a clinical trial was unavailable, or participation in a clinical trial was not feasible. The agency determined that the legal criteria for issuing an EUA are no longer met. Based on its ongoing analysis of the EUA and emerging scientific data, the FDA determined that chloroquine and HCQ are unlikely to be effective in treating COVID-19 for the authorized uses in the EUA. Additionally, in light of ongoing serious cardiac adverse events and other potential serious side effects, the known and potential benefits of chloroquine and HCQ no longer outweigh the known and potential risks for the authorized use.[176]*

184.    On the same day, the FDA Warned of Newly Discovered Potential Drug Interaction of hydroxychloroquine that—SURPRISE! --May Reduce Effectiveness of a COVID-19 Treatment Authorized for Emergency Use regarding Remdesivir:[177]

> *Today, the U.S. Food and Drug Administration is warning health care providers about a newly discovered potential drug interaction related to the investigational antiviral drug Remdesivir, which has received emergency use authorization for the treatment of hospitalized COVID-19 patients with severe disease.*

> *Based on a recently completed non-clinical laboratory study, the FDA is revising the fact sheet for health care providers that accompanies the drug to state that co-administration*

---

[175] Coronavirus: WHO advises to wear masks in public areas, BBC News (June 6, 2020) https://www.bbc.com/news/amp/health-52945210 (last visited Nov. 20, 2020).

[176] Coronavirus (COVID-19) Update: FDA Revokes Emergency Use Authorization for Chloroquine and Hydroxychloroquine (June 15, 2020) https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-revokes-emergency-use-authorization-chloroquine-and (last visited Nov. 24, 2020).

[177] https://www.fda.gov/news-events/press-announcements/coronavirus-COVID-19-update-fda-warns-newly-discovered-potential-drug-interaction-may-reduce (last visited Nov. 20, 2020).

*of Remdesivir and chloroquine phosphate or HCQ sulfate is not recommended as it may result in reduced antiviral activity of Remdesivir.*

185.    Physicians and researchers were courageously advocating for the early use of HCQ—as early as first symptoms prior to test confirmation—to shed the coronavirus in as few as 24 hours. [178] The WHO, CDC and FDA were all discouraging early use of HCQ that was best positioned to make hospitalization unnecessary.  This struck Plaintiffs' and many HAN users as very suspicious. On June 22, 2020, WHO hosted another conference on misinformation:

> *[Event #1] Pre-conference: 1st WHO Infodemiology Conference (Monday June 29, 2020 13:00 -18:00 Geneva/Paris time)*
>
> The history of public health in the 20th and 21st century is littered with examples of how misinformation caused harm during outbreaks and continue to do damage in trust in health authorities long afterward. The tools at health authorities' disposal have been limited and expertise siloed.
>
> The stakes are higher in a digitized world, where misinformation and mixed messages overwhelm individuals and communities, and affect the physical world as well. This is not just a communication problem. It is not just an issue that can be solved with a social media dashboard. Top-down approaches are not fit for purpose. We can't afford to get this wrong for COVID-19.
>
> How do we know if we have successfully mitigated/slowed down an infodemic? When behaviors at all levels—individual, community, health system? government—have shifted to resist misinformation and act on and propagate accurate health guidance to flatten the epi curve. [179]

---

[178] Doctors discover effective, life-saving treatment for Covid-19 (May 30, 2020) https://www.grandrapidsmn.com/opinion/doctors-discover-effective-life-saving-treatment-for-covid-19/article_3619c254-a1d4-11ea-a886-43929db0aeb5.html (last visited Nov. 24, 2020) Why Dr. Vladimir Zelenko staked his reputation on hydroxychloroquine (May 22, 2020) https://forward.com/news/national/447109/zelenko-hydroxychloroquine-trump/ (last visited Nov. 24, 2020)  Yale's COVID-19 inpatient protocol: Hydroxychloroquine plus/minus tocilizumab (April 26, 2020) https://www.mdedge.com/hematology-oncology/article/221558/coronavirus-updates/yales-covid-19-inpatient-protocol  (last visited Nov. 24, 2020)  Judging Drugs Fairly Whatever the efficacy of hydroxychloroquine in treating Covid-19 turns out to be, media coverage has been consistently biased. (June 5, 2020) https://www.city-journal.org/hydroxychloroquine-covid-19-treatment (last visited Nov. 24, 2020).
[179] WHO Public Events on #Infodemic Management and #Infodemiology (June 22, 2020) https://covid19misinfo.org/2020/06/22/who-public-events-on-infodemic-management-and-infodemiology/  (last visited Nov. 20, 2020).

186.     In June 2020, Veritas Videos interviewed a Facebook moderator whistleblower who admitted to outrageous and capricious censorship actions.[180] Unfortunately for Plaintiffs interested in getting the word out to save lives with HCQ, the undercover video depicts political censorship and it was a matter of public knowledge that HCQ had been designated as "Trump Pills."

187.     On June 29, 2020, Dr. Fauci apparently recommended a $1.6 Billion HHS agreement with Gilead Sciences involving Remdesivir.[181]

188.     On July 2, 2020, the Ford early-use paper *was* finally published showing that early HCQ cuts the COVID death rate by 51% in hospitalized COVID patients – with no heart-related side effects. This was followed by papers from Mt. Sinai Hospital[182] and Spain[183] confirming these results in their own studies. It was a breakthrough finding that was withheld for a month during a pandemic.

---

[180] Project Veritas: Facebook Moderation Aims To "Get The Cheetoh Out Of Office" (June 23, 2020) https://hotair.com/archives/ed-morrissey/2020/06/23/project-veritas-facebook-moderation-aims-get-cheetoh-office/  (last visited Nov. 20, 2020).
[181] Remdesivir for the Commercial Marketplace (June 28, 2020) https://www.phe.gov/emergency/events/COVID19/investigation-MCM/Pages/factsheet.aspx (last visited Nov. 20, 2020).
[182] NY study finds hydroxychloroquine may have saved COVID-19 patients' lives (July 3, 2020) https://thinkpol.ca/2020/07/03/ny-study-finds-hydroxychloroquine-may-have-saved-covid-19-patients-lives/ (last visited Nov. 20, 2020).
[183] Early Hydroxychloroquine Is Associated with an Increase of Survival in COVID-19 Patients: An Observational Study (May 2, 2020) https://www.preprints.org/manuscript/202005.0057/v1 (last visited Nov. 24, 2020).

189.     Finally, on July 6, 2020, the Ford System's request for a new EUA for an early-use outpatient clinical study using HCQ was submitted to the FDA. The FDA sat on the request for one month.

190. On July 17, 2020, it became apparent that Dr. Boulware, a key researcher and HCQ skeptic may not have disclosed conflicts.[184] In December it was belatedly discovered that reprocessing of Boulware's study of hydroxychloroquine Post-Exposure Prophylaxis shows that the data actually points to fast treatment reducing the risk by 42%.[185]



191.     On August 27, 2020, financial conflicts with Gilead were disclosed regarding eight members of the COVID-19 Treatment Guidelines Panel Financial Disclosure for Companies Related to COVID-19 Treatment or Diagnostics.[186]

---

[184] Twitter, (Jul 17, 2020) https://twitter.com/LukeMor19529310/status/1284023642058301440?s=20 (last visited Nov. 20, 2020).

[185] Effective post-exposure prophylaxis of Covid-19 is associated with use of hydroxychloroquine: Prospective re-analysis of a public dataset incorporating novel data (Nov 1, 2020) https://www.medrxiv.org/content/10.1101/2020.11.29.20235218v1 (last visited Dec 5, 2020).

[186] Appendix A, Table 2. COVID-19 Treatment Guidelines Panel Financial Disclosure for Companies Related to COVID-19 Treatment or Diagnostics (Oct. 9, 2020).

192.    As Meryl Nass, M.D. (Anthrax Vaccine Blogspot, July 21, 2020) succinctly

summed up:

> You have the head of the Coronavirus Task Force, Dr. Tony Fauci, insist the drug cannot
> be used in the absence of strong evidence
> (https://anthraxvaccine.blogspot.com/2020/04/the-avuncular-dr-fauci-fluent-yet.html)
> …while he insisted exactly the opposite in the case of the MERS coronavirus outbreak
> several years ago (https://anthraxvaccine.blogspot.com/2020/04/fauci-hypocrite-do-niaid-
> royalties.html), when he recommended an untested drug combination for use…which had
> been developed for that purpose by his agency.  And while he was bemoaning the lack of
> evidence, he was refusing to pay for trials to study Hcq
> (https://www.cnn.com/2020/03/28/health/coronavirus-hcq-trial/index.html. And he was
> changing the goalposts on the Remdesivir trial
> (https://anthraxvaccine.blogspot.com/2020/05/faking-results-faucis-niaid-paid.html), not
> once but twice, to make Remdesivir show a tiny bit of benefit, but no mortality benefit.
> And don't forget, Fauci was thrilled to sponsor a trial of a Covid vaccine in humans
> before there were any data from animal trials (https://www.NIAID.NIH.gov/news-
> events/nih-clinical-trial-investigational-vaccine-covid-19-begins).  So much for requiring
> high quality evidence before risking use of drugs and vaccines in humans. [187]

193.    On July 23, 2020, courageous Yale researcher, Dr. Harvey Risch, published an

article in Newsweek to draw attention to his May 27, 2020 op-ed in the American Journal of

Epidemiology (AJE) entitled, "Early Outpatient Treatment of Symptomatic, High-Risk COVID-

19 Patients that Should be Ramped-Up Immediately as Key to the Pandemic Crisis." That article,

published in the world's leading epidemiology journal (which had been roundly ignored),

analyzed five studies, demonstrating clear-cut and significant benefits to treated patients, plus

other very large studies that showed the medication safety. **"I am referring, of course, to the**

**medication HCQ. When this inexpensive oral medication is given very early in the course**

**of illness, before the virus has had time to multiply beyond control, it has shown to be**

---

https://www.covid19treatmentguidelines.nih.gov/panel-financial-disclosure/ (last visited Nov.
20, 2020).
        [187] https://www.lewrockwell.com/2020/07/no_author/how-a-false-Hydroxychloroquine-
narrative-was-created-and-more/.

**highly effective, especially when given in combination with the antibiotics azithromycin or doxycycline and the nutritional supplement zinc."** (emphasis added) [188]

194.    On July 28, 2020, President Trump retweeted a running list of 69 HCQ studies showing more promising and more clearly demonstrated efficacy in strong headwinds from his incompetent or corrupt health advisors. [189]



195.    July 29, 2020, Defendant Zuckerberg lining up with Trump's medical advisors, defended his company's policy of memory-holing HCQ [190] and stated that references to HCQ being a "cure" would be suppressed: "Hydroxychloroquine isn't a cure for COVID-19 and saying so will get your content yanked from Facebook, CEO Mark Zuckerberg told a House

---

[188] The Key to Defeating COVID-19 Already Exists. We Need to Start Using It | Opinion (July 23, 2020) https://www.newsweek.com/key-defeating-covid-19-already-exists-we-need-start-using-it-opinion-1519535 (last visited Nov. 20, 2020).
[189] C19study.com (last visited Dec 5, 2020).
[190] Facebook chief defends blocking Hydroxychloroquine videos (July 29, 2020) https://www.whio.com/news/politics/jamie-dupree/facebook-chief-defends-blocking-Hydroxychloroquine-videos (last visited Nov. 20, 2020).

hearing on Wednesday." [191]   Defendant Zuckerberg made this assertion to ingratiate himself with

his government overseers who were positioned to break up his monopoly or strip him of his

Section 230 immunity.

196.     Also on July 29, 2020, Dr. Fauci falsely rebutted the President's retweet in a

shared video claiming HCQ was a coronavirus cure "'isn't true'":

> Dr. Anthony Fauci, the nation's top infectious disease effort, said Wednesday that trials
> have shown "consistently" that HCQ is "not effective" in treating coronavirus. "The
> scientific data, the cumulative data on trials, clinical trials that were valid — namely,
> clinical trials that were randomized and controlled in the proper way — all of those trials
> show consistently that HCQ is not effective in the treatment of coronavirus disease or
> COVID-19," he said. Describing the video Trump promoted as "a bunch of people
> spouting something that isn't true," Fauci said, "the only recourse you have is to be very,
> very clear in presenting the scientific data that essentially contradicts that. [192]

197.     On July 30, 2020, panel of international experts concluded that Remdesivir was

not efficacious. [193]

198.     The Detroit Free Press reported that "FDA denies Henry Ford Health request to

use HCQ for COVID-19 patients": [194]

> Weeks after the U.S. Food and Drug Administration revoked emergency use
> authorization of HCQ to treat COVID-19, saying the drug doesn't help coronavirus

---

[191] Zuckerberg Promises to Yank Hydroxychloroquine 'Cure' Claims During Big Tech
Grilling (July 29, 2020) https://www.thedailybeast.com/zuckerberg-promises-to-yank-dodgy-
Hydroxychloroquine-claims-from-facebook-during-big-tech-house-hearing (last visited Nov. 20,
2020).

[192] Fauci says video Trump shared claiming drug as coronavirus cure 'isn't true' (July 29,
2020) https://www.msn.com/en-us/news/us/fauci-says-video-trump-shared-claiming-drug-as-
coronavirus-cure-isnt-true/ (last visited Nov. 20, 2020).

[193] Covid-19: Remdesivir probably reduces recovery time, but evidence is uncertain,
panel finds https://www.bmj.com/content/370/bmj.m3049 (last visited Nov. 20, 2020).

[194] FDA denies Henry Ford Health request to use hydroxychloroquine for COVID-19
patients (Aug. 13, 2020) https://www.freep.com/story/news/health/2020/08/13/henry-ford-
health-hydroxychloroquine-covid-fda/3360940001/ (last visited Nov. 20, 2020).

patients and has potentially dangerous side effects, Henry Ford Health System filed for permission to continue using it.

The Detroit-based health system told the Free Press this week that it sought emergency use authorization July 6 to resume treating some COVID-19 patients with the drug, which is commonly used as an anti-malarial medication and for people with autoimmune diseases like lupus.

The request came four days after Henry Ford published a controversial study in the International Journal of Infectious Diseases that suggested HCQ slashed the COVID-19 death rate in half. The peer-reviewed observational study contradicted other published reports that showed the drug doesn't help coronavirus patients and could cause heart rhythm problems in some people.

The FDA denied Henry Ford's request this week.

This new EUA is denied by the FDA despite its being supported by the Mount Sinai trial as well as the trial in Spain which showed a 61% improved survival rate in hospitalized COVID patients given the HCQ early. The studies involved several thousand patients with no adverse cardiac events.

199.    On September 9, 2020, the WHO expressed concerns about the COVID-19

lockdown mandates declaring: "COVID-19 could reverse decades of progress toward eliminating

preventable child deaths, agencies warn:"

With the number of under-five deaths at an all-time recorded low of 5.2 million in 2019, disruptions in child and maternal health services due to the COVID-19 pandemic are putting millions of additional lives at stake

The number of global under-five deaths dropped to its lowest point on record in 2019 – down to 5.2 million from 12.5 million in 1990, according to new mortality estimates released by UNICEF, the World Health Organization (WHO), the Population Division of the United Nations Department of Economic and Social Affairs and the World Bank Group.

Since then, however, surveys by UNICEF and WHO reveal that the COVID-19 pandemic has resulted in major disruptions to health services that threaten to undo decades of hard-won progress. [195]

---

[195] COVID-19 could reverse decades of progress toward eliminating preventable child deaths, agencies warn (Sp. 9 2020) https://www.who.int/news-room/detail/09-09-2020-COVID-19-could-reverse-decades-of-progress-toward-eliminating-preventable-child-deathsagencies-warn (last visited Nov. 20, 2020).

200.    On September 17, 2020, Facebook announced it would no longer host medical groups on its platform. [196] By this time, multiple hydroxychloroquine groups had been shuttered by Facebook. HAN remained open in part because the undersigned attorney on at least three occasions made videotaped pleas on July 29, and August 2 and 3 demanding that Facebook cease and desist in the suppression, threats, and censorship,  to stop preventing HAN members from saving lives and posting life-saving information,  to stop posting false information on its cite, and authorizing factcheckers to publish false and dangerous information that was costing lives.

201.    On September 21, 2020, the CDC still did not know how COVID-19 was transmitted and it is hard to believe that this could be caused by incompetence alone because it was so breathtaking:

> On Monday morning, the Centers for Disease Control and Prevention edited its Web page describing how the novel coronavirus spreads, removing recently added language saying it was "possible" that it spreads via airborne transmission. It was the third major revision to CDC information or guidelines published since May.
>
> The agency had posted information Friday stating the virus can transmit over a distance beyond six feet, suggesting that indoor ventilation is key to protecting against a virus that has now killed nearly 200,000 Americans.
>
> The CDC shifted its guidelines Friday, but the change was not widely noticed until a CNN report Sunday. Where the agency previously warned that the virus mostly spreads through large drops encountered at close range, on Friday, it had said "small particles, such as those in aerosols," were a common vector. [197]

---

[196] Facebook Says It Will No Longer Show Health Groups in Recommendations (Sep. 17, 2020) https://www.usnews.com/news/technology/articles/2020-09-17/facebook-says-will-no-longer-show-health-groups-in-recommendations (last visited Nov. 20, 2020).

[197] https://www.washingtonpost.com/nation/2020/09/21/cdc-covid-aerosols-airborne-guidelines/ (last visited Nov. 20, 2020).

202.    During October 2020, the UK Recovery trial and the Discovery trial in France were reanalyzed based on released data. The Recovery trial presented its data so that it obscured the fact that HCQ was just as effective as the much-lauded dexamethasone for ventilated patients, despite being labeled as "no-benefit." The French Discovery trial was terminated early with HCQ described as being of "no benefit." A reanalysis of its data shows a 17% benefit of HCQ in severe COVID patients over the controls. [198] Even with suspected rigging of the studies they couldn't completely remove efficacy in its entirety.

203.    On October 6, 2020, the FDA responded to an August 18, 2020 demand by Senators Johnson, Lee, and Cruz, who had asked for the studies and data it used to supported its EUA decision with respect to COVID outpatients.  The reply cites no peer-reviewed studies or data pertaining to outpatients receiving HCQ for COVID under physician supervision. It never answered the question. [199]

204.    On October 11, 2020, the WHO reversed its guidance on lockdowns. [200]

205.    In the end, the FDA recommended treatment protocols that banned early use of off-patent treatments that can cure patients in favor of having them languish at home maximizing the number of hospitalizations where they can be administered Remdesivir, that doesn't work.

---

[198] https://twitter.com/smackenziekerr/status/1313841137329729537?s=21 (last visited Nov. 20, 2020).
[199] https://www.hsgac.senate.gov/imo/media/doc/2020-3977%20RESPONSE%20JOHNSON.pdf (last visited Nov. 20, 2020)
[200] https://www.youtube.com/watch?v=63Ihe-PwKZw (last visited Nov. 20, 2020).

Figure 1. Recommendations for Pharmacologic Management of Patients with COVID-19 Based on Disease Severity

| DISEASE SEVERITY | PANEL'S RECOMMENDATIONS (Recommendations are listed in order of preference in each category below; however, all options are considered acceptable.) |
|---|---|
| **Not Hospitalized** or **Hospitalized but Does Not Require Supplemental Oxygen** | No specific antiviral or immunomodulatory therapy recommended The Panel **recommends against** the use of **dexamethasone (AI)** See the Remdesivir section for a discussion of the data on using this drug in hospitalized patients with moderate COVID-19.* |
| **Hospitalized and Requires Supplemental Oxygen** (but Does Not Require Oxygen Delivery Through a High-Flow Device, Noninvasive Ventilation, Invasive Mechanical Ventilation, or ECMO) | **Remdesivir** 200 mg IV for one day, followed by remdesivir 100 mg IV once daily for 4 days or until hospital discharge, whichever comes first (AI)[b,c,d] or **Remdesivir** (dose and duration as above) plus **dexamethasone*** 6 mg IV or PO for up to 10 days or until hospital discharge, whichever comes first (BIII)[f] If remdesivir cannot be used, **dexamethasone*** may be used instead (BIII) |
| **Hospitalized and Requires Oxygen Delivery Through a High-Flow Device or Noninvasive Ventilation** | **Dexamethasone**[e] plus **remdesivir** at the doses and durations discussed above (AIII)[f] or **Dexamethasone**[d,e] at the dose and duration discussed above (AI) |
| **Hospitalized and Requires Invasive Mechanical Ventilation or ECMO** | **Dexamethasone**[d,e] at the dose and duration discussed above (AI) or **Dexamethasone*** plus **remdesivir** for patients who have recently been intubated at the doses and durations discussed above (CIII)[f] |

Rating of Recommendations: A = Strong; B = Moderate; C = Optional
Rating of Evidence: I = One or more randomized trials with clinical outcomes and/or validated laboratory endpoints; II = One or more well-designed, nonrandomized trials or observational cohort studies; III = Expert opinion

* The Panel recognizes that there may be situations in which a clinician judges that remdesivir is an appropriate treatment for a hospitalized patient with moderate COVID-19 (e.g., a patient who is at a particularly high risk for clinical deterioration). However, the Panel finds the data insufficient to recommend either for or against using remdesivir as routine treatment for all hospitalized patients with moderate COVID-19.
[b] Treatment duration may be extended to up to 10 days if there is no substantial clinical improvement by Day 5.
[c] The Panel recognizes there is a theoretical rationale for initiating remdesivir plus dexamethasone in patients with rapidly progressing COVID-19.
[d] For patients who are receiving remdesivir but progress to requiring oxygen through a high-flow device, noninvasive ventilation, invasive mechanical ventilation, or ECMO, remdesivir should be continued until the treatment course is completed.
[e] If dexamethasone is not available, equivalent doses of other corticosteroids, such as prednisone, methylprednisolone, or hydrocortisone, may be used. See Corticosteroids for more information.
[f] The combination of dexamethasone and remdesivir has not been studied in clinical trials; see text for the rationale for using this combination.

Key: ECMO = extracorporeal membrane oxygenation; IV = intravenously; PO = orally

206.    The WHO recently confirmed Plaintiffs' worse fears that Remdesivir does not

work.[201]  Its comprehensive global study, in contrast to American Remdesivir and HCQ trials,

---

[201] Remdesivir has 'little or no effect' in reducing coronavirus deaths, WHO says (Oct. 16, 2020) https://www.cnbc.com/2020/10/16/who-remdesivir-has-little-or-no-effect-in-reducing-covid-19-deaths.html (last visited Nov. 20, 2020).

actually looks reliable and credible.[202]   It causes liver failure, how it mixes with other drugs is unknown, and it is unsuitable for pregnant women, nursing mothers or children.[203]

207.    With Defendants monopoly control of the public square and through its information suppression and predatory censorship, few Americans are permitted to know the sad truth: off patent solutions like HCQ[204] and Ivermectin[205] work, no one has to get sick or die, no one had to be locked down, banned from schools, deathbeds and funerals, and that the system is so corrupt, rigged by taxpayer funded federal agencies and a research cabal, that our elected representatives have been stripped of truth and options, denied the best science premised on the scientific method free of conflicts and corruption, and dependent on toxic advice, stripping from the authority and power that flows to them from a Constitutional Republic system.[206]

## VI. Means and Methods of Defendant's Monopolization Scheme and Schemes to Defraud and Defame Plaintiffs

208.     Defendants Facebook and Zuckerberg acquired a conspicuous monopoly of social media a/k/a "the public square." To avoid monopoly enforcement and curtailment of its immunity under the Communications Decency Act Section 230 (" Special Immunities"), Facebook engaged in a broad program to act as agents for and to ingratiate itself with government officials who were in a position to help it protect these Special Immunities.

---

[202] Repurposed antiviral drugs for COVID-19 –interim WHO SOLIDARITY trial results (Oct. 15, 2020) https://www.medrxiv.org/content/10.1101/2020.10.15.20209817v1.full.pdf (last visited Nov. 20, 2020).
[203] https://www.vekluryhcp.com/ (last visited Nov. 20, 2020).
[204] https://C19study.com.
[205] https://c19ivermectin.com/.
[206] America's Frontline Doctors https://www.americasfrontlinedoctors.com/ Dr. Zelenko https://thezelenkoprotocol.com/ (prior links last visited Nov. 20, 2020).

209.    Defendants Facebook and Zuckerberg, in the wake of the 2016, when they were being attacked for permitting allegedly "misleading" information to cause an unwanted election result, and to blunt any efforts to eliminate Facebook's Special Immunities, engaged in a broad information suppression program to support policies that government overseers would find useful.

210.   Defendants Facebook and Zuckerberg adopted censorship that marginalized users who were working against mandatory vaccines. After the COVID-19 pandemic began, Facebook expanded its program to engage in censorship and information control that promoted new drugs and new vaccines for COVID-19 in preference to off-patent solutions.

211.    When President Trump began criticizing the WHO and "experts" from the U.S. Health Care agencies, to protect its Special Immunities, Defendants Facebook and Zuckerberg put the WHO in charge of health content on the public square, gave money to the CDC and provided the WHO with an unlimited advertising and marketing budget, even after the United States government announced it would be withdrawing from the WHO. Defendants Facebook and Zuckerberg paid money to a wide array of entities and causes that ingratiated itself with those in a position to strip it of its Special Immunities, most recently, $350 million to the Center for Tech and Public Life that provided funding for "get out the vote" efforts in key battleground states.[207]

---

[207] Zuckerberg, Chan donate an additional $100 million for state, local election administration efforts (Oct. 21, 2020) https://news.ballotpedia.org/2020/10/21/zuckerberg-chan-donate-an-additional-100-million-for-state-local-election-administration-efforts/ (last visited Nov. 20, 2020); GOP Legislators Sue Philly, Delco, Centre County Over Election Grant Money (Sep 29, 2020) https://www.nbcphiladelphia.com/news/local/gop-legislators-sue-philly-delco-centre-county-over-election-grant-money/2547438/ (last visited Nov. 20, 2020).

212. When Plaintiffs' entered into Facebook user agreements, Facebook promoted its services as being without charge and paid for by advertising revenue. Defendants Facebook and Zuckerberg always had a funding scheme that went far beyond what was disclosed to Plaintiffs and the actual value of users' content and information was actually far in excess of the value of the free Facebook services provided. This was a direct purchase from a monopoly.

213. Despite a campaign to convince Plaintiffs they owned and controlled their content, Defendants Facebook and Zuckerberg always viewed it as belonging, in whole and in part, to Facebook. The free service offer upon sign-up, therefore, was actually a complex services agreement whereby Facebook would provide access and Plaintiffs would provide content, but the agreement governing the creation and control of user content never reflected that Facebook could seize user content and separate users from their content if it helped Facebook protect its Special Immunities.

214. After engaging in wide ranging and punitive censorship to please its government overseers, Defendants acted as agents of these government overseers controlling information on the public square. As agents of their government overseers, Defendants illegally seized Plaintiffs' content on behalf of these government overseers in October 2020, by unilaterally claiming rights to seize user content.

215. Since on or about January 2020, to protect its Special Immunities, Defendants have engaged in a scheme, plan and artifice to disparage and defraud anyone supportive  of "off-patent" treatments to COVID -19 such as HCQ, ivermectin, and zinc, by calling into question their necessity, efficacy and safety by means of materially false and fraudulent pretenses,

representations, and promises, through three principal methods: (A) making materially false statements; (B) omitting to disclose material facts; and (C) creating a materially deceptive scheme.

216.    In January 2020, Facebook imposed WHO-approved and CDC-approved restrictions and limitations on its curation of the public square.   The COVID-19 pandemic provided real world opportunity to push the pro-mandatory vaccine effort and it was widely promoted that "normalcy" could not return post-COVID-19 until a vaccine was developed. In the meantime, the massive increase in hospitalized patients and EAU ensured that test subjects were available for risky new drug therapies like Remdesivir. Unfortunately for Americans, the need to maintain an inflated supply of severely ill patients foreclosed prophylaxis treatments and early-stage cures like HCQ and Ivermectin.

217.    Information aggregated, selected, curated, created, and posted by Plaintiffs'—i.e. objective truth-- contrary to this orthodoxy, made them targets of censorship as the COVID-19 pandemic developed creating and strengthening an official information echo chamber. Competing off-patent treatment solutions that countered this orthodoxy and that would have prevented mass hospitalizations attracted Facebook's reputational disparagement first on individual users' pages and then on HAN posts in early May 2020.

218.    The pall of censorship expanded to anyone claiming alternative COVID-19 treatments like Ivermectin and HCQ were available or efficacious. Suggestions that HCQ and other off-patent solutions functioned as a cure, prompted swift censorship action. Indeed, thinking that an off-patent solution could be a cure was treated as being "false" or as a "thought crime" and Facebook imposed these viewpoints on the public square, promoting mockery and shame for anyone that promoted such ideas.

219.    Plaintiffs citing on-going studies regarding the efficacy of HCQ and Ivermectin, pointing out obvious conflicts of the researchers and research institutions, pointing out indicia of fraud and corruption, organizing meetings in public that did not meet the content approval of their government overseers, presenting evidence that the studies were corrupt and false, were suppressed by Facebook's and Defendant Zuckerberg's Artificial Intelligence (AI) programs. Likewise, questioning the credibility and independence of CDC, WHO and NIH officials (including officials like Dr. Anthony Fauci) of the assertions first that masks did not work and then that they should be mandatory, of the FDA guidelines that result in patients and their physicians being denied the choice of potential early treatments, such as ivermectin, while ineffective treatments, like Remdesivir, are promoted, all become forbidden speech that supposedly justified the defendants' seizure of plaintiffs' content.

220.    Defendants have created the false appearance that HAN and its users are in violation of Facebook's Terms for publishing "false information." Under that ruse, defendants have deactivated and coerced administrators and users of HAN into taking its platform private (on August 13, 2020), making it impossible to share posts directly from HAN's platform. Defendants continue to censor content and user posts, publish materially false or misleading content on HAN's page, "shadow ban" HAN and "sandbox" third-party users (i.e., the defendants deceptively limit the reach of HAN content and of content that could be published by HAN users, keeping it from other whom the Defendants psychologically profile as "undecided"), all while concealing defendants' methods and collaborators. In truth, as Defendants are fully aware, HAN has neither posted any objectively false information and Defendants have not applied this supposed standard to blatantly false information which Defendants routinely permits to be posted. Furthermore, HAN has not violated any fundraising or any terms of service and its

administrators and users have stated numerous times: "our only agenda is to save American lives and we allege that Facebook is aiding and abetting a mass crime against humanity which has caused us emotional distress."

221.    Defendants and others engaged in a scheme to defraud users by, among other conduct:

(A)    Misrepresenting to all third-party Facebook users by means of a "warning label" on Plaintiffs' posts.  When a person seeking to save a loved one's life somehow gets through the obstacles Facebook has arrayed to ensure s/he gets diverted from HAN's page, the user is diverted to health information of questioned value, endless "get out the vote" efforts, and to "recognized" health agencies with "officially approved" information. Plaintiffs were accused of dishonesty, falsely suggesting that the vaccine-related content and treatment related content on HAN's page is not reliable, truthful, and up-to-date information.

(B)    Misrepresenting as facts to all third-party Facebook users that particular enumerated third party-content posted on the HAN page contains "False Information Checked by independent fact-checkers," and to "see why" users should instead accept the content posted by Facebook's "fact-checkers" on HAN's page as "true" information on the same subjects. Voiding Facebook's "Good Samaritan" exceptions under CDA Section 230, these actions were 1) in Bad Faith 2) were for Compensation 3) were imposed through Gross Negligence and 4) with Wanton or Willful Misconduct.

(C)      Engaging deceptive mechanisms and machine-learning algorithms, which secretly

demote, hide, and/or limit the visibility and reach of Plaintiffs' HAN's page and posts on

HAN's page (practices known as "ghosting"  "shadowbanning" or "deboosting") from

third party users whom Facebook psychologically profiles as "undecided" (a practice

known as "sandboxing") in order to hide content from those it might sway, while

misrepresenting that no such artificial processes or limitations have occurred.

(D)      Misrepresenting as fact to all third-party Facebook users that Facebook relies

upon "independent fact-checkers" to identify and tag "false information" posted on

HAN's Facebook page or the pages of its users based on a set of objectively neutral,

reliable, and up-to-date factual criteria. In actuality, the criteria that is actually applied is

neither neutral, reliable, nor up-to-date, and the "factcheckers" are in privity with, or

controlled by Facebook. Defendant Facebook funds the factchecking organizations and

must provide them with content direction and guidance. [208]

(E)      Misrepresenting as fact to all third-party Facebook users that Plaintiffs and HAN

have had content removed from or tagged on its platform, can appeal that decision either

to Facebook's content moderator panel, or to an "independent" "Oversight Board," and

that in making such determinations, Facebook does not have any conflicts of interest that

compromise its judgment. [209]

---

[208] Facebook is quietly pressuring its independent fact-checkers to change their rulings (Aug 20, 2020) https://www.fastcompany.com/90538655/facebook-is-quietly-pressuring-its-independent-fact-checkers-to-change-their-rulings Facebook repeatedly overruled fact checkers in favor of conservatives (Aug, 27, 2020) https://www.engadget.com/facebook-overruled-fact-checkers-to-protect-conservatives-220229959.html (prior links checked December 2, 2020).

[209] M. Zuckerberg, Facebook's commitment to the Oversight Board, FACEBOOK (Sept. 2019), https://about.fb.com/wp-content/uploads/2019/09/letter-from-mark-zuckerberg-on-oversight-board-charter.pdf (checked November 5, 2020).

(F)     Concealing the extent to which Facebook actively collaborated with Rep. Schiff

and other government overseers, including members of Congress directly and through

intermediaries,[210] the CDC and WHO to implement their overall scheme.  Based on

information and belief this collaboration extended to other state and federal officials both

inside and outside of government as well as drug company executives. It created a false,

pessimistic, hopeless "reality" for its users for profit to protect its Special Immunities.

(G)     Defendant Zuckerberg concealed the fact that he was developing a drug or

vaccines with Bill Gates and others and was therefore developing products that competed

with off-patent solutions discussed by Plaintiffs and censored by Defendants.

(H)     Concealing their overall scheme by these and other deceptions, including false

and disparaging statements about HAN and its users.

(I)      Creating a market for "factchecking" organizations including Factcheck.Org,

Poynter Institute, Lead Stories LLC, and others whose purpose was to create a façade of

respectability and objectivity to what was a "brass knuckles" political exercise that

involved predatory deprivations of Constitutional Rights to protect and maintain

Defendants Special Immunities.

(J)      By supplying unlimited free advertising to WHO and $20 million to the CDC

whose incompetent guidance and advice was often being criticized by Plaintiffs.

---

[210] Dozens of Facebook lobbyists tied to members of Congress, investigation shows,
Lobbyists worked for 29 current members of Congress, including Democratic party leaders,
helping promote company's interests (Nov 20, 2019)
https://www.theguardian.com/technology/2019/nov/20/dozens-of-facebook-lobbyists-tied-to-members-of-congress-investigation-shows (last checked Dec 9, 2020).
https://www.opensecrets.org/orgs/facebook-inc/summary?all=2020&id=D000033563.

(K)     Defendants promote mandatory vaccine policies and patented drugs, ingratiating themselves with BigPharma advertisers, while engaging in an array of infringements which have the effect of ingratiating Facebook with its government overseers, that might otherwise destroy Facebook's special immunities. Violating plaintiffs' constitutional rights provides a 'win win' for defendants. In short, Defendant Facebook is Big Brother, deployed by and on behalf of those whose policy and financial goals require that off-patent drugs cannot be either prophylactic or therapeutic for COVID-19.

222.    Among the means and methods by which these Defendants carried out the scheme to:

1) defraud and deprive Plaintiffs of Constitutional Rights and disparage them in the public square;

2) to protect their Special Immunities (monopoly and Section 230 immunity); and

3) to violate their contracts and promises

were their transmission by means of wires in interstate commerce of the following telephone calls, payments, emails and/or online communications that contained materially false and misleading information, and proximately caused damages, including (1) the falsely disparaging "warning label"; (2) the materially deceptive use of "fact-checkers"; (3) disabling HAN's right to "appeal"; (4) paying international government organizations and US government officials free advertising, cash, and political endorsements and (5) concealment of the overall scheme.

## VII.   Defendants Falsely Disparage Plaintiffs and HAN Through the Warning Labels, and Materially Deceptive use "Fact-Checkers" and Branding Posts as False

223.    As alleged supra, on September 4, 2019, after "several months of discussion" with the WHO, Facebook published warning labels on newsgroups that advocated health policy that conflicted with WHO policy. [211]

224.    Facebook republished this disparaging falsehood every time a user uploaded to newsgroups like HAN, as has occurred literally thousands of times since May 2020.

225.    In reference to HAN, users must perform a search which yields the following screen:



226.    Most users reasonably believe that the newsgroup content is described at the blue bar and below and it's the rare user who would know that they are actually required to click on an invisible hyper link on the name itself. Clicking on the icon is not sufficient and if you click less than perfectly the user is drawn into the "official truth abyss." Conditions here have changed

---

[211] Vaccine Misinformation: Statement by WHO Director-General on Facebook and Instagram, supra, (https://www.who.int/news-room/detail/04-09-2019-vaccinemisinformation-statement-by-who-director-general-on-facebook-and-instagram

where some click areas have been removed (making diversion less likely) and predictive search

has returned as of December 9, 2020 for existing members.



227.    Facebook's presentation of HAN top banner space of any webpage is valuable

"screen real estate" where prime content would ordinarily be shown. Facebook's intended effect

is to deprive HAN of this screen space and to redirect users away from HAN's page to its

approved content. Defendant Zuckerberg publicly boasts that his "warning labels" and "fact-

checks" effectively divert 95% or more of all users from clicking through to the actual

content.[212] In HAN's case, users must develop somehow sharpshooter computer mouse control

to get to the HAN group.

228.    Those falling onto Facebook's trap get diverted away from HAN's discussion of

research papers, competing protocols, clear and convincing evidence regarding the importance of

---

[212] Entire CNN April 16 Coronavirus Town Hall [Video], CNN BUSINESS (Apr. 17, 2020), https://www.cnn.com/videos/business/2020/04/17/entire-april-16-coronavirus-town-hall-part5-sot-vpx.cnn.

early treatment, etc. Again, since CDC has published and given a rash of false and erroneous

information, the fact that Facebook users might fall into the CDC's trap if they did not click

perfectly torments Plaintiffs who only wanted to help save lives.





229.    As part of Plaintiffs' First Amendment rights, they were specifically using

Facebook to present potentially lifesaving health information from organizations, physicians,

researchers that Facebook did not consider to be officially "recognized." Facebook's design

ensured that most users looking for the Plaintiffs' newsgroup would be diverted to Defendant's

"recognized" organizations that promoted falsehoods or voting advice.



230.    On or around May 8, 2020, Plaintiff Loveland had experienced some masking of posts regarding HCQ but her problems with Facebook grew when she posted the MATH+ protocol from Eastern Virginia Medical School by Dr. Marik.  Loveland was distressed after following the patients in New York who had been dying after being put on ventilators which prompted her to research the Math+ protocol. Soon after she posted, she was informed by Facebook moderators that she was wrong for posting it and that she would be banned next time she violated community standards by posting false information.  This post involved a medical COVID-19 protocol by the doctor who developed the IV vitamin C and steroid response to sepsis.  His hospital at the time had a 6-8% death rate for critical patients (versus 30% plus).  He was the first doctor who used steroids for COVID-19 against the advice of the WHO

231.    On or around May 15, 2020, a HAN administrator contacted Loveland who expressed mystification and outrage about her suspension and requested that Loveland serve as

an administrator. By this time, Loveland was alarmed by the responses of Facebook moderators to informational posts on HAN as posts were being flagged aggressively and she refused. Her primary motivation was that she was humiliated by Facebook in being reprimanded, then banned and she feared a permanent ban. She was worried about losing her access to all friends and family on Facebook.

232.    On or around June 6, 2020, Loveland posted a link to a chart that is STILL being updated that provided an undeniable case that HCQ was efficacious and then the HCQ research studies that at the time only numbered over 30 studies. This list was so comprehensive, it even included the negative Recovery trial in the UK (paragraph 173, footnote 148) as well as the Boulware Studies (see 189).  It was a comprehensive chart that linked to the literature with a summary for each study and was strictly an informational resource.  Her posts were removed for causing public danger and Loveland was banned for two days. Although the chart has been updated since her ban, and the authors have also added other treatment solutions, this is the current version of the chart which tracks all HCQ studies that now number 192 studies, 124 are peer reviewed. [213]

---

[213] C19study.com.





233.     On or around early June 2020, Loveland was banned a third time.  This time the pretext was that she linked to a third study with a link to an interview with Dr. Thomas Borody who is promoting a potential triple regimen cure for COVID-19.  Dr. Borody states that COVID-19 is surprisingly easy to cure, much more successful and immediate than his cure for ulcers.  Borody believes that COVID-19 is completely treatable, and he calls the death of senior citizens completely avoidable.  He says that his government will not talk to him, so he has been forced to take it to interviews.  HAN members were banned for three days for posting an interview with

Dr. Borody on COVID 19 and Ivermectin.  Loveland was banned for three days.  Other HAN members had pop-up windows on their accounts during and for a few weeks after each ban reminding them not to post any more things that went against community standards and they would be banned if they did.



234.     From the time HAN was formed in early May 2020 to present, based on information and belief, Facebook is estimated to have performed inestimable censorship decisions in a variety of ways, many of which referred to factchecks by Defendants. While Facebook promoted the idea that there is a method to contest censorship decisions, users rarely got a response to appeals and often the feature was disabled. The following are just examples of censorship and references to factchecks that were made against Plaintiffs and posters and, in some cases, by posters who are not yet Plaintiffs whose posts required administrative action. The

flurry of censorship decisions was so intense in July and August 2020 that HAN administrators and users assumed the newsgroup would be banned and that users of the newsgroup risked a ban as well. Members, some plaintiffs knew about who were accomplished researchers, became concerned about the public attention HAN was receiving and they left, as members came over from other banned groups, outraged and indignant about being banned, and changed the tenor of the group and it became difficult to get administrators. Also, members volunteered, but then withdrew when they experienced the risks and controversy being imposed on administrators and moderations by Facebook.

235.    This post below, indicating that that the US would be treated like a malaria zone (over the counter or widely available HCQ) was blocked by Facebook on May 6, 2020 for no stated reason. If HCQ had been made widely available at this time countless lives could have been saved.



236.    Facebook oriented this barrage of censorship as if to impress upon Plaintiffs and Facebook users that there was no treatment solution and, most certainly, HCQ was not a treatment solution, it was dangerous and it could not be obtained in the United States.  On or around June 15, 2020, a user posted the following to let users know that HCQ was legal and physicians were prescribing HCQ as a prophylaxis. Facebook falsely alleged not only that the

information posted was false and dangerous—in actuality the information was true and

lifesaving—Facebook's deceptive censorship short circuited searches for physicians willing to

prescribe HCQ because users coming across the fraudulent censorship would conclude it really

was futile to try to obtain it, it was illegal or unsafe to use or there just were no doctors who

could legally prescribe it. Had HAN users not been deterred from continuing to search, they

would have learned the truth, that HCQ could be a life-saving preventative for many Americans.

This would have unburdened their minds and permitted them to leave their homes. The second

row of censored items involve statements made by Pfizer's head of research and comments

attributed to Dr. Fauci suggesting he had knowledge about HCQ.







237.    To get a view of the state of the HCQ research in February 2020, one need just go to the handy link that lists the studies as they existed when Dr. Fauci would have learned about a new coronavirus emerging from Wuhan, China that we laid out in great detail in paragraphs 98 to 106, infra,  along with additional studies below .  At the time, horrified Americans observing what looked like a morally bereft fraud and corruption scheme were searching to explain why clear evidence of HCQ efficacy seemingly could not be seen. Politifact and Science Feedback rely on technicalities which obscure the overarching truth: Dr. Fauci must have known full well that HCQ was efficacious and defendant Politifact is helping with the cover up,



| 2/20 | Late | Jiang et al., Chin. J. Tuberc. Respir. Dis., 2020, 43, doi:10.3760/c... | Expert Consensus on Chloroquine Phosphate for the Treatment of Novel Coro... |
| | | Early trials in China show CQ results in shorter hospital stays and improved patient outcomes. | |
| 2/19 | Late | Gao et al., BioScience Trends, 2020, doi:10.5582/bst.2020.0104... | Breakthrough: Chloroquine phosphate has shown apparent efficacy in treatme... |
| | | Results from 15 clinical trials in China showing CQ is effective. | |
| 2/17 | Late | Sun Yanrong, deputy hea... news | Antimalarial drug confirmed effective on COVID-19 |
| | | HCQ under clinical trials in >10 hospitals in China and has shown fairly good efficacy. | |
| 2/11 | Late | Xia et al., ChiCTR200002... viral+, ↓37.5%, p=0.17 | Efficacy of Chloroquine and Lopinavir/ Ritonavir in mild/general novel coronav... |
| | | Early results from a very small trial, reported within the application for a later trial. Very minimal details are provided, but we include this as the earliest publishe... | |
| 2/4 | In Vit... | Wang et al., Cell Res. 30,... in vitro | Remdesivir and chloroquine effectively inhibit the recently emerged novel coro... |
| | | In vitro study, not included in the study count or percentages. Remdesivir and CQ potently blocked virus infection in vitro. | |

238.    In July 2020, Plaintiffs and all users of Facebook began to receive messages like these whenever they "liked" a news article that was judged by Defendants Facebook AI programs as being "fake news." Censorship decisions seemed to rehabilitate Dr. Fauci [214] with great urgency while *The Lancet* studies were left up untouched, and references to the efficacious HCQ Ford System study (paragraph 172) were masked, factchecked and blocked.



---

[214] https://www.poynter.org/search/?q=fauci;  https://leadstories.com/cgi-bin/mt/mtsearch.cgi?IncludeBlogs=1&search=fauci; https://sciencefeedback.co/?s=fauci; https://www.politifact.com/search/?q=fauci.

239.     In July 2020, after the Frontline Doctors had a press conference about the lifesaving characteristics or early treatment with HCQ, Facebook moderators initially blocked, suspended, and censored any posts about the event. It could have exceeded 100 posts.[215] After a few days Facebook continued to block all links to the video press conference but permitted some print pieces to stay up with cloaking. Eventually the cloaking stopped, but Facebook cloaked photos depicted a full facial photo of Dr. Stella Immanual.  This alarmed many users of HAN and could not have had a good faith purpose.



---

[215] https://www.rev.com/blog/transcripts/americas-frontline-doctors-scotus-press-conference-transcript.





240.   Sometimes the abuse was so extreme there was a graveyard humor to it.  This was an extensive pattern and malicious "news" stories were left up or when an effort was undertaken to discredit the doctors (Dr. Immanual especially) the discrediting posts were left unmolested as were her religious observance videos that Facebook seemed to view as being helpful to the cause of its government overseers.







**Ronald, You Reacted to a Post With False Information About COVID-19**

That post was removed because it had harmful false information. The World Health Organization (WHO) has a webpage with common rumors that you can share with friends so everyone can stay safe.

Share Link        Go to who.int







241.    Since June 2020, Plaintiff Loveland was dissuaded from posting about COVID-19 treatment solutions, but she would occasionally post and the pattern of harassment from Facebook has continued. It is not just outright bans, of which she has endured three, they also do things to make it difficult for anyone to find her post or easily discern its importance.  Here are examples from August 18, 2020 and September 29, 2020.



242.    On August 1, 2020, a user posted an article out of frustration regarding the foot

dragging with HCQ.  The meme stated: "Just because hundreds of doctors are reporting HCQ is

curing some COVID-19 patients, it is not valid until we have a major study done. As soon as a

COVID-19 vaccine is manufactured, it must be delivered to healthcare professionals for

immediate human injection. Proper studies can be done later."  While the meme perhaps was not

technically accurate, the fact check from USA Today was interpreted by most everyone that

HCQ is not efficacious which of course was the intention of the fact check. The point being that

HCQ that was FDA approved and safe for 70 years seemed to be getting drastic scrutiny when

new drugs like Remdesivir, that is not efficacious, and vaccines were met with streamlined

approvals. This was not to benefit American Covid-19 patients. [216]



243.    On August 4, 2020, another HAN user was reprimanded for posting something

regarding the efficacy of HCQ and directed to a false and dangerous fact check. He stated: "Will

---

[216] https://www.factcheck.org/2020/06/meme-misrepresents-faucis-position-on-vaccine-trials/.

someone please inform Facebook that we left the World Health Organization? Apparently,

Senior Zuckerberg hasn't received the news yet."



244.    On August 8, 2020, Facebook again posted a factcheck from Facebook's

Factchecker Science Feedback maintaining that HCQ was not efficacious. This was and is false

and has caused many deaths. All references to the Ford study referenced infra (paragraphs 172,

180 and 189) were banned (examples below), Facebook moderators were very aggressive about

making certain this study could not be seen. But Facebook always and continues to promote the

fraudulent *Lancet* Study referenced immediately below that has also killed countless human



beings through research fraud.[217]





245.    On August 17, 2020, Facebook flagged a post by a HAN user about how much lower COVID-19 death rates are in malaria zones as falsely represented by Defendant LeadStories.Com and Science Feedback. Based on information and belief, the science the user referenced is accurate.





246.    On September 1, 2020, Facebook censored a HAN user for posting an article about over counting COVID-19 cases as if this were not a legitimate area of concern. Facebook referred users to Defendants' LeadStories.Com, Science Feedback, and PolitiFact who apparently have super truth diving powers.



247.    On September 19, 2020, Plaintiff Sharon Cheatle, attempted to post guidance to HAN users about migrating to another platform but was prevented from posting by Facebook. She developed a workaround having had extensive experience getting around the Facebook algorithms that requires users to misspell words or develop code words. Cheatle eventually

abandoned her efforts to migrate because few were willing to abandon their Facebook profiles and friends and there are no competitors to Facebook.



248.    On September 21, 2020, Facebook again directed Factcheck to draft a factcheck that outlined yet another distinction without a difference. By doing so, Facebook colluded with governmental overseers to maintain the false façade that HCQ was not an available preventative and treatment cure. The Factcheck was drafted by LeadStories.Com and disputed the

professional opinion of a leading physician and attorney Dr. Simone Gold.





249.    HAN also received a factcheck about what was claimed as "partially" false information on COVID-19 statistics from what was a posting of a scientific journal by Plaintiff Tyler Boyle directly.



250.    Here is an example of an alleged violation of community standards where stellar citizens are flagged as dangerous individuals. Facebook erased the underlying post and record of the censorship:



251.   On or about May 2020, Facebook permanently disabled the "dispute" function on HAN's account so that no one could challenge Facebook's actions through direct submission, and Facebook has ignored HAN's written requests over the past five months that both its content and full functionality be restored to HAN's page.

### VIII. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (FIRST, FOURTH AND FIFTH AMENDMENTS — *BIVENS* VIOLATIONS)
### (All Defendants)

252.   Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

253.     Plaintiff seeks an implied private damages remedy against private Defendants who act jointly or in concert with federal government agencies or actors, referred to herein as government overseers, to deny Plaintiffs First Amendment speech, Fourth Amendment Freedom from unreasonable search and seizure, and Fifth Amendment property rights. *Davis v. Passman*, 442 U.S. 228 (1979) (implied damages remedy under Fifth Amendment Due Process Clause); *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (Fourth Amendment). The private cause of action is implied under 28 U.S.C. § 1331 to vindicate constitutional rights which would otherwise go unredressed. By analogy to 42 U.S.C. § 1983, Plaintiffs must show both (1) the deprivation of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was committed by a person acting under color of [federal] law. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138 (9th Cir. 2012).

254.     The purpose of *Bivens* is to deter individual federal officers from committing constitutional violations, and the constitutional tort remedy against private entities is foreclosed only where claimant has other effective remedies. *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 71 (2001); *cf. Davis v. Passman*, 442 U.S. at 245 ("For Davis, as for Bivens, it is damages or nothing."). Here, too, a private remedy should be implied because Plaintiffs have no other recourse to right the wrongs of all Defendants, corporate and individual.

255.     The First Amendment protects Plaintiffs rights of free speech and association. Under the First Amendment, Americans have the right to hear all sides of every issue and to make their own judgments about those issues without government interference, censorship, or limitations. Content-based restrictions on speech are presumptively unconstitutional, and courts analyze such restrictions under strict scrutiny. It is axiomatic that public agencies such as the CDC, the FDA and WHO could not themselves directly censor or issue a prior restraint upon

Plaintiffs online speech. *See*, *e.g.*, *Freedman v. Maryland*, 380 U.S. 51, 59 (1965) (motion picture exhibition censoring panel could prohibit screening of films only if it assured exhibitor "that the censor will, within a specified brief period, either issue a license or go to court to restrain showing the film"); *Speiser v. Randall*, 357 U.S. 513, 526 (1958) ("Where the transcendent value of speech is involved, due process certainly requires . . . that the State bear the burden of persuasion to show that the appellants engaged in criminal speech."). So, here, the judicial branch must affirm a bedrock principle of liberty that governmental agencies cannot legally "sub-contract" or "privatize" the role of public censor to Facebook as an end-run around the Constitution. Facebook's actions, taken "under color of" federal law, *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 954 (9th Cir. 2008) (en banc), constitute a violation of Plaintiffs constitutional free speech rights.

256.     Defendants' deprivation of Plaintiffs federal rights is "fairly attributable" to the government, *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982), as it was taken with significant encouragement from, and in close consultation with, governmental agencies and actors. *Franklin v. Fox*, 312 F.3d 423, 444-45 (9th Cir. 2002). Ultimately, joint action exists when the government has "'*so far insinuated itself into a position of interdependence with* [*the private entity*] *that it must be recognized as a joint participant in the challenged activity.*'"*Gorenc v. Salt River Project Agric. Improvement & Power Dist.*, 869 F.2d 503, 507 (9th Cir.1989) (emphases added). Defendants' misconduct is a far cry from "merely hosting speech by others." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019); *Fed. Agency of News LLC v. Facebook, Inc.* 2020 U.S. Dist. LEXIS 6159, *26 (N.D. Cal. 2020).

257.     Specifically, the corporate and individual Defendants have acted in concert with the government overseers, to deprive Plaintiffs of their constitutional free expression rights.

Under Article 71 of its Constitution, the WHO may only consult and cooperate with non-governmental national organizations *with the consent of the Government concerned*.[218]

258.    Facebook willfully participated in joint action with its government overseers to "police" policies through Facebook's signature algorithms and machine learning to define, identify, label as "false news" and/or censor Plaintiffs speech with respect to COVID-19.

259.    Rep. Schiff's February 14, 2019 public letter to Zuckerberg deployed the term "vaccine misinformation" as it has been used by the CDC and WHO, as a euphemism for any expression of skepticism toward government or pharmaceutical industry pronouncements about vaccine safety or efficacy, regardless of its truth. Rep. Schiff also forcefully encouraged Facebook to refer users to "authoritative" sources of information, i.e., the CDC and/or WHO. In early 2020, Facebook expanded its application of "misinformation" to anything the CDC might not like, including off-patent prophylaxis, off patent cures, questioning shutdowns, organizing demonstrations against shutdowns, and questioning the rationale behind mask use.

---

[218] *Basic Documents*, WHO, *supra*, https://apps.who.int/gb/bd/pdf_files/BD_49th-en.pdf#page=1 (emphasis added).

**COVID-19: Community Standards Updates and Protections**

As people around the world confront this unprecedented public health emergency, we want to make sure that our Community Standards protect people from harmful content and new types of abuse related to COVID-19. We're working to remove content that has the potential to contribute to real-world harm, including through our policies prohibiting coordination of harm, sale of medical masks and related goods, hate speech, bullying and harassment and misinformation that contributes to the risk of imminent violence or physical harm.

As the situation evolves, we continue to look at content on the platform, assess speech trends, and engage with experts, and will provide additional policy guidance when appropriate to keep the members of our community safe during this crisis.

260.    On April 10, 2020, Facebook released a video about how it determines what content is appropriate for "all users" on its platform. Neal Potts, Facebook's Public Policy Director states that, "These policy changes must be clear, so they can be applied consistently across the world." [219]

261.    On October 22, 2020, Facebook announced that its Oversight Board is:

"announcing an important milestone in the progress of the Oversight Board. From today, if your content is removed from Facebook or Instagram and you have exhausted the company's appeal process, [220] you can challenge this decision by appealing to the Oversight Board. Similarly, Facebook can now refer cases for a decision about whether content should remain up or come down. In the coming months you will also be able to appeal to the Board about content you want Facebook to remove." The Board, staffed by citizens from all over the world, makes no reference to the importance of protecting the constitutional rights of Americans. In fact, its ignorance of the US Constitution and the rationale for creating it are manifest: "freedom of expression is a fundamental human right. Facebook seeks to give people a voice so we can connect, share ideas and

---

[219] https://about.fb.com/news/2019/04/insidefeed-community-standards-development-process/.

[220] Based on information and belief, since HAN was formed in early May, 2020, there really was no appeal process to speak of and that was because Facebook was in the middle of changing its policies and creating this Board.

experiences, and understand each other. <mark>Free expression is paramount, but there are times when speech can be at odds with authenticity, safety, privacy, and dignity. Some expression can endanger other people's ability to express themselves freely. Therefore, it must be balanced against these considerations."</mark>

\*\*\*\*

ARTICLE 2

Authority to Review

\*\*\*

1. Scope

In instances where people disagree with the outcome of Facebook's decision and have exhausted appeals, a request for review can be submitted to the board by either the original poster of the content or a person who previously submitted the content to Facebook for review. Separately, Facebook can submit requests for review, including additional questions related to the treatment of content beyond whether the content should be allowed or removed completely. Detailed procedures on submission and requirements for review by the board will be publicly available.

2.  Basis of Decision-making

Facebook has a set of values that guide its content policies and decisions. The board will review content enforcement decisions and determine whether they were consistent with Facebook's content policies and values. For each decision, any prior board decisions will have precedential value and should be viewed as highly persuasive when the facts, applicable policies, or other factors are substantially similar.

<mark>When reviewing decisions, the board will pay particular attention to the impact of removing content in light of human rights norms protecting free expression.</mark>

\*\*\*\*

ARTICLE 7

Compliance with Law

<mark>Nothing in this charter or other governing documents shall be interpreted in a manner that would result in a violation of law by Facebook, the trust, the board or any other associated entity. The board will not purport to enforce local law.</mark>
https://www.oversightboard.com/governance/ (highlight added)

Based on information and belief, by "local law," the Facebook Board is referring to the United States Constitution.

262.    Defendants' behavior qualifies as "state action" under the joint action test due to their active cooperation and interdependence with their government overseers. On the public record, there is a "sufficiently close nexus" or symbiosis between the federal government and the challenged actions of Defendants that the actions of the latter may be fairly treated as those of the government itself. *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974). The CDC's and WHO's open and extensive coordination with Facebook shows "state action" in furtherance of an agreement between the government and a private party for purposes of Plaintiffs *Bivens* claim.

263.    Rep. Schiff and others also acted "under color of federal law" in issuing his pointed request to Facebook to censor and remove COVID-19 misinformation from its platform. Thus, Rep. Schiff's conditional notice to remove Facebook's Section 230 immunity (regarding "vaccine misinformation:") also constitutes "significant encouragement, either overt or covert, that the [private actor's] choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). Having leveraged Facebook into complying with his mandates, Rep. Adam Schiff (D-CA) sent a letter to Google, YouTube, and Twitter as well "urging the platforms to explicitly notify users when they've engaged with misinformation about the coronavirus…" "Though the best protection is removing or downgrading harmful content before users engage with it, that is not always possible," Schiff wrote in his letter [to Google and Twitter]…[a]s you are likely aware, Facebook recently announced plans to display messages to any users who have

engaged with harmful coronavirus-related misinformation that has since been removed from the platform and connect them with resources from the World Health Organization.[221]

264.     It is well-established that, as a rule, the government "may not suppress lawful speech as the means to suppress unlawful speech." *Ashcroft v. Free Speech Coalition*, 535 U. S., 234, 255 (2002). Facebook has closely coordinated with government actors in the design of its aims, and the technical means by which Facebook applies public agency definitions and literature to accomplish their jointly-held goals: to identify, warn against purportedly "rebut," and censor so-COVID-19 speech that does not agree with certain Facebook censors. Defendants actions in censoring Plaintiffs protected speech amounts to state action for purposes of the First Amendment. *See*, *e.g.*, *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983).

265.     In the typical case raising a state action issue, a private party has taken the decisive step that caused the harm to the Plaintiffs, and the question is whether the State was *sufficiently involved* to treat that decisive conduct as state action. *Nat'l Collegiate Athletic Ass'n. v. Tarkanian*, 488 U.S. 179, 192, 102 L. Ed. 2d 469, 109 S. Ct. 454 (1988). Beyond the public record cited *supra*, the missing pieces of official "involvement" are within the Facebook Defendants' possession, custody, and control. Plaintiffs requires judicial process to obtain Defendants' records and recollections of the "who, what, when, where, why, and how" of Facebook's collaboration with Rep. Schiff, the CDC, the FDA and WHO, the CDC, and/or others under their aegis, to design, implement, and monitor Facebook's "COVID-19 misinformation"

---

[221] https://www.theverge.com/2020/4/30/21243026/facebook-twitter-youtube-coronavirus-covid-19-misinformation-adam-schiff.

algorithm for identifying anti-HAN content, anti-Plaintiff conduct, and/or to supervise or monitor Facebook "fact-checkers" opposition articles.

266.   Facebook violated Plaintiffs First Amendment rights by labeling their content "False Information," and taking other steps effectively to censor or block content from HAN users. Facebook took these actions against Plaintiff in an effort to silence and deter its free speech solely on account of their viewpoint. The case raises an urgent wrong that will go unredressed absent a judicial remedy fitted to the high stakes of speech suppression in a free society.

267.   In addition, the Fifth Amendment provides that "[n]o person shall be . . . deprived of . . . property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. Facebook has taken Plaintiffs and other HAN users' valuable content for and in which action Facebook received significant encouragement from the government. *Cf. Del's Big Saver Foods, Inc. v. Carpenter Cook, Inc.*, 795 F.2d 1344, 1346 (7th Cir. 1986) ("A state cannot avoid its obligations under the due process clause by delegating to private persons the authority to deprive people of their property without due process of law."). Defendants' actions amount to an unlawful deprivation or "taking" of Plaintiffs property interests.

268.   "[T]he existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 164 (1998) (*quoting Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)). Certainly, by that measure, valuable content is a "thing of value" to HAN and the Plaintiffs as its beneficial owner, and a valid property interest.

*See*, *e.g.*, *Boston Chamber of Commerce v. Boston*, 217 U.S. 189, 195 (1910) (Holmes, J.) ("the question is what has the owner lost, not what has the taker gained").

269.    Facebook violated Plaintiffs' Fifth Amendment rights by confiscating their content under color of law without just compensation or due process. Facebook took these actions against Plaintiffs and other HAN users  solely on account of the viewpoints of Plaintiffs and HAN users, which conflicted with official viewpoints of U.S. and state government officials, and it was damaging to Plaintiffs reputations and their ability to sustain their common, sacred mission as Americans to save lives. This represents another urgent wrong that will go unredressed absent a judicial remedy fitted to the high stakes of officially sponsored viewpoint suppression in a free society.

270.    Additionally, with its dramatic "night and day" changes to its terms and conditions in October 2020, Facebook confesses to the scheme by claiming a right it does not legally have, to engage in conduct it had already serially engaged in, to "avoid or mitigate adverse legal or regulatory consequences important to Facebook" such as furthering its Special Immunities by acting as agents of its government overseers. In seizing its users content, Facebook violates the Fourth Amendment by engaging in unreasonable searches and seizures under color of law.

271.    Facebook's warning labels and "fact-checks" on Plaintiffs posts and on HAN's page increased the price of sharing free expression to requiring courage and the willingness to put years of content at risk—the preserved history of the Plaintiffs themselves.  Defendants made, authored, and published the warning label and "fact-checks" on HAN's page in order to deter Plaintiffs and their followers and other consumers from listening to, trusting, and relying on Plaintiffs content, and seeking available early treatments. By warning consumers instead to "go

to CDC.gov" for "reliable and up-to-date [vaccine] information," Defendants intended to persuade consumers instead to follow the CDC's recommendations that created a false impression that treatment options did not yet exist and that isolation, mask use, and living in fear of a virus was the only option until alleged life-saving vaccines could be produced by its major advertisers, pharmaceutical companies such as Merck, GSK, Sanofi, and Pfizer, who buy $1 billion per annum in advertisements from Facebook as well as others.[222]

### SECOND AND THIRD CAUSES OF ACTION
### (SHERMAN ACT VIOLATIONS — 15 U.S.C. § 2; Clayton Act § 4)
### MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION
### (Defendants Facebook and Zuckerberg)

272.     Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

273.     Section 2 of the Sherman Act, 15 U.S.C. § 2, provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person . . . to monopolize any part of the trade" is guilty of an offense and subject to penalties. In addition, the Government may seek injunctive relief. 15 U.S.C. § 4. The elements of a private cause of action monopolization claim under the Sherman Act, 15 U.S.C.§ 2, and Clayton Act Section 4 are: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development because of consequence of a superior product, business acumen, or historic accident. *United States v. Grinnell Corp.,* 384 U.S. 563, 570-71 (1966); *United States v. Dentsply Int'l, Inc.,* 399 F.3d 181 (3d Cir. 2005).

---

[222] Big Pharma pushing targeted Facebook ads (March 4, 2020) https://www.axios.com/facebook-users-targeted-pharmaceutical-ads-66a16870-c4da-4a9d-a45f-743d8a8852c5.html (last checked Dec 5, 2020).

274.    To state a claim for attempted monopolization under Section 2 of the Sherman

Act, the plaintiff must plead facts showing (1) that the defendant engaged in predatory or

anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability

of achieving monopoly power.  In evaluating allegations of anticompetitive conduct, liability

"hinges on whether valid business reasons, as part of the ordinary competitive process, can

explain the defendant's actions that resulted in a dangerous probability of achieving monopoly

power." [223]

275.    Defendants have willfully acquired and maintained monopoly power in the

relevant market. There are no reasonably interchangeable products that would effectively

constrain, or have effectively constrained, Facebook from imposing and profitably sustaining

during the relevant period a significant artificial decrease in compensation to consumers for their

user information and attention paid to advertisements.  Facebook also has the power to impose

and profitably sustain lower levels of data privacy protections and social media network quality

than would occur in a world where Facebook had not illegally monopolized the Social Network

Market.  Facebook has the power to control prices and exclude competition in the Social

Network Market.

276.    High barriers to entry, high switching costs, and strong direct and indirect

network affects make it unlikely, at any time in the foreseeable future, for a competitor to enter

or take away substantial market share from Facebook in the Social Network Market in the United

States to compete effectively with Facebook.

---

[223] *Phila. Taxi Ass'n v. Uber Tech., Inc.*, No. 17-1871 (3d Cir. Mar. 27, 2018)

277.     Facebook has willfully acquired and maintained monopoly power in the Social Network Market by means of predatory, exclusionary, and anticompetitive conduct.

278.     By eliminating competition and obtaining and maintaining monopoly power over the Social Network Market as described above, Facebook was able to, and did, artificially decrease compensation to Plaintiffs and other consumers for their information and attention and provide lower value to Plaintiffs and other consumers than it would have provided in a competitive market.

279.     There is a long tradition of monopolists working with government overseers to deter monopoly enforcement.  In the most notorious instance of corruption connected to railroad trusts:

> Union Pacific Railroad executives formed a sham construction company, Crédit Mobilier, that submitted bills for nearly double the construction cost of the eastern portion of the Transcontinental Railroad and pocketed the overcharges. To avert any investigation and ensure votes to benefit the company, railroad officials bribed approximately one dozen influential congressmen with Crédit Mobilier shares at below-market prices. Swept up in the Crédit Mobilier scandal was not just Ulysses S. Grant's first vice president, but his second one as well.

> The graft grew even closer to Grant. The Whiskey Ring scandal in which federal agents and whiskey distillers underreported sales to cheat the government out of excise tax revenue and pocket the cash ensnared Grant's personal secretary, Orville Babcock. In an attempt to corner the gold market, Wall Street financier and railroad magnate Jay Gould bribed Abel Rathbone Corbin, who had married Grant's sister, to use his influence to steer the president toward policies that would favor the robber baron's plan. "Grant is not a corrupt man as far as I can tell," White says, "but he combines an incredible lack of attention to detail—astonishing given his army record—and a blind loyalty to friends." [224]

---

[224] https://www.history.com/news/gilded-age-corruption-corporate-wealth.

The graft around the Grant White House mirrors the activities of Defendants here as they sought to make ingratiate themselves with their government overseers.

280.    Facebook's destruction of competition caused antitrust injury to Plaintiffs by decreasing compensation and lowering value for consumers, who received lower compensation and lower value from Facebook than those consumers would have if Facebook competed on the merits.  Plaintiffs were injured and received substantially less compensation and lower value than they would have absent Facebook's unlawful and anticompetitive conduct. As a result of Facebook's illegal conduct, Plaintiffs and other Class members received lower compensation and value than they would have absent Facebook's illegal conduct.

281.    There are no legitimate pro-competitive or business justifications for the conduct alleged herein, and even if there were, the anticompetitive effects would far outweigh any possible pro-competitive effects.

282.    Facebook's conduct has had a substantial effect on interstate commerce.

283.    Plaintiffs seek an award of treble damages or, in the alternative, disgorgement of Facebook's ill-gotten gains.  Plaintiffs also seek appropriate equitable relief to enjoin Facebook from continuing to engage in anticompetitive behavior to the detriment of Plaintiffs and to remedy the harms that Facebook's monopolization of the Social Network Market has caused, including: (a) divestment of assets that would continue to entrench its monopoly power; and (b) requiring Facebook to submit to independent monitoring of its conduct.

**COUNT FOUR**
**LIBEL IN VIOLATION OF PA LAW**
**Title 42 § 8343**
**(ALL DEFENDANTS)**

284.    Plaintiffs re-allege and incorporate by reference herein all the allegations

contained above.

285.    Pennsylvania defamation law provides a reference point for establishing

Defendants' liability for willfully publishing its false "warning label" on Plaintiffs' posts on their

own pages and on the HAN page.

286.    PA Title 42 § 8343.  Burden of proof.

(a)  Burden of plaintiff. --In an action for defamation, the plaintiff has the burden of
proving, when the issue is properly raised:

(1)  The defamatory character of the communication.

(2)  Its publication by the defendant.

(3)  Its application to the plaintiff.

(4)  The understanding by the recipient of its defamatory meaning.

(5)  The understanding by the recipient of it as intended to be applied to the plaintiff.

(6)  Special harm resulting to the plaintiff from its publication.

(7)  Abuse of a conditionally privileged occasion.

(b)  Burden of defendant. --In an action for defamation, the defendant has the burden of
proving, when the issue is properly raised:

(1)  The truth of the defamatory communication.

(2)  The privileged character of the occasion on which it was published.

(3)  The character of the subject matter of defamatory comment as of public concern.

287.    The Complaint is replete with instances where all the above elements were met or

exceeded, but we will pick one episode for example purposes. Defendant Facebook permitted

users to post the fraudulent *Lancet* study alleging HCQ was dangerous, while, over the same

period, members publishing references to the Ford study showing HCQ efficacy was blocked, banned and members were banned. Defendants falsely disparaged Plaintiffs posts through warning labels and materially deceptive use of fact checkers and branding posts as false. As the group made plain to Facebook serially, its only purpose was to save American lives.

288.    Facebook's intention to lessen the goodwill which Plaintiffs' and HAN's services enjoy is manifest from its false "warning label" and "fact-checks" and disabling its marketing potential.

289.    The "warning label" and "fact-check" deceptions are "material" in that these are likely to lessen the goodwill and reputation that HAN and its users services enjoy with the public and to influence consumers' vaccine purchasing decisions. By affixing the "warning label" and "fact-checks" to HAN's Facebook page where these have been viewed hundreds of thousands of times since May 6, 2020 by members of Facebook's global community, Defendants effectively disseminated their false statements widely within the relevant purchasing public.

290.    As alleged more specifically *infra*, on or about May 2020, and continuously since then, Defendants have made, authored, and/or published and circulated false and unprivileged statements about HAN in the form of Facebook's Warning Labels on HAN's Facebook page. A warning label is, by definition, the disclosure of facts concerning dangers inherent in the use of a product or service. *Black's Law Dictionary* 1421 (5th ed. 1979) ("The purpose of a 'warning' is to apprise a party of the existence of danger of which he is not aware to enable him to protect himself against it[.]" Facebook has perverted the consumer-safety protection of a manufacturer's "duty to warn" into a license to denigrate true speech where the truth conflicts with Facebook's economic interests, business model, and/or relations with government, or Zuckerberg's own perception of what is true or scientific fact.

291.   Facebook's warning label concerning HAN and its members is false on its face and by clear implication. Defendants knew that their warning label was untrue and perpetuated it to divert users from HAN's Facebook page to the CDC's website. This was one of the tactics in Defendants' RICO fraud enterprise to damage HAN and its users financially and marginalize the health advocacy work of Plaintiffs and HAN, and unjustly enrich themselves through their continued receipt of billions of dollars in pharmaceutical advertising revenue, tens of billions of dollars in monopolizing and threatening continued access to Plaintiffs' content.

292.   Defendants' false statements have already harmed Plaintiffs and likely will harm them and their mission in the future, especially within the large community of HAN followers, and among countless others who wish to be informed of true facts about vaccine safety risks. Plaintiff has been seriously damaged as a direct and proximate cause of the falsity of the Defendants' warning label, in an amount to be determined at trial. The false statement attributes conduct, characteristics, and conditions incompatible with the proper exercise of Plaintiffs trade and professional duties. The false statements were intended to hold Plaintiff up to hatred, distrust, contempt, aversion, ridicule, and disgrace in the minds of a substantial number in that community, and were calculated to harm, and have harmed their business relationships and goodwill, and deterred others from associating or dealing with Plaintiff. Defendants' warning label constitutes egregious conduct constituting malice. Defendants' acts were willful and malicious. As such, in addition to compensatory damages and/or presumed damages, Plaintiff demands punitive damages relating to Defendants' making of the above-referenced false statements and other willful misconduct, in an amount to be determined at trial.

293.   The Communications Decency Act (CDA) states: "No provider or user of an interactive computer shall be treated as the publisher or speaker of any information provided

by another information content provider." 47 U.S.C. § 230(c)(1). The affirmative defense of Section 230 immunity has been broadly construed as to information provided by third parties and hosted on Facebook. However, if an entity is "responsible, in whole or in part, for the creation or development of information" that forms the subject matter of the lawsuit, it is itself a <u>content provider</u> and is not protected. 47 U.S.C. § 230(f)(3).

294.    In publishing its false "warning label" and "fact-checks," Facebook has acted, and continues to act, both as an interactive computer service provider and as "content provider." Section 230(f)(3) defines an information content provider as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." Under the CDA, 47 U.S.C. § 230(f)(3), Facebook's warning label and its other affirmative content-creation far exceed "a publisher's traditional editorial functions," See, *Batzel v. Smith*, 333 F.3d 1018, 1031 n.18 (9th Cir. 2003Facebook has no immunity from liability for actionable harms arising from its fraudulent course of conduct.

295.    On May 28, 2020, President Donald J. Trump issued an Executive Order on Preventing Online Censorship. The Executive Order provides, in pertinent part:

> *Sec. 2. Protections Against Online Censorship. (a) [. . .] It is the*
>
> *policy of the United States to ensure that, to the maximum extent permissible under the law, this provision [47 U.S.C. § 230] is not distorted to provide liability protection for online platforms that —*
>
> *far from acting in "good faith" to remove objectionable content —instead engage in deceptive or pretextual actions (often contrary to their stated terms of service) to stifle viewpoints with which they disagree. [. . .] When an interactive computer service provider removes or restricts access to content and its actions do not meet the criteria of [47 U.S.C. § 230] subparagraph (c)(2)(A), it is engaged in editorial conduct. It is the policy of the United States that such a provider should properly lose the limited liability*

*shield of subparagraph (c)(2)(A) and be exposed to liability like any traditional editor and publisher that is not an online provider.*215F217F[225]

296.    The Executive Order's free expression principles are consistent with this lawsuit, and its statement of the policy of the United States may be informative for the Court. But the Court need not rely upon the Executive Order to adjudicate this controversy because Plaintiffs' claims for relief are fully viable and warrant extraordinary relief under existing authorities.

297.    Plaintiff is entitled to injunctive relief and to recover their damages, including for reputational harm and for intentional infliction of emotional distress.

298.    "The Centers for Disease Control (CDC) has information that can help **answer questions you may have about vaccines.**" Read with the preceding "reliable, up-to- date information" sentence to which it refers, and which together make its essential point, this sentence is false, and provably so -- as HAN has devoted much of its organizational life to showing. Read in context, the fair meaning of the sentence is to equate the word "information" with "reliable and up-to-date information" in the preceding sentence. Any reasonable reader would read the second "information" as shorthand for the first, and apply the "reliable, up-to-date" modifiers to both. What else, if not the "reliable and up-to-date information," which Facebook says "everyone wants," and which Facebook claims to be in a position to discern and provide with respect to vaccines? By its terms of service and community standards incorporated therewith, Facebook purports to be viewpoint-neutral except for limited instances of speech, which poses an "imminent threat of harm or violence." Facebook's pretense of neutrality only

---

[225] *Executive Order on Preventing Online Censorship*, Executive Orders, THE WHITE HOUSE(May 28, 2020), https://www.whitehouse.gov/presidential-actions/executive-order-preventing-online-censorship/.

compounds the reputational harm of its libel to Plaintiff. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 513 (1991) (New Yorker article which purported to be non-fiction was actionable because it gave the reader no clue that fabricated quotations were being used other than to allow the subject to speak for himself, which made them all the more damning).

299.    **"Go to CDC.gov."** Once more, the bolded and larger font size underscore that Facebook has singled out Plaintiffs Facebook page for negative comment. The very existence of Facebook's Warning Labels on HAN's page and on users' posts, and its redirection link "Go to CDC.gov," are well understood as a "black mark" on that page among Facebook's community of 2 billion users worldwide. Facebook's highly-sporadic and selective exercise of its content-regulation authority as community moderator underscores its audience's reasonable expectation that, in this context, a Facebook warning label on a third party's page conveys an objective fact, not an expression of Facebook's opinion, or an undisclosed commercial interest and ambition. *See Knievel v. ESPN*, 393 F.3d at 1075 (analyzing the format, structure, the language used, and the expectations that the target audience would have with regard to the type of information that might be found in the context, and noting that such context might be "paramount," if not "dispositive"). For any reasonable reader, the "gist" or "sting" of Facebook's "warning label" misrepresentation is its unsubtle insinuation *as fact* that, in contrast with the HAN's information posted by its users, "what you see below on HAN's page is *not* reliable, up-to-date information. **Rely on the CDC instead."** That is the only reasonable interpretation of Facebook's Warning Label in light of its specific wording, prominent placement on HAN's page, and the context of the HAN-user created content on that page which features scathing factual exposés of the WHO, CDC and other government agencies.

300.     Through Facebook's warning label on HAN's page Defendants imputed dishonesty to plaintiffs, falsely implying that the content on HAN's page was not reliable or not up to date, saying that users should, instead, 'go to CDC.gov', and that CDC has reliable, up-to-date information about vaccines. That is how third-party readers understand it and, as such, it is falsely disparaging. Defendants are liable for what is insinuated, as well as for what is stated explicitly. Further, the determinative question is whether the 'gist or sting' of the statement is true or false, benign, or defamatory, in substance.  A statement is deemed false if it "would have a different effect on the mind of the reader (or viewer) from that which the pleaded truth would have produced." *Metabolife Int'l Inc. v. Wornick*, 264 F.3d 832, 849 (9th Cir. 2001) (*quoting Masson v. New Yorker Magazine, Inc.*, 501 U.S. at 517). Facebook's warning label is reasonably susceptible of an interpretation which implies a provably false assertion of fact. Here, the conclusion that HAN's vaccine-related information is "unreliable and out-of-date" is sufficiently factual to be verifiable as true or false, *Milkovich v. Lorain Journal Co.*, 497 U.S. at 19, and indeed, it is false.

301.     Facebook's warning label implies a provably false assertion of fact, whether or not the words used are termed "fact" or "opinion." *Milkovich*, 497 U.S. at 18-19. The "gist" or "sting" of the disparagement — **that HAN's page conveys "unreliable and out-of-date information"** — is objectively false in light of the totality of the circumstances: HAN's page-content and the fact-checking process by which it creates and curates such content, while at times free ranging routinely provides discussion and information that distinguishes between known and unknown scientific facts, and labels expressions of opinion on its page as such, Certainly the pleaded truth — that HAN's page in fact contains "reliable and up-to-date information" while CDC's page does not — would produce an effect on the mind of the reader 180-degrees different

than the effect produced by Facebook's warning label. *Masson*, 501 U.S. at 516-17. Third-party readers understood Facebook's warning label as Facebook intended, namely as a statement of fact that the information on HAN's Facebook page is neither reliable nor up to date.

302.    *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767 (1986) left open the question whether non-media publisher Defendants such as Facebook and Zuckerberg are entitled to the same level of protection that media publisher Defendants receive under the *New York Times* standard. Either way, these Defendants acted with the requisite mental state to be liable for defamation measured by the "actual malice" standard that they subjectively doubted the veracity of the statement or purposely avoided the truth, or by the negligence standard applicable to non-media Defendants. *Dodds*, 145 F.3d at 1060; *St. Amant v. Thompson*, 390 U.S. at 731 (stating test as whether defendant "in fact entertained serious doubts as to the truth of [his] publication"); *Garrison*, 379 U.S. at 74 (whether defendant published the material while subjectively possessing a "high degree of awareness of the probable falsity of the publication").

303.    "Actual malice" can be shown by, inter alia, "subsequent defamations [and other statements of Defendants, circumstances indicating the existence of rivalry, ill will, or hostility between the parties, [and] facts tending to show a reckless disregard of the Plaintiffs' right[,]"*Herbert v. Lando*, 441 U.S. 153, 164 n.12 (1979) (quoting 50 Am. Jur. 2d, § 455), all of which are strongly present. In particular, Defendants harbor an adverse motive to profit from their unfettered development of vaccines and patented cures, in furtherance of which they have committed multiple other predicate acts of misrepresentation amounting to wire-fraud for purposes of RICO enterprise liability. And, crucially, they knew their published warning label was false or acted with reckless disregard to its falsity.

304.    Defendant Zuckerberg's public statements to the CNN audience, to Congress, and to his investors are replete with boasts that he works with government officials to identify and suppress "vaccine misinformation," and redirect users to the government's authoritative "information," and that his "understanding of the scientific consensus is that it's important that people get their vaccines." He has also publicly boasted of his "outside interests in health." Zuckerberg has openly bragged about eliminating any references to there being a "cure" for COVID-19 which just happens to further the scheme to secure EUA that was necessary for easier human trials and created a clear path for remdesivir while sabotaging HCQ and other treatment solutions.

305.    Defendants have exclusive possession, custody, and control of other evidence of falsity and/or Zuckerberg's actual malice, e.g., private records and testimony concerning when, with whom, how, and why Zuckerberg came to his "understanding" concerning "vaccine misinformation," which he confidently holds at "near 100%" certainty; his actual knowledge or serious doubt of the "warning label's" falsity; and what "deliberative process," if any, occurred. *See*, *e.g.*, *Metabolife*, 264 F.3d at 846 (ordering discovery of information within Defendants' exclusive control which may be highly probative of falsity).

306.    Plaintiff has suffered general and special damages as enumerated below. It is hornbook law that in measuring damages, the Court may consider Facebook's influence and that of Plaintiff, and Facebook's global footprint, "for the greater the circulation, the greater the wrong, and the more reason why greater care should be exercised in the publication[.]" *Graybill v. De Young*, 140 Cal. 323, 330 (1902).

**FIFTH CAUSE OF ACTION**

## RICO — WIRE FRAUD VIOLATIONS
### (All Defendants)

307.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

308.    18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act("RICO") makes it illegal for any person associated with an alleged racketeering enterprise "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

309.    To state a civil claim for violations of 18 U.S.C. § 1962(c), as authorized by 18 U.S.C. § 1964(c), Plaintiff must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) that proximately causes (6) damages to the Plaintiff. Under 18 U.S.C. § 1961(1)(B), an act which is indictable under 18 U.S.C. § 1343 (relating to wire fraud) constitutes a predicate act. A "pattern" requires at least two related predicate acts that amount to or pose a threat of continued criminal activity. A pattern does not require multiple schemes or multiple victims. "Enterprise," as defined in 18 U.S.C. § 1961(4), broadly includes "any individual, partnership, corporation, association, or other legal entity, or any union or group of individuals associated in fact although not a legal entity." The definition of a RICO enterprise has wide reach and is liberally construed to effectuate its remedial purpose. Here, the "persons" were Defendants Facebook, Zuckerberg, Factcheck.Org, Science Feedback, Poynter Institute, Lead Stories LLC and Does 1-20, and the "enterprise" was that distinct group of persons who associated in fact (the Facebook "content management" team) as a coordinated group to effectuate their fraudulent scheme. *River City Mkts., Inc. v. Fleming Foods W., Inc.*, 960 F.2d 1458, 1461 (9th Cir. 1992) (concluding that "business relationship akin to a joint venture"

was sufficient to establish an associated-in-fact RICO enterprise). As alleged *supra*, the Facebook content management team is an associated-in-fact enterprise in that it is an ongoing organization, formal or informal, and its various associates' function as a continuing unit for a common purpose — to damage Plaintiffs trade and property interests, to divert users of their page to the CDC, and other government overseers, and to unjustly enrich themselves – by fraudulent means.

310.    Defendants' motive to profit from vaccine and pharmaceutical ads and products unconstrained by negative publicity on their platform to protect its monopoly and Section 230 immunity is highly probative of their intent to commit RICO wire-fraud, even though economic motive itself is not an element of the claim. *See*, *e.g.*, *National Organization for Women, Inc. v. Schiedler*, 510 U.S. 249, 252 (1994) (rejecting the argument that "RICO requires proof either the racketeering enterprise or the predicate acts of racketeering were motivated by an economic purpose"). Essentially, the task of the Facebook fraud enterprise was to "clear the field" of HAN users' viewpoints—**that early intervention with off patent solutions like HCQ and ivermectin could save hundreds of thousands of lives**--for at least three market purposes that involve property or money, and lots of it: (1) brand protection for its vaccine maker and new drug development ad buyers; and (2) its own future secured interest in vaccine and new drug patents and (3) continued management of its monopoly of the public square free of concerns regarding libel law *See*, *e.g.*, *United States v. Reyes*, 660 F.3d 454, 463 (9th Cir. 2011) (admitting evidence that defendant made money on a fraudulent scheme). In addition, HAN's users and followers and others relied upon Defendant's misrepresentations in ways that caused Plaintiffs reputational injury and HAN to lose members, and injured HAN in its purpose to inform and save lives.

311.    Defendant Zuckerberg was active in managing with his wife the day-to-day affairs of CZI and CZ-Biohub[226], and he exercised specific control over their vaccine development efforts. By his public statements, Zuckerberg was directly responsible for Facebook's false and misleading statements about Plaintiffs' posted content. He participated in the ongoing associated-in-fact enterprise to develop his for-profit vaccine products and took a personal position regarding HCQ efficacy unconstrained by any public scrutiny of that effort by Plaintiffs.

312.    Thus, all named Defendants both inside Facebook's formal structure (Zuckerberg, Does 1-10) and out (Factcheck.Org, Science Feedback, Poynter Institute, Lead Stories LLC, Does 1-20) aided in one or another aspect of their common fraud scheme: to label HAN's page and the posts of its users "unreliable" and "out-of-date" and redirect users to the CDC; to label Plaintiffs speech-content "False" when it is critical of vaccine or new drug development or sought to inform readers that safe and efficacious off-label solutions existed, accomplishing this censorship through the sham machinations of "content moderators" and "independent fact-checkers"; and to conceal their true purposes of profiting from ingratiating themselves with government overseers in a position to question its monopoly or Special Immunity and by promoting vaccine and new drug manufacturer advertising and, all of which would be adversely affected by Plaintiffs' ongoing public health-related speech.

313.    The wire fraud statute, 18 U.S.C. § 1343, prohibits schemes to defraud or to obtain money or property, or cause financial loss to another, by means of "false or fraudulent pretenses, representations, or promises" if interstate wire or electronic communications are used to execute the scheme. The concept of a misrepresentation is broad, reaching not only false

---

[226] https://chanzuckerberg.com/

statements of fact, but also all of Facebook's misleading half-truths, deceptive omissions, and knowingly false suggestions and promises as to the future. It is no defense that the intended victim was too gullible or, on the other hand, was too sophisticated to be taken in by the deception.

314.    Defendants also committed wire-fraud acts constituting "interference with interstate commerce by threat" under 18 U.S.C. § 1951 in that the residual 0.05% of users who—notwithstanding Facebook's false "warning label" and "fact-checks" — actually click-through to view Plaintiffs' actual content, suffer particular adverse consequences in terms of "sandboxing," and other detriments to their accessible tools and information on Facebook. As alleged = with respect to its active collaboration with government officers and agencies, Facebook took such actions under "color of official right." 18 U.S.C. § 1951(2).

315.    Plaintiffs' further alleges that Defendants caused a domestic injury to their business or property. Where, as here, Defendants specifically targeted their conduct at Plaintiffs' with the aim of thwarting Plaintiffs rights in the United States, their activity results in a domestic injury. These injuries included creating content for Facebook since sign-up and having continued access to that content used as leverage, intentional infliction of emotional distress, and denial of the ability to share life-saving information without enduring reputational damage.

316.    Under Fed. R. Civ. P. 9(b), predicate acts of wire fraud must be alleged with specificity as to the contents of the communications, who was involved, where and when they took place, and why they were fraudulent. As alleged *supra*, Defendants engaged in a scheme to defraud and made use of electronic and internet transmissions, and/or telephone calls, emails, and texts in furtherance of the scheme, with the specific intent to deceive or defraud.

317.    Plaintiff reasonably relied on defendant Facebook to adhere to its terms of service and community standards; not to engage in content creation on their Facebook pages; and not to mislead them, their advertising agency, or the world of third-party users as to the truth or falsity of content on their pages, or the visibility or reach of those pages. Plaintiff was misled by Defendants and was derivatively injured by many third-party users' reliance on Defendants. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008) (Plaintiff alleging a RICO violation may establish causation through first person or third-party reliance).

318.    As a direct and proximate result of Defendants' predicate acts in violation of 18 U.S.C. §§ 1961(1)(B), 1962(c), Plaintiffs have been and are continuing to be injured by harm to their specific property interests and financial losses, and their concerted efforts to reduce the visibility and reach of Plaintiffs page, to reduce traffic to that page, and to reduce membership. By publishing false and disparaging warning labels, and censoring of content, which have caused damage to Plaintiffs professional reputation and other valuable tangible and intangible property rights resulting in financial loss. Part of Plaintiffs' life saving strategy was to reach out to friends, acquaintances, clients, employers, co-workers, and customers and tell them to come to HAN to get updated on the latest information. Obviously, with the controversy foisted upon HAN and its members by Defendant's tags—that they were radical cranks, driven by politics, pushing dangerous drugs on unsuspecting Americans—the risks associated with trying to help other Americans could not have been anticipated by anyone.  The ordinary rules where efforts to help fellow Americans were viewed favorably, now somehow took a back seat to becoming a political badge of dishonor. This had negative consequences on all the Plaintiffs, and it was stoked by Defendants.

319.    Defendants' actions have already injured Plaintiffs and will have the effect of further injuring them by damaging their reputations and goodwill in their respective vocations and professions, diverting traffic from the HAN site.

320.    Under 18 U.S.C. § 1964(c), Plaintiff seeks to recover threefold the damages they have sustained, and the cost of this suit, including an award of their reasonable attorneys' fees.


### SIXTH CAUSE OF ACTION
### BREACH OF CONTRACT
### PA Law
### (Defendant Facebook)

321.    Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.


322.    In Pennsylvania, a breach of contract action involves: (1) the existence of a contract; (2) a breach of a duty imposed by the Contract; and (3) damages.  *J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc.,*792 A.2d 1269 (Pa.Super.2002).

323.    In a breach of contract action, damages are awarded to compensate the injured party for loss suffered due to the breach. The purpose of damages is to put the plaintiff in the position he or she would have been in but for the breach. *Maxwell v. Schaefer*, 381 Pa. 13, 21, 112 A.2d 69, 73 (1955); *Harman v. Chambers*, 358 Pa. 516, 521, 57 A.2d 842, 845 (1948); *Mancini v. Morrow*, 312 Pa. Super. 192, 204, 458 A.2d 580, 586 (1983). The measure of recovery and the method of evaluation that are adopted should in every case be so adjusted as to attain as nearly as possible the purpose of our system of remedial justice. This purpose is to put the injured party in as good a position as the promised performance would have put him, having

regard both to the reasonable foreseeability of the harm and to the extent that it could reasonably have been avoided by the injured party himself.  5 Corbin on Contracts § 1005 at 63 (1951).

324.    Here Plaintiffs each entered contracts upon signing up for Facebook sometime prior to October 1, 2020 (when Facebook announced it was now breaching its contract) at allegedly no charge.

325.    For instance, at least 87 million Facebook users had their data used without consent by a political firm to influence elections (including the 2016 US Presidential election) ("Cambridge Analytica).[227] Facebook admitted fault already in allowing third-parties to access user data inappropriately, but companies that received this data continued to use it and there is no perfect way to prevent them from selling it. Based on information and belief, Facebook has continued to use its user information as an asset that it could use to further its position and further its illegal schemes to protect its Special Immunities. Prior to its announcement in October 2020, Plaintiffs were not aware that their content could be taken or seized, or  that Facebook would be claiming in writing, that which it had always concealed, ---"the right to remove or restrict access to content, services or information to avoid or mitigate adverse legal or regulatory impacts to Facebook."[228]

326.    Facebook's October 2020 announcement that it would seize user content clearly violates the express contract and has caused Plaintiffs' damages. Plaintiffs have now spent years,

---

[227] Facebook Exposed 87 Million Users to Cambridge Analytica Previously, the number had been 50 million; Facebook CEO Mark Zuckerberg says the fixes to Facebook's data-sharing woes will be a "multi-year" process. (Apr 4, 2018) https://www.wired.com/story/facebook-exposed-87-million-users-to-cambridge-analytica/ (last checked Dec 7, 2020).

[228] Paragraph 3, *supra*.

many for over a decade, populating Facebook with their most cherished content only to learn last month that it could be snatched away in an instant.

## SEVENTH CAUSE OF ACTION
### Promissory Estoppel
### (Defendant Facebook)

327.   Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

328.   Under Pennsylvania law, the elements for a promissory estoppel or detrimental reliance claim: "(1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise." *Edwards v. Wyatt,* 335 F.3d 261, 277 (3d Cir. 2003) (citing *Crouse v. CyclopsIndus.*, 745 A.2d 606, 610 (Pa. 2000)); see also *C & K Petroleum Prods., Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir. 1988) (Pennsylvania adopts promissory estoppel doctrine embodied in Restatement (Second) of Contracts § 90). Here the plaintiffs' multi-year creation and storing of personal content on Defendant Facebook's platform while building a network of fellow collaborating users, is proof there was express promise.  Why would so many invest countless hours into Facebook?  Plaintiffs' believed this promise and they refrained from searching for other options/

## EIGHTH CAUSE OF ACTION
### (DECLARATORY RELIEF)
### (All Defendants)

329.   Plaintiffs re-allege and incorporate by reference herein all the allegations contained above.

330.   The Declaratory Judgment Act, codified in 28 U.S.C. § 2201(a), provides in pertinent part that, "[i]n a case of actual controversy within its jurisdiction [] any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or

decree and shall be reviewable as such."

331.     An actual controversy has arisen and now exists between Plaintiff and Defendants, concerning their respective rights and duties in that these Defendants have published a false and misleading warning label on Plaintiffs Facebook pages and have fraudulently misrepresented to third-party users of the pages that Plaintiffs have posted and are posting "false [factual] information" in violation of their terms of service. Defendants have used deceptive means to limit the reach and visibility of HAN's page. Finally, and within the past two months, Defendant Facebook has threatened to ban, limit, warn, deboost, block or censor content.

332.     Plaintiff seeks a judicial determination of its rights and remedies and a declaration as to the parties' respective rights and obligations with respect to HAN's Facebook page and in regard to each newsgroup page and personal page maintained by Plaintiffs. A judicial declaration is necessary and appropriate at this time so that Plaintiff may ascertain its rights to publish content on those pages without any interference, censorship, warning labels, "shadowbanning," "deboosting," "sandboxing," or other deceptive means and methods employed by Defendants, and with respect to other affirmative relief such as a public apology and entry on a First Amendment "shield list" by Defendants.

333.     As a result of Facebook's unlawful conduct, Plaintiffs' have suffered substantial damages, including, but not limited to:

a.     Since joining Facebook "at no charge," as promised by Facebook, Plaintiffs' had instead relinquished all ownership rights to their content and profile and endured surveillance.

b.     The original transaction was actually a direct purchase made with the pledge to create content and years in the future give up all rights to that content.

c.     Plaintiffs were deprived of freedom of speech and subject to unreasonable searches and seizures in violation of their First, Fourth and Fifth Amendment rights through Defendants arbitrary and capricious censorship decisions and sustained bans and confiscation of content.

      d.      Plaintiffs were foreclosed from future opportunities to reach subscribers on Facebook.

      e.      Plaintiffs lost status and prestige amongst Facebook followers, the general public, the journalistic community, and withstood stigma of publishing information falsely branded as false by Facebook.

      f.      Plaintiffs suffered reputational harm and suffered emotional distress. These injuries are continuing in nature requiring injunctive relief.

WHEREFORE, Plaintiffs' demands judgment against Facebook Inc. for damages and injunctive relief as set forth below.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request:

A.      Compensatory damages in an amount to be determined by the Jury, but not less than $5,000,000.

B.      An award of treble damages to Plaintiff in an amount to be determined at trial.

C.      An injunction and declaratory judgment ordering Facebook to remove its warning labels and misclassification of all content on Plaintiffs Facebook pages, and to desist from any further warnings or classifications.

D.      An award of attorneys' fees and costs to Plaintiffs in an amount to be determined at trial.

E.      An award of punitive damages to Plaintiffs in an amount to be determined at trial.

F.      An order requiring Defendants to make a public retraction of their false statements.

G.      An award of such other and further relief as the Court may deem just and proper.

Date:

**VERIFICATION**

I, declare under penalty of perjury as follows:

1.      I am the counsel for Plaintiffs in this action.

2.      I have reviewed the foregoing Complaint and declare that the facts set out therein are true to the best of my knowledge and belief, except those matters stated as upon information and belief, which are true to the best of my belief. I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed this 11th day of December, 2020


/s/ Brad Geyer_____

Bradford L. Geyer

FormerFedsGroup.Com LLC
2006 Berwick Drive
Cinnaminson, NJ 08077-4502
(856) 607-5708

Attorney for Plaintiffs