IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SALLY LOVELAND, et al., | : | |
|     Plaintiffs, | : | 20-cv-6260-JMY |
| | : | |
| v. | : | |
| | : | |
| FACEBOOK, et al., | : | |
|     Defendants. | : | |

MEMORANDUM

**Younge, J.**                                                                                   May 3, 2021

## I.  INTRODUCTION

Currently before this Court is a Motion to Transfer Venue pursuant to 28 U.S.C. § 1404(a) filed by Defendant, Facebook, Inc.  (Mot. to Transfer, ECF No. 12.)  In its Motion, Facebook seeks transfer of this action to the United States District Court for the Northern District of California.  (*Id.*)  The remaining named Defendants, Mark Zuckerberg, FactCheck.org, Poynter Institute for Media Studies, Inc., and Lead Stories, LLC, filed a Joinder in Facebook's Motion to Transfer.  (Joinder, ECF No. 14.)  Plaintiffs, Sally Loveland, Sharon Cheatle, Janine Cortese, Tyler Boyle, and Steve McCann ("Plaintiffs") filed an Opposition to the Motion to Transfer.  (Opp., ECF No. 16.)

The Court finds the Motion to Transfer appropriate for resolution without oral argument.  Fed. R. Civ. P. 78; L.R. 7.1(f).  For the reasons set forth in this Memorandum, the Motion to Transfer will be granted and this matter will be transferred to the Northern District of California pursuant to 28 U.S.C. § 1404(a).

## II.  BACKGROUND

As pled in the Complaint, Plaintiffs are individual members of the Facebook social networking website who undertook the mission of using their Facebook accounts to spread

information related to the COVID-19 pandemic.  (Complaint ¶ 2, ECF No. 1.)  Plaintiffs allege that they are or were members of a Facebook group called Hydroxychloroquine Access Now.  (*Id*. ¶¶ 14–19.)  The Complaint describes Hydroxychloroquine Access Now as a Facebook group that was formed in May of 2020 to provide a forum for discussion and exchange of information related to COVID-19, with a focus on various treatment strategies.  (*Id*. ¶ 53.)  The Complaint further describes Hydroxychloroquine Access Now as a community with approximately 4,300 followers on Facebook's forum.  (*Id*. ¶ 56.)

Prior to filing the Complaint, members of Hydroxychloroquine Access Now specifically touted the benefits of various treatments like Hydroxychloroquine, Ivermectin and Vitamin-D in combating the COVID-19 pandemic.  (*Id*. ¶¶ 52-53.)  Hydroxychloroquine Access Now allegedly published multiple articles per a day on its Facebook page which described current scientific research, new technologies and treatments, and vaccine information related to COVID-19.  (*Id*. ¶¶ 53-54.)  Plaintiffs allege that members of Hydroxychloroquine Access Now "collect[ed] information and research around themes to create and preserve the historical record and to provide one place where desperate Americans [could] come to learn about medical research and where they might receive treatments from licensed physicians."  (*Id*. ¶ 55.)  According to Plaintiffs, opinions and information offered in these publications "were often at variance with [World Health Organization] and [Centers for Disease Control] opinions."  (*Id*. ¶¶ 53-54.)

Plaintiffs allege that Defendants began a campaign of censorship and suppression against many of the concepts that they espoused in relationship to Hydroxychloroquine Access Now, and that this campaign began as early as May 2020 when the group was formed.  (*Id*. ¶¶ 5, 76.)  They allege that Defendants covertly demoted and/or banned content that they posted, administered, or

moderated on the Hydroxychloroquine Access Now Facebook group page.  (*Id*. ¶ 76.)  Plaintiffs aver, for example, that Defendants censored their posts by removing search features for Hydroxychloroquine Access Now so that the group was buried in Facebook's platform where the public could not find its content.  (*Id*. ¶¶ 76-77.)  They further allege that their posts were subject to a factchecking process through which they were marked with "warning labels" identifying the content as "false," "fake," "misinformation," or "hoax."  (*Id*. ¶¶ 5, 63, 73.)  These warning labels were visible to the public when viewing Plaintiffs' Facebook posts.  (*Id*.)

Key to Plaintiffs' theory of this case is their perception that access to the wide audience provided by Facebook's social media platform was and remains essential for combating the COVID-19 pandemic.  (*Id*. ¶¶ 33-34.)  Plaintiffs aver, "Facebook has a near monopoly on the public forum for speech over the internet.  With the cumulative popularity of Facebook, WhatsApp, Messenger, and Instagram, Facebook dominates the global social media landscape." (*Id*. ¶ 31.)  They further aver that "[e]ven more important for its monopoly power in the social network market is Facebook's influence over developing new stories through Facebook Stories." (*Id*. ¶ 32.)  Plaintiffs cite to Congress's determination that in the United States, Facebook has monopoly power in the relevant social networking product market.  (*Id*. ¶¶ 33-34.)

With specific relevance to Defendants' Motion to Transfer, Plaintiffs allege that they created their Facebook accounts in 2008 and 2009.[1]  (*Id*. ¶¶ 14-18.)  As part of the user-registration process in place at that time, each Plaintiff was required to acknowledge that he or she agreed to Facebook's Terms of Service.  (Pricer Decl. ¶ 9, ECF No. 12-2.)  Plaintiffs were

---

[1] One Plaintiff, Janine Cortese, failed to plead the date she became a member of Facebook's internet community.  (Compl. ¶ 16.)  However, Facebook produced evidence reflecting that Cortese created an account after 2007.  (Pricer Decl. ¶¶ 4-8.)  This evidence further reflects that since 2007, Facebook's user-registration process has required would-be users to acknowledge that they agreed to Facebook's Terms of Service—and, by continuing to use Facebook's services, to updates to those Terms. (*Id*. ¶¶ 9-10.)

3

also required to acknowledge that, by continuing to use Facebook's Services, they assented to modifications to those Terms.  (*Id.* ¶ 10.)  Plaintiffs admit that they "each entered [into a] contract[] upon signing up for Facebook" and they thereby assented to the Terms.  (Compl. ¶¶ 56, 317, 324; Pricer Decl. ¶ 9.)  The Terms of Service require that claims arising out of or relating to the use of Facebook's services be resolved in California.  The Terms also provide that California law will govern any state law claim.  The Terms read in relevant part as follows:

> For any claim, cause of action, or dispute you have against us that arises out of or relates to these Terms or the Facebook Products . . . you agree that it will be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County. You also agree to submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim, and that the laws of the State of California will govern these Terms and any claim, without regard to conflict of law provisions.

(Pricer Decl., Ex. 1 § 4.4; Ex. 2 § 4.4.)

Based on the allegations summarized above, Plaintiffs filed a 333-paragraph, 178-page Complaint, seeking to pursue claims for: violation of the First, Fourth, and Fifth Amendments pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) (Count 1)[2]; monopolization and attempted monopolization pursuant to 15 U.S.C. §§ 2, 4 (Counts 2, 3); wire fraud pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) (Count 5); libel, breach of contract, and promissory estoppel under state law (Counts 4, 6, and 7); and declaratory relief (Count 8).  Plaintiffs seek compensatory damages of not less than $5 million dollars; treble and punitive damages; a declaratory judgment and

---

[2] In *Bivens*, the Supreme Court first recognized an implied cause-of-action against federal officials for constitutional violations, and *Bivens* thus became the short-hand name for such causes of action.  *See, e.g., Bistrian v. Levi*, 912 F.3d 79, 88 (3d Cir. 2018)

injunctive relief against Facebook; an order requiring Defendants to publicly retract their "false statements"; and attorneys' fees and costs. (Compl., Prayer for Relief ¶¶ A-F.)

### III. LEGAL STANDARD

Section 1404(a) provides: (a) for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented. 28 U.S.C. § 1404(a). "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988). A transfer, however, "is not to be liberally granted." *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970). Defendants—as movants—bear the burden of establishing the need for transfer, and "'unless the balance of convenience of the parties is strongly in favor of defendant, the plaintiff's choice of forum should prevail.'" *Id.*; *see also Jumara v. State Farm Ins. Co*, 55 F.3d 873, 879 (3d Cir. 1995).

In a transfer of venue analysis that does not involve a forum selection clause, the court conducts a two-part analysis. First, the court must decide whether the proposed transferee district has proper jurisdiction and venue, *i.e.*, could the case have been brought in the transferee district in the first instance. *Lawrence v. Xerox Corp.*, 56 F. Supp. 2d 442, 450-451 (D.N.J. 1999). Second, the court applies a number of public and private factors to determine which forum is most appropriate to consider the case. *Id.*; *Centimark Corp. v. Jacobsen*, No. 11-1137, 2011 U.S. Dist. LEXIS 138673, at *6 (W.D. Pa. No. 30, 2011).

In *Jumara*, the Third Circuit recognized that in analyzing whether transfer is appropriate under § 1404(a), courts have not limited their analyses to the "three enumerated factors in

§ 1404(a)," and it set forth a list of private and public interest factors that a court should consider to determine whether transfer is appropriate. *Jumara*, 55 F.3d at 879-80. The private factors include: the plaintiff's forum preference; the defendant's forum preference; whether the claim arose elsewhere; the convenience of the parties as indicated by their relative physical and financial condition; the convenience of the witnesses—but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum). *Id.* at 879. The public interest factors include: enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; the public polices of the fora; and the familiarity of the trial judge with the applicable state law in diversity cases. *Id.* at 879-80.

"The weighing of private and public interests under § 1404(a) changes . . . if a forum-selection clause enters the picture." *In re: Howmedica Osteonics Corp.*, 867 F.3d 390, 402 (3d Cir. 2017). A valid forum-selection clause alters the court's analysis in three ways: the district court must: (1) give no weight to the forum preferred by "the party defying the forum-selection clause"; (2) deem the private interests to "weigh entirely in favor of the preselected forum" because the parties agreed to the preselected forum and thereby waived the right to challenge it as inconvenient; and (3) proceed to analyze only public interests. *Id.* (quoting *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. Of Texas*, 571 U.S. 49, 63-64 (2013). "[W]ith these modifications, to the typical § 1404(a) analysis, district courts should enforce valid forum-selection clauses '[i]n all but the most unusual cases.'" *Id.* (quoting *Atl. Marine*, 571 U.S. at 66).

## IV. DISCUSSION

Defendants argue that this case should be transferred to the Northern District of California pursuant to 28 U.S.C. § 1404(a). They rely on the forum selection clause in the Terms of Service and cite to the fact that Plaintiffs agreed to the Terms of Service when they opened their user accounts and became members of the Facebook community. Defendants further argue that since the matter falls within the scope of a valid forum selection clause, the analysis under 28 U.S.C. § 1404(a) yields a result requiring transfer.

Plaintiffs attack the validity of the forum selection clause by arguing that it is a contract of adhesion, procured by overreach and fraud, which should be strictly construed against Facebook. (Opp. at 12-13.) They further argue that the operative facts and legal theories asserted in their Complaint are not encompassed within the scope of the forum selection clause. (*Id.* at 12.) Plaintiffs' overarching theory is that this action arises from various constitutional violations related to the removal, seizure, and censorship of their content during a time of crisis—the COVID-19 pandemic. (*Id.* at 1-2.) They argue that Defendants' conduct barred them from discussing potentially life-saving treatments. (*Id.*) Plaintiffs contend: "[H]ad Plaintiffs known that their content and Constitutional rights could be snatched away from them, when at time of crisis, they might well have taken other actions that would have opened the door to other Facebook competitors." (*Id.* at 3.) Plaintiffs cite to *Alt. Marine*, 571 U.S. at 62, and argue that exceptional circumstances exist in this instance which require either that the forum selection clause be held invalid or that jurisdiction be retained in the Eastern District of Pennsylvania after an analysis of the public interest factors under § 1404(a). (Opp. at 4.) They argue that disposition of this action in Defendants' chosen forum would be less favorable to them than it

7

would be in this District because of the interpretation of applicable law in the Northern District of California.  (*Id.* at 2.)

For the reasons set forth below, this Court disagrees with the arguments advanced by the Plaintiffs and will transfer this matter to the U.S. District Court for the Northern District of California.

### A.     The Parties Are Bound by the Valid, Enforceable Forum Selection Clause

To enforce the forum selection clause, the Court must first determine that the clause is valid and that this litigation falls within the scope of the clause.  *Jumara*, 55 F.3d at 877-878.  Forum selection clauses are *prima facie* valid and should be enforced unless enforcement is shown to be unreasonable under the circumstances.  *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972); *Foster v. Chesapeake Ins. Co.*, 933 F.2d 1207, 1219 (3d Cir. 1991).  To overcome a presumptively valid forum selection clause, the party objecting to it must make a "strong showing" that the clause is unreasonable by demonstrating: "(1) that it is the result of fraud or overreaching; (2) that enforcement would violate strong public policy of the forum; or (3) that enforcement would . . . result in jurisdiction so seriously inconvenient as to be unreasonable." *Moneygram Payment Sys. V. Consorcio Oriental, S.A.*, 65 Fed. App'x 844, 846 (3d Cir. 2003); *Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd.*, 709 F.2d 190, 202 (3d Cir. 1983).  The level of unreasonableness to overcome a valid forum selection clause must exceed "mere inconvenience or additional expense." *Banc Auto, Inc. v. Dealer Servs. Corp.*, No. 08-3017, 2008 U.S. Dist. LEXIS 67514, at *8 (E.D. Pa. Aug 28, 2008).  A forum selection clause is "unreasonable" where the defendant can make a strong showing either that the forum thus selected is "so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court." *Foster*, 933 F.2d at 1219.

The forum selection clause as it appears in Facebook's user agreement and as cited by the Defendants in their Motion to Transfer Venue is valid and enforceable.  On the issue of validity and enforceability, several district courts have previously addressed this issue and unequivocally reached the conclusion that Facebook's forum selection clause is valid and enforceable.[3]  Any potential argument that the forum selection clause should be set aside based on Plaintiffs' purported failure to read or understand the ramifications of its terms would be unpersuasive.

Forum selection clauses appearing in internet agreements are enforceable.  *Feldman v. Google*, 513 F. Supp. 2d 229, 243 (E.D. Pa. 2007) (finding a forum selection clause in a "clickwrap" agreement valid and enforceable).  Furthermore, under Pennsylvania law, the failure to read a contract does not excuse a party from being bound by its terms.  *Schwartz v. Comcast Corp.*, 256 Fed. App'x 515, 520 (3d Cir. 2007) (where the terms of the agreement were available on Defendant's website, the terms were binding despite the fact that plaintiff was unaware of specific provisions); *Pentecostal Temple Church v. Streaming Faith, LLC*, No. 08-0554, 2008 U.S. Dist. LEXIS 71878, at *5 (W.D. Pa. Sept. 16, 2008) (stating that "internet provisions . . . readily available on the identified internet site, and plainly and clearly set forth therein," are binding even where the party has not read them).

---

[3]  *See, e.g., We Are the People, Inc. v. Facebook, Inc.*, No. 19-8871, 2020 U.S. Dist. LEXIS 98599, at *2 (S.D.N.Y. June 3, 2020); *Loomer v. Facebook, Inc.*, No. 19-80893, 2020 U.S. Dist. LEXIS 99430, at *3 (S.D. Fla. Apr. 13, 2020); *Hayes v. Facebook*, No. 18-2333, 2019 U.S. Dist. LEXIS 229574, at *3 (D. Colo. Mar. 6, 2019); *Thomas v. Facebook, Inc.*, No. 18-856, 2018 U.S. Dist. LEXIS 138333, at *4 (E.D. Cal. Aug. 15, 2018) ("Numerous courts have affirmed the validity and enforceability of Facebook's [terms of use] and the forum selection clause contained therein.  Indeed, the Court is not aware of any case concluding that the forum selection clause in Facebook's [terms of use] is invalid."); *Dolin v. Facebook, Inc.*, 289 F. Supp. 3d 1153, 1160 (D. Haw. 2018); *Franklin v. Facebook, Inc.*, No. 15-655, 2015 U.S. Dist. LEXIS 159891, 2015 WL 7755670, at *2 (N.D. Ga. Nov. 24, 2015); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 836-41 (S.D.N.Y. Jan 24, 2012) (enforcing Facebook's forum selection clause from 2009); *Miller v. Facebook, Inc.*, No. 09-2810, 2010 U.S. Dist. LEXIS 145550, at *1 (N.D. Ga. Jan. 15, 2010).

Although Plaintiffs argue that the forum selection clause in Facebook's Terms of Service is a contract of adhesion, they have not established that the clause should be void based on theories of fraud or overreach. The requirement that Plaintiffs litigate disputes arising from their use of Facebook's service in the designated forum is not unconscionable, because Plaintiffs were under no obligation or duress at the time when they entered into the agreement with Facebook.[4] *Loomer v. Facebook, Inc.*, No. 19-cv-80893, 2020 U.S. Dist. LEXIS 99430, at *7 (S.D. Fla. April 13, 2020) ("[W]hile the Terms [were] presented on a take-it-or-leave-it basis, Plaintiff was under no obligation to enter into the agreement. Social media is not a requirement of life and there are other social media platforms available to Plaintiff.").

Plaintiffs further failed to develop any factual basis for their statement that the forum selection clause was precured by fraud or overreach. To the extent that Plaintiffs develop a claim for fraud, it relates to events that transpired after May of 2020—during the COVID-19 pandemic. In their Complaint, for example, Plaintiffs advance various theories that their constitutional rights were violated when Defendants removed or seized content that they posted on Facebook's forum. However, this says nothing about any purported fraud at the time when Plaintiffs agreed to the Terms of Service requiring that they litigate claims in either the U.S. District Court for the Northern District of California or a state court located in San Mateo County. Plaintiffs have adduced nothing to show that they were fraudulently tricked into agreeing to litigate claims in the Northern District of California. *Franklin v. Facebook, Inc.*, 2015 U.S. Dist. LEXIS 159891, at *5 (Stating that the "Court cannot identify a single instance where any federal court has struck down Defendant's [Terms] as an impermissible contract of

---

[4] Plaintiffs were under no duress caused by a social obligation to combat the COVID-19 pandemic at the time they opened their user accounts and became members of the Facebook community. Plaintiffs all became members of Facebook and agreed to the Terms of Service along with the forum selection clause well before the beginning of the COVID-19 pandemic.

adhesion induced by fraud or overreaching or held the forum selection clause now at issue to be otherwise unenforceable due to public policy considerations" and collecting cases.).

Turning to Plaintiffs' argument that the forum selection clause should be void based on public policy, or unreasonable inconvenience, the Court finds these arguments unpersuasive. The Northern District of California Court is well equipped to address the constitutional concerns and public policy issues raised by Plaintiffs in this litigation. Plaintiffs have failed to show that they would be deprived of their day in court or completely unable to litigate this matter in the Northern District of California. *Banc Auto, Inc.*, 2008 U.S. Dist. LEXIS 67514, at *9 (a forum selection clause will only be deemed unreasonable where the selected forum is so gravely difficult that the party challenging the forum selection clause would be deprived of their day in court if the clause were enforced).

### B. This Litigation Is Within the Scope of the Forum Selection Clause

This action so clearly falls within the scope of the forum selection clause in the Terms of Service that little explanation is required. A plain reading of the Complaint illustrates that this case arises from the Plaintiffs' use of Facebook's internet social networking platform. The forum selection clause that Plaintiffs agreed to unambiguously states in relevant part: "For any claim, cause of action, or dispute you have against us that arises out of or relates to these Terms or the Facebook Products . . . you agree that it will be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County." (Pricer Decl., Ex. 1 § 4.4; Ex. 2 § 4.4.) The most recent version of the Terms of Service attached to the Defendants' Motion to Transfer Venue similarly states: "These Terms govern your use of Facebook, Messenger, and the other products, features, apps, services, technologies, and software we offer (the Facebook Products or Products), except where we expressly state that

11

separate terms (and not these) apply." (Terms of Service, Ex. 2 page 1, ECF No. 12-4.) Simply stated, Plaintiffs claims and the factual allegations on which they are based arise entirely from Plaintiffs' use of Facebook's platform.

### C. The Applicable Factors Support Transfer Pursuant to 28 U.S.C. § 1404(a)

Having found that this matter falls within the scope of a valid and enforceable forum selection clause, this Court must now weigh the public interest factors to determine if transfer is appropriate.[5] An assessment of the private interests under Section 1404(a) is unnecessary because the Plaintiffs agreed to litigate claims in the Northern District of California when they entered into the Terms of Service that contained the forum selection clause. *Atl. Marine*, 571 U.S. at 64 ("When parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for the pursuit of the litigation.").

An analysis of the public interest factors does nothing to change the conclusion that transfer is appropriate. In terms of practical considerations such as ease of trial and access to witnesses, Facebook is located in California, and all named Defendants seek transfer to California. Additionally, the lead Plaintiff, Sally Loveland, is from California. These factors suggest that trial would be easier and less expensive in California. Nothing suggests that the Northern District of California Court's docket is more congested than docket in this District, and a judgment obtained in either jurisdiction would be equally enforceable. Likewise, nothing suggests that the Northern District of California is incapable of hearing this case. In fact, all

---

[5] As noted *supra*, where a valid forum selection clause exists, the district court must (1) give no weight to the forum preferred by "the party defying the forum-selection clause"; (2) deem the private interests to "weigh entirely in favor of the preselected forum" because the parties agreed to the preselected forum and thereby waived the right to challenge it as inconvenient; and (3) proceed to analyze only public interests. *In re: Howmedica*, 867 F.3d at 402 (quoting *Atl. Marine*, 571 U.S. at 63-64).

named parties agree that the Northern District of California Court has experience handling litigation brought against Facebook by its users.

Plaintiffs' argument that exceptional circumstances warrant retention of jurisdiction in the Eastern District of Pennsylvania is not persuasive. Plaintiffs' argument in this regard hinges on the theory that the COVID-19 pandemic constitutes a public emergency that should supersede Facebook's Terms of Service and, therefore, the forum selection clause. Plaintiffs opine that Defendants' infringement of their speech constitutes exceptional circumstance as described in *Atl. Marine,* 571 U.S. 49 (2013). Plaintiffs, however, have offered no basis to suggest, much less establish, that the Court in the Northern District of California is incapable of addressing the purported constitutional violations averred in this matter. Likewise, there is nothing to show that the Northern District of California Court is under any improper influence based on Facebook's local presence. Any argument that the COVID-19 pandemic is or was a regional problem with geographic ties to Pennsylvania is inaccurate; COVID-19 is a global pandemic. https://www.who.int (last visited April 28, 2021).

### D. The Court Will Not Sever Claims and Retain Jurisdiction as to Defendants Not Parties to the Forum Selection Clause

Having found this matter appropriate for transfer based on the existence of a valid forum selection clause, it would be inefficient to retain jurisdiction over claims brought against Defendants, Factcheck.org, Poynter Institute, Lead Stories, LLC, and Mark Zuckerberg, who were not parties to the Terms of Service agreement between Facebook and Plaintiffs. These Defendants have all joined in Facebook's Motion to Transfer. Moreover, the claims against these Defendants are inextricably intertwined with the claims against Facebook. A court "should not sever if the defendant over whom jurisdiction is retained is so involved in the controversy to be transferred that partial transfer would require the same issues to be litigated in two places."

*Sunbelt Corp. v. Noble, Denton & Assoc*, 5 F.3d 28, 33-34 (3d Cir. 1993).  In other words, "[l]itigating these facts in separate [jurisdictions] would make little sense, as it is likely that many of the witnesses and much of the evidence would overlap . . . and trying these cases in two different places could result in inconsistent results."  *Pioneer Mech. Servs, LLC v. HGC Constr., Co.*, No. 18-cv-0507, 2018 U.S. Dist. LEXIS 209349, at 14-15 (W.D. Pa. Dec. 12, 2018) (declining to sever claims against different defendants because all claims "relate[d] to the same occurrence").

V.      **CONCLUSION:**

For these reasons, this action will be transferred to the U.S. District Court for the Northern District of California.  An appropriate Order follows.

**BY THE COURT:**

  /s/ John Milton Younge
Judge John Milton Younge